## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| In re: | Case No. 8-24-bk-00676-RCT |
| THE CENTER FOR SPECIAL NEEDS TRUST ADMINISTRATION, INC., | Chapter 11 |
| Debtor. | |

| | |
|---|---|
| Michael Goldberg, *on behalf of* Javier Perales; Michael Passino *on behalf of* Allison Passino; and John Griffith *on behalf of* Jackson Griffith, individually and on behalf of all others similarly situated, | Adversary Pro. No. _____ |
| Plaintiffs, | CLASS ACTION JURY DEMAND[1] |
| v. | |
| AMERICAN MOMENTUM BANK, | |
| Defendant. | |
| _____/ | |

## CLASS ACTION COMPLAINT

The Plaintiffs, Michael Goldberg, Michael Passino, and John Griffith, by and through undersigned counsel and on behalf of all others similarly situated, bring this action for aiding and abetting breach of fiduciary duty against the Defendant, American Momentum Bank, as set forth below.[2]

---

[1] Pursuant to 28 U.S.C. § 157(e) and Bankruptcy Rule 9015, the Plaintiffs expressly consent to the Bankruptcy Court conducting a jury trial in this proceeding.

[2] Each of the three named plaintiffs brings this case in a representative capacity on behalf of another individual, each of whom lacks legal capacity to sue on her or his own behalf. *See infra* ¶¶ 23–37.

## INTRODUCTION

1.      More than two thousand of our most vulnerable community members—including permanently disabled children, victims of catastrophic injuries and medical malpractice, and people suffering from severe mental illnesses—entrusted their life-sustaining special needs trust funds to the Center for Special Needs Trust Administration. The Center deposited the funds at American Momentum Bank (the "Bank") for safekeeping. Instead of guarding these essential funds that the trust beneficiaries rely on for their basic needs, the Bank facilitated a decade-long fraud and theft scheme by which Leo Govoni, former director of the Center, aided by others, siphoned $100,000,000 from the special needs trust accounts to line his own pockets.

2.      The Bank knew that the Center's accounts held trust funds: All of the accounts were clearly labeled as such and, in some cases, the Bank itself signed trust instruments as custodial trustee. Despite this knowledge, the Bank willingly and knowingly facilitated Govoni's theft, waste, and abuse, enabling him to fund his other business ventures and buy, among other things, real estate, a private jet, and box seats to the Kentucky Derby and the Tampa Bay Lightning.

3.      Throughout the duration of the scheme, the Bank permitted the Center to affix the Bank logo to false account statements sent to beneficiaries; allowed wires out of Center accounts on the word of Govoni's cronies, who had no authority to move Center funds; and charged thousands upon thousands of dollars of administrative fees for *all* of Govoni's various business accounts to the Center.

4.      The scheme left Center employees scrambling to find liquidity to cover the costs of beneficiaries' housing and medical care. Accordingly, the Center treated beneficiaries' funds as fungible, using one beneficiary's liquid funds to cover the expenses of another beneficiary, whose funds had been stolen—a classic Ponzi-scheme model.

5.      Through its conduct, the Bank enabled Govoni's depletion of special needs trust assets, leaving the Center in bankruptcy and the trust beneficiaries empty handed.

6.      The Plaintiffs, Michael Goldberg, Michael Passino, and John Griffith, now bring this action on behalf of a proposed class of the approximately 6,000 trust beneficiaries across the United States who entrusted their assets to the Center between approximately 2009 and 2024 (the "Beneficiaries").

7.      The Beneficiaries relied on the Center to administer their special needs trusts ("SNTs") with all the loyalty, prudence, and good faith required of a fiduciary. Instead, the Center breached its fiduciary duties by loaning the Beneficiaries' trust funds to other entities owned and controlled by the Center's founder, Leo Govoni.

8.      Through a series of amended and restated revolving lines of credit, authorized by written consent of the Center's Board of Directors, the Center loaned a staggering $100,000,000 of the Beneficiaries' trust funds to Boston Finance Group ("BFG"), a company founded and controlled by Govoni.

9.      Govoni then used the Beneficiaries' money to support the luxurious lifestyle he desired: real estate, a private jet, a brewery business, suites for sporting events. Govoni also used the Beneficiaries' trust funds to prop up a web of sketchy business ventures, all for his ultimate personal benefit. Govoni treated the Beneficiaries' trusts—funds intended for their necessities of life—as his personal slush fund.

10.     Govoni conducted the vast majority of his theft through the Bank, which treated Govoni's hundred-plus entities as, in their own words, "one big company." Each one of Govoni's accounts was opened under a different corporate name, with different combinations of people listed as account holders and signatories. Nevertheless, the Bank treated them interchangeably and

enabled the Center's mismanagement and Govoni's theft.

11.     For example, throughout the duration of the scheme, the Bank charged the account fees for dozens of Govoni's various business entities to the Center's corporate operating account—the account that contained hundreds of thousands of dollars in administrative fees paid by the Beneficiaries. In other words, the Beneficiaries, through their administrative fees to the Center, were paying Govoni's business expenses because of the Bank's misattribution of account fees.

12.     All the while, Govoni and the Center misled the Beneficiaries by continuing to represent that their funds were safely and conservatively invested in a manner intended to protect the longevity of the trusts and backed up these representations with false account statements printed on Bank letterhead—*with the Bank's express permission*.

13.     Over the approximate fifteen-year duration of the scheme, BFG made only sporadic interest payments on its loan—even then, often using money looted from the Center and churned through other accounts to fund the "interest" payments—and never repaid so much as a dollar of principal, causing approximately $154,000,000 of losses. As a result, many of the Beneficiaries' trusts have been depleted entirely, and many more have suffered substantial losses.

14.     Govoni's scheme would have collapsed without the knowing and substantial assistance of the Bank, the Center's longstanding primary banking institution. Collectively, the accounts related to Govoni represented at peak, on information and belief, about 8% of the Bank's total assets under management, making the Bank eager to cater to a lucrative client.

15.     The Bank substantially assisted in the scheme by knowingly and regularly processing irregular transactions, including transfers from the Center to Govoni's entities to enable interest payments on the loan; issuing wires out of Center accounts without proper approval; comingling funds; authorizing the Center to print false account statements on its letterhead; and

otherwise catering to one of its largest customers.

16.    By taking these affirmative steps to facilitate the shuffling of funds through years' worth of illegitimate transactions, the Bank assisted the Center's scheme and facilitated the Center's breach of the fiduciary duties it owed to the Beneficiaries.

17.    The Bank's conduct propelled Govoni's scheme forward for well over a decade, and all the while the Bank had specific knowledge of the Center's fiduciary duty to the Beneficiaries, acquired specific knowledge of the Center's continuous breach of that duty, and nevertheless continued to substantially assist in the breaching conduct.

18.    The Center has admitted the essential facts of the underlying scheme. In February of 2024, the Center filed a voluntary petition for Chapter 11 bankruptcy. In the initial Case Management Summary, the Center confirmed that "between 2009 and 2020 approximately $100 million of funds under The Center's control was paid out as a loan under a purported line of credit agreement. The funds utilized to make . . . this purported loan were taken from over 1,000 of The Center's beneficiaries and The Center itself."[3] The Center also reported that "the purported $100 million loan was made to the Boston Finance Group ("BFG"), a company controlled by The Center's founder, Leo Govoni."[4]

19.    Based on an internal investigation, the Center determined that "BFG and Govoni appear to have undertaken a multi-year effort to access trust funds under The Center's management while simultaneously ensuring beneficiaries did not receive proper disclosure related to these funds

_____

[3] Chapter 11 Case Management Summary at 2, *In re: The Center for Special Needs Trust Administration, Inc.*, No. 24-bk-676 (M.D. Fla. Bankr. Feb. 9, 2025) ECF No. 7.

[4] *Id*. at 2–3.

and failing to take any meaningful steps to repay the funds."[5] The Center also claims that its "demands for immediate repayment of these funds and for documents addressing the use of the funds have gone unanswered."[6]

20.     Govoni and his business associate, John Witeck, were indicted on June 18, 2025.[7] They stand charged with conspiracy to commit mail and wire fraud (Count I), mail fraud (Counts II–V), wire fraud (Counts VI–XI), and money laundering conspiracy (Count XII). Govoni also faces charges for bank fraud (Count XIII), illegal monetary transactions (Count XIV), and a false bankruptcy declaration (Count XV).

21.     Witeck, who served as Govoni's accountant, has been released on bond. Govoni, however, was detained pending trial based on factors including his possible 265-year prison sentence; the seriousness of the accusations against him; his apparent concealment of assets from the Center's bankruptcy trustee; obstruction of the chief restructuring officer's work during the Center's bankruptcy; and the bankruptcy judge's Final Order of Contempt finding that Govoni "willfully disobeyed" three discovery orders.[8]

22.     The Bankruptcy Court and Trustee will, no doubt, make their best efforts to restore the bankruptcy estate for the benefit of the Center's creditors. And the District Court and U.S. Attorney's Office will ensure that justice is done on the criminal front. The Plaintiffs bring this class action on behalf of the Beneficiaries to recover the more than $150,000,000 in financial losses

---

[5] *Id*. at 3.

[6] *Id.* at 2.

[7] Indictment, *United States v. Govoni et al.*, 25-cr-00299 (M.D. Fla. June 18, 2025) ECF No. 1.

[8] Detention Order, *United States v. Govoni et al.*, 25-cr-00299 (M.D. Fla. June 18, 2025) ECF No. 37, at 3–4; *see also* Final Order of Contempt, *In re: the Center for Special Needs Trust Administration, Inc.*, Case No. 24-bk-676 (M.D. Fla. Bankr. Feb. 9, 2025) ECF No. 7.

that they suffered as a result of the Bank's knowing and willing participation in the Center's scheme.

## PARTIES AND RELEVANT NON-PARTIES

### The Parties

23.     The Plaintiff Michael Goldberg is a natural person over the age of 21 and is otherwise *sui juris*. Mr. Goldberg is a citizen and resident of the State of Florida.

24.     Mr. Goldberg brings this case on behalf Javier Perales, beneficiary of the Javier Daniel Perales Irrevocable Annuity Trust (the "Perales Trust"), pursuant to the authority vested in him by the Bankruptcy Court's Order Granting Chapter 11 Trustee's Motion to Approve (I) Wind Down and Termination of Operations of the Debtor, (II) Resignation of the Debtor as Trustee of Trusts, (III) Approve Procedures to Appoint CPT Institute, Inc. as Successor Trustee of the Trusts, and (IV) Approve Form and Manner of Opt-Out Notice for Appointment of CPT Institute, Inc. as Successor Trustee. *See In re: the Center for Special Needs Trust Administration, Inc.*, Case No. 24-bk-676 (M.D. Fla. Bankr. Feb. 9, 2025) ECF No. 409 (the "Wind-Down Order").

25.     In the Wind-Down Order, the Bankruptcy Court accepted Mr. Goldberg's resignation as trustee of the Beneficiaries' trusts, but affirmed that Mr. Goldberg "shall automatically retain all rights and standing in his capacity both as Trustee of the Trusts and Chapter 11 Trustee of the Debtor to pursue Litigation Claims on behalf of the Beneficiaries," except to the extent that Beneficiaries choose to opt out.  *See id.* ¶ 21.

26.     Javier Perales did not opt out. Accordingly, Mr. Goldberg retains the rights and authority to pursue litigation claims on Javier Perales's behalf.

27.     Javier Perales is a citizen and resident of the State of Florida.

28.     The Perales Trust was administered by the Center from September 24, 2001, through and beyond February 9, 2024, until (pursuant to the Wind-Down Order) the Perales Trust moved to the care of a different SNT administrator.

29.     As a result of the Bank's aiding and abetting the Center's breach of fiduciary duty, the Perales Trust incurred substantial harm and its balance was depleted, causing injury to Javier Perales.

30.     The Plaintiff Michael Passino is a natural person over the age of 21 and is otherwise *sui juris*. Mr. Passino is a citizen and resident of the State of Tennessee.

31.     Mr. Passino brings this case on behalf of Allison Passino, for whom Mr. Passino holds a power of attorney. Allison Passino is the beneficiary of the Allison Passino Special Needs Trust (the "Passino Trust"). Ms. Passino is a citizen and resident of the State of Oregon.

32.     The Passino Trust was administered by the Center from April 12, 2011, through and beyond February 9, 2024, until (pursuant to the Wind-Down Order) the Passino Trust moved to the care of a different SNT administrator.

33.     As a result of the Bank's aiding and abetting the Center's breach of fiduciary duty, the Passino Trust incurred substantial harm and its balance was depleted, causing injury to Allison Passino.

34.     The Plaintiff John Griffith is a natural person over the age of 21 and is otherwise *sui juris*. Mr. Griffith is a citizen and resident of the State of Florida.

35.     Mr. Griffith brings this case on behalf of Jackson Griffith, for whom Mr. Griffith is the legal guardian and personal representative. Jackson Griffith is the beneficiary of the Jackson Griffith Trust (the "Griffith Trust"). Jackson Griffith is a citizen and resident of the State of Florida.

36.     The Griffith Trust was administered by the Center from April 26, 2019, through and beyond February 9, 2024, until (pursuant to the Wind-Down Order) the Griffith Trust moved to the care of a different SNT administrator.

37.     As a result of the Bank's aiding and abetting the Center's breach of fiduciary duty, the Griffith Trust incurred substantial harm and its balance was depleted, causing injury to Jackson Griffith.

38.     There are no material differences between the Bank's actions and practices directed to the Plaintiffs and the Bank's actions and practices directed to the rest of the putative Class members.

39.     The Defendant, American Momentum Bank, is a Texas-chartered banking association with its principal place of business at One Momentum Boulevard in College Station, Texas.

40.     American Momentum Bank was established on October 25, 2006, in Tampa, Florida, but moved its charter to Texas in 2014. American Momentum Bank has branches throughout Texas and in Florida, concentrated in Central Florida and on the state's Gulf Coast.

41.     American Momentum Bank undertook most of the conduct at issue in this Complaint, and the accounts at issue were held, at the Bank's Urban Centre Branch at 4830 West Kennedy Boulevard in Tampa, Florida.

## **Relevant Non-Parties**

42.     Leo Govoni is a citizen and resident of Pinellas County, Florida. Govoni was a businessman who founded the Center in 2000, together with John Staunton, for the apparent purpose of administering special needs trusts. Govoni also owns, manages, or otherwise controls a network of more than one hundred business entities, including Boston Financial Group, Boston

Asset Management, Boston Settlement Group, and Fiduciary Tax & Accounting Services.

43.     John Staunton is a citizen and resident of Pinellas County, Florida. Staunton is a barred attorney in the state of Florida, Bar No. 126950. Together with Govoni, Staunton co-founded the Center in 2000.

44.     John Witeck is an accountant who, with Govoni, co-owned Fiduciary Tax & Accounting Services, LLC. The Center retained Witeck and Fiduciary Tax & Accounting Services, LLC to perform trust accountings and prepare tax filings for the Beneficiaries' trusts.

45.     Tracey Gregory was employed by one of Govoni's entities, Boston Settlement Group, LLC, from 2008 until her resignation in 2020. Even though she was a Boston Settlement Group employee, Gregory performed work for the Center and the Center paid a portion of her salary. Gregory was a member of the Center's Board of Directors, served as the Center's accounting manager, and had full access to and control over the Center's accounts at the Bank.

46.     Sherry Lilly, at all relevant times, was the Assistant Vice President and Management Sales Officer at the Tampa branch of American Momentum Bank and served as a relationship manager to the Center and to Govoni's entities. The vast majority of the Center's daily interactions with the Bank, including account openings and transactions, were communicated through Lilly.

47.     Boston Finance Group, LLC is a Florida for-profit limited liability company in the financial services sector. BFG ostensibly loaned money to businesses and profited from the interest charged on the loans. Govoni founded BFG in 2008 and served as CEO and managing member of BFG from 2008 to 2024. Govoni used BFG as the vehicle for his fraud. He and the Center loaned the Beneficiaries' trust funds to BFG and, from there, Govoni distributed the money to his other entities for his personal benefit.

48.     Boston Asset Management, Inc. ("BAM") is a Florida for-profit corporation that purports to function as an investment advisory firm for trustees who administer SNTs, including the Center. Govoni was BAM's majority owner and served as chief executive officer from 1992 through 2025. As of 2024, the Center was BAM's only client. During the course of the scheme, BAM legitimately managed some funds for the Center. Govoni also used BAM to funnel Beneficiaries' funds for his own personal benefit. Govoni's brother, Mark Govoni, serves as president and managing director of BAM.

49.     Boston Holding Company, LLC ("BHC") is a Florida limited liability holding company founded and controlled by Govoni, which served as parent company of approximately thirty other Govoni-controlled entities, including BAM, BFG, and Big Storm Brewery. Govoni was the president of BHC. Witeck served as a senior advisor to BHC. Govoni directed Beneficiaries' funds to BHC and used the funds to pay BHC's purported operating costs, including Govoni's own salary.

50.     Boston Settlement Group, LLC ("BSG") is a for-profit Florida limited liability company that purported to provide case settlement services to personal injury law firms. Govoni owned and controlled BSG.

51.     Fiduciary Tax & Accounting Services, LLC ("FTAS") is a Florida for-profit tax and accounting limited liability company co-owned by Govoni (majority owner, through another corporate entity) and Witeck (minority owner). FTAS purported to provide tax and accounting services to trustees, including the Center. Govoni and Witeck used FTAS to siphon off Beneficiaries' money for their personal benefit. On information and belief, approximately 95% of FTAS's work was on the Center's behalf, and the Center paid FTAS approximately $650,000 per year for its services.

52.     Global Litigation Consultants, LLC ("GLC") is a Florida for-profit company, founded and controlled by Govoni, that negotiated medical liens for clients who won personal injury settlements. Govoni funneled the Beneficiaries' funds to GLC for his own benefit.

53.     Big Storm Brewery, LLC is a brewery and restaurant located in Clearwater, Florida, owned by Govoni (run and managed by L.J. Govoni, Leo Govoni's son) and now under the control of the bankruptcy trustee. Govoni funneled the Beneficiaries' funds to Big Storm Brewery and used their money to cover the Brewery's operating expenses and payroll, with no investment returns to the Beneficiaries. The Big Storm Brewery website now broadcasts the following statement:

> In the past, serious mistakes were made. Funds meant to support individuals with special needs were misused by the former owner—violating the trust of families and a community that deserved better.[9]

## JURISDICTION AND VENUE

54.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 157(c)(1) and 1334(b).

55.     This adversary proceeding is related to a case under Title 11 pursuant to 28 U.S.C. § 157(c)(1), and the Plaintiffs consent to the entry of final orders and judgment by the Bankruptcy Court.

56.     This Court has personal jurisdiction over the Defendant, American Momentum Bank, pursuant to Florida Statutes § 48.193(1)(a)(1), (2), and (6) because American Momentum Bank conducts substantial business in this State (including in this judicial district), and a substantial portion of the actions giving rise to the claims took place in this judicial district. Further,

---

[9] Big Storm Brewery, "A New Chapter at Big Storm Brewery: Brewing Hope and Healing," https://bigstormbrewery.com/ (last accessed September 6, 2025).

Florida has significant contacts with American Momentum Bank, as it has eleven branches or offices in Florida. This action arises out of and relates to the Defendant's contacts with this forum.

57.　　Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTUAL ALLEGATIONS

### Special Needs Trusts

58.　　Javier Perales, Allison Passino, and Jackson Griffith are all beneficiaries of special needs trusts, or SNTs.

59.　　SNTs are irrevocable trusts that typically hold assets derived from judgments, settlements, insurance payouts, and similar sources, all intended to compensate the Beneficiaries for their injuries or disabilities.

60.　　The funds often come from personal injury or medical malpractice settlements, and the resulting SNTs may be (but are not always) court ordered.

61.　　Because many beneficiaries of SNTs are permanently disabled in a way that precludes gainful employment, the SNTs are commonly their sole source of income. SNT beneficiaries often depend on their SNTs to cover the basic costs of living, such as housing, food, clothing, and transportation.

62.　　By placing their funds in SNTs, beneficiaries remain financially eligible for needs-tested programs like Medicaid and Supplemental Security Income ("SSI"), for which they would likely not qualify if their settlements or judgments were paid directly to them.

63.　　Federal law provides for this arrangement. 42 U.S.C. § 1396p specifies, among other things, that assets held in certain qualified trusts—like the Beneficiaries' SNTs—do not affect eligibility for public benefits.

64.　　Section 1369p(d)(4)(C) permits SNTs to be pooled together for investment

purposes in certain circumstances. While allowing pooled trusts, the statute still requires that administrators of SNTs, like the Center, maintain separate accounts for each beneficiary and records of those accounts, and reiterates that the accounts in the pooled trust remain established solely for the benefit of the disabled beneficiary.

65.    Pooled trusts may allow for more fruitful investment opportunities because of the aggregate volume of assets available.

66.    Assets held in a pooled SNT are "solely for the benefit of individuals who are disabled" during the beneficiary's life, but upon the beneficiary's death, any remaining assets may be retained by the pooled SNT. Any funds not retained by the SNT may be paid to the state as reimbursement for medical assistance paid on the beneficiary's behalf during his or her lifetime. Pooled trusts do not leave a remainder to the beneficiary's next of kin.

67.    Alternatively, individual SNTs may stand alone without pooling, as described in § 1369(d)(4)(A). Individual SNTs may be used to pay the beneficiary's expenses during the beneficiary's life, and after the beneficiary's death the remainder is used to satisfy taxes and reimburse the state for medical assistance. Whatever is left then reverts to the beneficiary's next of kin. No portion of the assets remains in the control of the trust administrator, as would be the case for pooled funds.

68.    In either case—whether pooled or not—SNTs that comply with § 1369(d) are excluded from needs-based eligibility determinations, allowing permanently disabled individuals to maintain important Medicaid and SSI benefits.

69.    Because of the beneficiaries' dependence on their SNTs, and the gravity of their need, the law imposes fiduciary duties on SNT administrators like the Center to safeguard and preserve the longevity of the assets.

70.     The Center for Special Needs Trust Administration, as trustee of the Beneficiaries' SNTs, owed the Beneficiaries fiduciary duties of loyalty, prudent administration, control, and protection of the trust assets. In flagrant breach of these duties, the Center loaned $100,000,000 of the Beneficiaries' funds to BFG, a Govoni-controlled entity, for Govoni's personal use.

### The Center

71.     The Center is a 501(c)(3) Florida corporation that provided trust administration services for SNTs until its Chapter 11 filing.

72.     Govoni and Staunton founded the Center in 2000.

73.     Govoni served on the Center's Board of Directors until 2009.

74.     After his nominal resignation, Govoni maintained strong influence over the Center and continued to influence the Center's staffing, finances, and decision making until at least early 2022.

75.     Staunton also served on the Board of Directors until 2009, when he resigned and transitioned to a role as legal advisor.

76.     From its founding in 2000 through 2024, the Center managed funds for more than 6,000 total trust beneficiaries, making it one of the largest SNT administrators in the country.

### The Beneficiaries' SNTs

77.     As of the date of the Center's Chapter 11 filing, the Center administered more than 2,000 SNTs, comprising both individual and pooled trusts. The SNTs together should have held about $200,000,000 according to their paper value.

78.     The Center served as trustee for the SNTs under its administration, memorialized in the individual SNT agreements related to each Beneficiary's trust.

79.     The Center deducted administrative fees from every Beneficiary's trust for which

it served as Trustee.

80.     Upon information and belief, all the administrative fees taken from the Beneficiaries' individual accounts were transferred to the Center's corporate bank account, which the Center also maintained with the Bank.

81.     For each Beneficiary, the Center executed an Irrevocable Declaration of Trust.  The Irrevocable Declarations identify The Center for Special Needs Trust Administration as trustee for each SNT.

82.     The Bank held copies of many of the Beneficiaries' Irrevocable Declarations and, at times, specifically requested copies of trust instruments from the Center.

83.     The Irrevocable Declarations state that the trust established under each agreement is a Special Needs Trust created pursuant to 42 U.S.C. § 1396p(d).

84.     The Irrevocable Declarations define the purpose of the trusts, with a primary focus on the preservation of trust assets for the Beneficiary's use. Examples of the "purpose" language used in the Center's Irrevocable Declarations include:

> The purpose of this Trust is to supplement any benefits received by [the Beneficiary], or for which he may be eligible, through or from various governmental assistance programs and not to supplant any such benefits or to provide support. All actions of the Trustee shall be directed toward carrying out this intent and purpose as specifically expressed in this Article II and as expressed more generally throughout this Trust.

> *or*

> The primary purpose of the Trust is to preserve the settlement amount conveyed to the Trust for the future use and benefit of the Beneficiary and to protect such amounts from inappropriate use and wasteful dissipation.

85.     The stated purpose of the SNTs does not contemplate lending the Beneficiaries' SNT property to a Center affiliate for personal use.

86.     Because the Bank had the Beneficiaries' trust instruments, it knew that the Center

was not authorized to loan trust funds to a business venture.

87.     In a list of "Non-exclusive Examples of Appropriate Distributions," certain of the

Irrevocable Declarations identify the following or substantially similar expenditures:

    a.   medical, dental, and diagnostic work and treatment for which there are no available private or public funds;

    b.   medical procedures that are desirable in the Trustee's sole discretion, even though they may not be medically necessary or lifesaving;

    c.   supplemental nursing care, rehabilitative and/or occupational therapy services;

    d.   differentials in cost between housing and shelter for shared and private rooms in institutional settings;

    e.   care appropriate for the Beneficiary that assistance programs may not or do not otherwise provide;

    f.   expenditures for travel, companionship, experiences, and expenses in bringing the Beneficiary's siblings and others for visitation; and

    g.   items of a similar nature to those contained in subsections a–f above.

88.     Loaning the Beneficiaries' SNT property to a Center affiliate for personal use is not

an authorized expenditure, nor is such a loan similar in nature to the listed examples of approved

expenditures.

89.     Because the Bank had the Beneficiaries' trust instruments, it knew that the Center

was only authorized to disburse trust funds for these narrow purposes.

90.     As examples of permissible payments by the Trustee, some of the Irrevocable

Declarations provide the following examples:

    a.   to persons, corporations, or other entities for the sole use and benefit of the Beneficiary;

    b.   to a commercial bank account or savings institution in the name of the Beneficiary, or in a form reserving the title, management, and custody of the account to a suitable holder for the sole use and benefit of the Beneficiary;

    c.   in any prudent form of annuity purchased for the sole use and benefit of the Beneficiary;

d.  to any guardian or other person deemed suitable by the trustee and who has assumed responsibility of caring for the Beneficiary;

e.  in any form allowed by law;

f.  to any person deemed suitable by the trustee; and

g.  by direct payment for the expenses of the Beneficiary.

91.     None of the examples of appropriate distributions include loaning the Beneficiaries' SNT property to a Center affiliate for personal use, and the Bank knew as much.

92.     In a subsection titled "Powers to be Exercised in the Best Interests of the Beneficiary," exemplar Irrevocable Declarations state that "the Trustee shall not exercise any power in a manner that is inconsistent with the Beneficiary's right to the beneficial enjoyment of the Trust property in accordance with general principles relating to the law of trusts or that is inconsistent with the purpose and intent of this Trust."

93.     This caveat plainly limits the trustee's stated power to invest the SNT assets. Accordingly, while the Center is permitted to invest trust assets in typical ways, such as securities, commodities, options, futures, currency, domestic or foreign markets, and mutual or investment funds, any such transaction must be consistent with the Beneficiaries' right to beneficial enjoyment and must accord with general trust law and the purpose of the SNT.

94.     The Irrevocable Declarations also lay out parameters for the Center's ability to buy and sell real estate; execute deeds, leases, contracts, notes, and security instruments; to *borrow* money from other sources and secure such a loan or guaranty by mortgage; to expend funds in ways that are proper for the preservation or improvement of assets; and to make gifts of trust property to the Beneficiary's family for purposes of health care planning, financial planning, or tax planning, provided such gifts are consistent with the terms and purpose of the trust.

95.     The Irrevocable Declarations do not, however, authorize the Center to loan out the

SNT funds. The Bank knew this.

96.    Under the Irrevocable Declarations, the Center is required to report, at least annually, to the Beneficiary or the Beneficiary's legal representative and to provide "a complete statement of the Trust assets and all of the receipts, disbursements and distributions to or from the Trust occurring during the reporting period."

97.    This provision does not permit the Center to make unauthorized loans or distributions and then conceal them from the Beneficiaries.

98.    The Bank knew of these restrictions, yet expressly permitted the Center to affix the Bank logo to falsified account statements that omitted any reference to the loans of trust funds to Govoni's company.

99.    All of the powers granted to the Center in the Irrevocable Declarations are cabined by the clear pronouncement that "[t]he Trustee . . . shall exercise these powers at all times in a fiduciary capacity, primarily in the interest of the beneficiaries of the Trust." On information and belief, this language or substantially similar language appears in every Irrevocable Declaration or other trust agreement establishing the SNTs in the Center's care.

100.    There can be no dispute that, in its role as trustee of the SNTs, the Center owed fiduciary duties to every Beneficiary. These duties are imposed as a matter of law and are reaffirmed in the Beneficiaries' contracts with the Center.

101.    Likewise, there can be no dispute that the Bank was aware of the Center's fiduciary duty. The Bank possessed the Beneficiaries' trust instruments, often requested additional trust documents when new accounts were opened, and, in some cases, signed the trust instruments as custodial trustee.

102.    In some instances, the Beneficiaries' assets were placed into pooled SNTs at the

trust creation.

103.    To create pooled SNTs, the Center entered into irrevocable master declarations of trust in each state where it served as a trustee.

104.    For example, in Florida, the Center executed a Master Declaration of Trust on October 22, 2009, effective retroactively to March 10, 2001.

105.    To join a Beneficiary into a pooled trust, the Center and the Beneficiary or the Beneficiary's representative would execute a Joinder Agreement or similarly titled document, enrolling the SNT into the pooled trust.

106.    The Joinder Agreements re-identify the Center as trustee.

107.    The Joinder Agreements reiterate the same or substantially the same fiduciary obligations as the Irrevocable Declarations, including that the Center shall comply with the sole-benefit requirement by ensuring that sub-account funds shall benefit no one other than the Beneficiary for whose benefit the sub-account is established.

108.    The Bank knew about the pooled trust and, at times, specifically inquired as to trust documents relating to the "North Carolina Pooled Trust" or the "Florida Pooled Trust f[or] b[enefit] o[f]" a specific beneficiary.

109.    While the Joinder Agreements grant the Center discretion to make distributions, they affirm that all distributions must be solely for the Beneficiary's supplemental needs and care.

110.    Joinder Agreements require, in accordance with § 1369p, that a separate sub-account be maintained for each Beneficiary within a pooled trust.

111.    On information and belief, the Center maintained nine Pooled SNT accounts, eight of which were at the Bank. Each Pooled SNT contained dozens or hundreds of subaccounts, each relating to an individual Beneficiary. The Bank—which issued statements and made specific email

requests regarding the trust instruments underlying the Pooled SNTs—knew that the Pooled SNT accounts were trusts and knew the identities of the Beneficiaries whose interests were aggregated within the Pooled SNTs.

112.    As trustee of the Beneficiaries' SNTs, the Center owed the Beneficiaries fiduciary duties, including, among other things:

    a.  the duty to administer the trusts in good faith in accordance with the trusts' terms and purposes and the interests of the Beneficiaries;

    b.  the duty of loyalty, including administration of the trusts solely in the interests of the Beneficiaries and avoidance of conflicts;

    c.  the duty of impartiality; and

    d.  the duty of prudent administration, requiring the exercise of reasonable care, skill, and caution.

113.    The Center, as trustee of the Beneficiaries' trusts, owed these fiduciary duties to each Beneficiary. And the Bank—which had the Beneficiaries' trust instruments, labeled the accounts as "trusts," and regularly corresponded with Center employees about the trust nature of the accounts—knew the Center owed these duties to the Beneficiaries.

**The Center's Breaches of Fiduciary Duty**

114.    The Center repeatedly and flagrantly violated its fiduciary duties to the Beneficiaries. In the Center's own words, "between 2009 and 2020 approximately $100 million of funds under The Center's control was paid out as a loan under a purported line of credit agreement. The funds utilized to make . . . this purported loan were taken from over 1,000 of The Center's beneficiaries and The Center itself."[10]

115.    Allowing this loan to occur, under any circumstances, would violate the Center's

---

[10] Chapter 11 Case Management Summary at 2, *In re: The Center for Special Needs Trust Administration, Inc.*, No. 24-bk-676 (M.D. Fla. Bankr. Feb. 9, 2025) ECF No. 7.

fiduciary duties to the Beneficiaries—whether by the Center's knowing participation in the loan scheme or by the Center's failure to identify Govoni's actions and attendant failure to notice $100,000,000 missing from its care.

116.    After Govoni resigned from the Center's Board in 2009, in the Center's own view, "Govoni continued to control and exert his influence over The Center's operations and finances."[11] That is to say, Govoni's resignation was nominal only and he continued to influence the Center from behind the scenes.

117.    Govoni maintained influence over the Center's finances, information technology systems, and human resources functions. Through this concentration of power, Govoni caused the Center to transfer approximately $100,000,000 to his entity, BFG—through the Center and BFG's accounts at the Bank—under the guise of a loan that was restated and amended several times between 2009 and 2012.

118.    Once the money was in the BFG account at the Bank, Govoni would transfer what he wanted to his other business accounts, all of which were held at the Bank. The Bank treated all of Govoni's entities as if they were "one big company," but this is belied by the account documents reflecting different names and authorized signatories—and is legally impossible, given the Bank's obligations under federal Anti-Money Laundering and Know Your Customer regulations[12].

The Center's Improper Loans of SNT Funds to BFG

119.    On June 1, 2009, the Center entered into a Revolving Line of Credit ("LOC") Agreement with BFG, under which the Center agreed to loan up to $2,500,000 to BFG.

120.    The LOC Agreement was accompanied by a Promissory Note, in which BFG

---

[11] *Id*. at 3.

[12] *See infra* ¶¶ 247–54.

promised to repay the $2,500,000, or any outstanding portion, with interest. The maturity date of the Promissory Note was July 1, 2012.

121.    On the same date, June 1, 2009, the Center and BFG executed a related Security Agreement, under which BFG collateralized all of BFG's right, title, and interest in all real and personal property as of the date of the LOC Agreement and granted the Center a security interest in the same.

122.    The Security Agreement was executed with an illegible signature labeled as Managing Member of the Center, and by Govoni as managing member of BFG.

123.    The Center and BFG also executed a Negative Pledge Agreement in which BFG promised not to sell, assign, mortgage, or otherwise encumber any of the collateral—defined as all of BFG's right, title, and interest in all real and personal property as of the date of the LOC Agreement—without the Center's written consent.

124.    The Negative Pledge Agreement was executed with an illegible signature labeled as Managing Member of the Center, and by Govoni as managing member of BFG.

125.    On information and belief, Staunton signed the LOC Agreement, Security Agreement, and Negative Pledge Agreement on the Center's behalf.

126.    On December 1, 2009, BFG and the Center executed an Amended and Restated Revolving Line of Credit Agreement in which they increased the loan amount to $15,000,000.

127.    The December 2009 LOC Agreement was signed by Patricia Julian, as Director/Vice President of the Center, and by Govoni as managing member of BFG.

128.    BFG also signed an Amended and Restated Promissory Note in the Center's favor, reflecting the higher value of the LOC Agreement.

129.    On March 15, 2010, BFG and the Center extended the loan value again, with

another Amended and Restated Revolving Line of Credit Agreement under which the Center permitted BFG to borrow $30,000,000 of the Beneficiaries' assets.

130.    The March 2010 LOC Agreement is executed by Todd Belisle as President of the Center, and Govoni for BFG.

131.    The Center's Board of Directors provided a Written Consent authorizing this $30,000,000 loan, in which they also acknowledged the previous $15,000,000 loan.

132.    The Written Consent, dated March 15, 2010, was signed by Todd Belisle, Patricia Julian, and Rafael Gonzalez, all Directors on the Center's Board.

133.    On March 15, 2011, the Center increased the loan amount even further in an Amended and Restated Revolving Line of Credit Agreement that raised BFG's lending ceiling to $50,000,000.

134.    That March 2011 LOC Agreement was executed by Todd Belisle as President of the Center and Govoni as Managing Member of BFG.

135.     BFG, through Govoni, also signed another Amended and Restated Promissory Note in the Center's favor, reflecting the $50,000,000 amount of the new LOC Agreement.

136.    Contemporaneous with the March 2011 LOC Agreement and Promissory Note, the Center's Board of Directors again issued a Written Consent approving of the $50,000,000 loan. The Written Consent was signed by Todd Belisle, Patricia Julian, Richard Shonter, and Joseph Huenke on behalf of the Center's Board.

137.    On September 1, 2011, BFG and the Center again executed an Amended and Restated Promissory Note. This Note retained the same $50,000,000 amount as in March 2011, but adjusted the method by which interest on the loan would be calculated.

138.    The Board simultaneously issued a Written Consent approving the new interest

calculation expressed in the September 2011 Promissory Note. The Written Consent was signed by Todd Belisle, Patricia Julian, Richard Shonter, and Joseph Huenke on behalf of the Center's Board.

139.    On January 1, 2012, the Center doubled its loan of Beneficiaries' funds to BFG.

140.    In another Amended and Restated Revolving Line of Credit Agreement, the Center agreed to make an additional $50,000,000—for a total of $100,00,000—available to BFG.

141.    That $100,000,000 LOC Agreement was executed by Todd Belisle as President of the Center and Govoni as Managing Member of BFG.

142.    On information and belief, Todd Belisle was not only the President of the Center, but also an employee of BAM and BFG. Further, on information and belief, Belisle resigned from the Center in March 2023 and died in February 2025.

143.    Also on January 1, 2012, BFG, through Govoni, executed another Amended and Restated Promissory Note reflecting the new $100,000,000 loan amount.

144.    This final iteration of the Promissory Note included a promise to pay interest at a rate of 2% per annum through December 31, 2012, and for later periods, "such rate or rates as Debtor and the Center may from time to time negotiate in good faith . . . consistent with prevailing market rates[.]"

145.    The maturity date under the January 2012 Promissory Note is January 1, 2017.

146.    As for interest on defaulted past-due sums, the Promissory Note provides for "interest at the lesser of the highest rate for which Debtor may legally contract or . . . 18% per annum[.]"

147.    Govoni signed the January 2011 Promissory Note as Managing Member of BFG.

148.    Govoni executed another document with respect to this final extension of the loan:

a Personal Guaranty.

149.    The January 1, 2012, Personal Guaranty states that "the [Center] is unwilling to enter into the Loan Documents unless it receives this Guaranty from [Govoni]," and that Govoni was "willing to enter into this Guaranty in order to induce the [Center] to enter into the Loan Documents."

150.    Govoni signed the Personal Guaranty in his individual capacity.

151.    Under the terms of the final January 2012 LOC Agreement, the LOC and Note matured on January 1, 2017.

152.    According to the Center's Chapter 11 filings, however, the Center continued to pay out money to BFG under the LOC Agreement until 2020, through their respective accounts at the Bank.

<u>Govoni's Use of the Funds in BFG's Hands</u>

153.    According to communications sent from the Bank to the Center, many of the transactions under the LOC Agreements flowed directly from the Center to BFG, via their accounts at the Bank. As just a few examples, the following transactions were all carried out at the Bank in an eight-week window:

      a.    August 6, 2012: $300,000 from the Center Acct. 1722 to BFG Acct. 0013;

      b.    August 15, 2012: $240,000 from the Center Acct. 1722 to BFG Acct. 0013;

      c.    August 30, 2012: $300,000 from the Center Acct. 1722 to BFG Acct. 0013;

      d.    September 6, 2012: $362,500 from the Center Acct.1722 to BFG Acct. 0013;

      e.    September 14, 2012: $3,000,000 from the Center Acct. 1722 to BFG Acct. 0013; and

      f.    September 21, 2012: $1,500,000 from the Center Acct. 1722 to BFG Acct. 0013.

154.    The Bank executed each one of these transactions upon request from Tracey

Gregory on behalf of the Center.

155.    The Bank was undoubtedly aware of the suspicious nature of the transactions. On September 24, 2014, the Bank sent a letter to Todd Belisle, a Center executive at the time, listing these large transactions—all of which transpired in a 60-day period—and asking Belisle to sign the letter indicating his approval of the transfers.

156.    Nevertheless, the Bank continued processing transfers out of the Center's accounts, facilitating the movement of trust funds into Govoni's hands. Additional transfers include, but are certainly not limited to, the following:

    a.  March 7, 2011: $500,000 check from a Center account at the Bank, deposited in BFG Acct. 0013;

    b.  June 16, 2011: $6,224,000 from the Center's operating account at the Bank to a BFG account at the Bank;

    c.  June 17, 2011: $123,000 from a Center account at the Bank to BFG Acct. 0013;

    d.  June 28, 2011: $36,000 from the Center's "SNT Admin Operating Account," Acct. 1640, to BFG Acct. 0013;

    e.  January 12, 2012: $253,300 from the Center's operating account at the Bank to BFG Acct. 0013;

    f.  January 12, 2012: $250,000 from the Center's depository account at the Bank to BFG Acct. 0013;

    g.  February 10, 2012: 307,000 from a Center account at the Bank to BFG Acct. 0013;

    h.  February 28, 2012: $39,000 from the Center Acct. 1722 to BFG Acct. 0013;

    i.  December 10, 2013: $510,000 check from a Center account at the Bank deposited in BFG Acct. 0013;

    j.  March 9, 2015: $450,000 from Center account at the Bank to BFG Acct. 0013;

    k.  March 23, 2015: $590,000 from a Center account at the Bank to BFG Acct. 0013;

    l.  March 31, 2015: $1,159,097.26 from a Center account at the Bank to BFG Acct. 0013;

    m.   April 9, 2015: $567,000 from a Center account at the Bank to BFG Acct. 0013;

    n.   May 21, 2015: $600,000 from a Center account at the Bank to BFG Acct. 0013;

    o.   June 11, 2015: $250,000 from a Center account at the Bank to BFG Acct. 0013;

    p.   June 25, 2015: $700,000 from a Center account at the Bank to BFG Acct. 0013;

    q.   July 13, 2015: $481,000 from a Center account at the Bank to BFG Acct. 0013; and

    r.   July 23, 2015: $489,000 from a Center account at the Bank to BFG Acct. 0013.

157.    During the same brief window described in paragraph 153, the Bank executed the following transfers from BFG—which was receiving a steady flow of Center funds, as noted in the Bank's letter to Belisle—to other Govoni-controlled companies whose accounts were also held at the Bank:

    a.   July 12, 2012: $20,000 from BFG Acct. 0013 to BFG Acct. 0408;

    b.   August 13, 2012: $175,290.25 from BFG Acct. 0013 to Broadleaf Forest Acct. 0921;

    c.   August 16, 2012: $240,000 from BFG Acct. 0013 to Broadleaf Properties Acct. 1683; and

    d.   September 6, 2012: $485,000 from BFG Acct. 0013 to Broadleaf Properties Acct. 1683.

158.    The Center knew about all of these transactions because Tracey Gregory was copied on the communications requesting that the Bank execute each one of these transfers.

159.    Govoni also entered into self-interested loan agreements between BFG and his other entities to facilitate the shuffling of the Beneficiaries' funds.

160.    The Bank—as the financial institution where all of the accounts were established— knew that all of the transferee companies were owned or controlled by Govoni based on the account opening documents and signatory authorizations.

*Gravitas Equity Partners*

161.    For example, on December 1, 2009, BFG entered into a Revolving Line of Credit Agreement with Gravitas Equity Partners, a now-inactive Florida limited liability company jointly owned and managed by Govoni and Staunton.

162.    Gravitas's bank account was held at AMB and, on information and belief, Govoni was the only authorized signer.

163.    On January 1, 2011, BFG and Gravitas amended a previous LOC Agreement, raising Gravitas's borrowing limit to $10,000,000. Govoni signed the Amended and Restated LOC Agreement for BFG and, on information and belief, Staunton signed for Gravitas.

164.    At the same time, Gravitas executed an Amended and Restated Promissory Note in which it promised to pay the $10,000,000 back to BFG on or before December 12, 2012. Govoni executed the Promissory Note as Managing Member of Gravitas—i.e., Govoni (as Gravitas) promised to repay the money to Govoni (as BFG).

165.    On June 1, 2012—six months before the maturity date—Govoni granted himself an extension to pay back the $10,000,000 to BFG. Govoni, on behalf of Gravitas, signed another Amended and Restated Promissory Note in BFG's favor in which the principal remained the same, but the maturity date was extended five years, through December 12, 2017.

166.    The Center-originated money traveled from the Center account at the Bank, to the BFG account at the Bank, to the Gravitas account at the Bank, even though the Bank knew the trust nature of the funds.

*Prospect Funding Holdings LLC*

167.    On May 20, 2011, BFG entered a Loan Agreement with Prospect Funding Holdings LLC, another Florida limited liability company entity controlled by Govoni and Staunton through

BFG, under which BFG lent $8,000,000 to Prospect.

168.    Prospect was incorporated under Florida law only one week before the loan, on May 11, 2011, and the articles of incorporation identified BFG as managing member. A few days later, Prospect amended its articles of incorporation to change from member-managed (which requires disclosure of members' identities) to manager-managed, listing BFG as the manager.

169.    The Loan Agreement between BFG and Prospect, in light of this corporate relationship, was signed by John Fernando as President of BFG (for BFG) and John Fernando as President of BFG, as Manager of Prospect (for Prospect).

170.    On information and belief, BFG later increased the Prospect loan to $14,000,000.

171.    Prospect was supposed to be using the loan funds to support its affiliate, Prospect Finance, which provided cash advances to plaintiffs in exchange for an interest in the plaintiffs' prospective settlement or judgment proceeds. The plaintiffs would pay a cut to Prospect Finance, which would in turn use those profits to repay the loan to Prospect. And Prospect would, in turn, repay BFG.[13]

172.    The money that BFG used to fund the Prospect loan came from the Center.

173.    Similarly, on January 30, 2012, a Center employee emailed Tracey Gregory and

---

[13] Instead, Prospect's portion of the investment scheme seems to have collapsed on itself based on fraudulent misrepresentations that Govoni and his affiliates made to other parties engaged in related loan agreements with Prospect, in which Govoni and his entities grossly exaggerated the value of the litigation portfolio securing Prospect's debts. *See Arena National Finance, LLC v. BFG Investment Holdings, LLC, et al.*, Case No. 20-CA-002356 (Fla. Cir. Ct.). In the final judgment issued on May 27, 2025, the court found "clear proof of the fraud" and concluded that "Berlin, Govoni, Boston Finance Group and BFG Holdings improperly used Prospect Holdings, Prospect Holdings III and Prospect Partners to perpetrate fraud against Arena. Govoni dominates BFG Holdings and Boston Finance Group. Govoni, with Golden's aid, improperly used BFG Holdings, Boston Finance Group and Prospect Holdings to conspire with the other Defendants to perpetrate fraud against Arena, and, further, to aid and abet the other Defendants' fraud against Arena." Final Judgment and Findings of Fact ¶¶ 22, 81–83.

instructed her to process a $300,000 transfer from one Center account to another "for the Dane Boza SNT." He then told Gregory to "transfer this $300,000 to Boston Finance Group, LLC today." After Gregory confirmed that the transfer—executed by Sherry Lilly at the Bank—was complete, the Center employee forwarded the email chain to another BFG employee and told her "this is for Prospect Holdings."

174.    The Center-originated money traveled from the Center account at the Bank, to the BFG account at the Bank, to the Prospect account, even though the Bank knew the trust nature of the funds.

### Big Storm Brewery

175.    On February 1, 2014, BFG loaned $200,000 to Big Storm Brewery, LLC. The maturity date in the related Promissory Note was January 31, 2016. Govoni authorized the transaction on BFG's behalf.

176.    The Center-originated money traveled from the Center account at the Bank, to the BFG account at the Bank, to the Big Storm Brewery account at the Bank, even though the Bank knew the trust nature of the funds.

### Big Storm Pinellas

177.    On December 1, 2014, BFG entered into a Revolving Line of Credit Agreement with Big Storm Pinellas LLC, another Govoni entity, under which BFG loaned $10,000,000 to Big Storm Pinellas with a maturity date of December 1, 2024.

178.    On September 18, 2020, Big Storm Pinellas and BFG amended the agreement in Big Storm Pinellas's favor, raising the borrowing limit to $17,000,000 and extending the maturity date to May 1, 2028. Govoni signed the Note Extension and Modification Agreement on Big Storm Pinellas' behalf, and Jonathan Golden signed for BFG.

179.    The Center-originated money traveled from the Center account at the Bank, to the BFG account at the Bank, to the Big Storm Pinellas account which was, on information and belief, at the Bank, even though the Bank knew the trust nature of the funds.

*Big Storm Real Estate*

180.    Similarly, on January 1, 2015, Govoni signed a Revolving Line of Credit Promissory Note on behalf of another of his entities, Big Storm Real Estate LLC, in which he promised to repay $10,000,000 to BFG by December 31, 2025.

181.    The Center-originated money traveled from the Center account at the Bank, to the BFG account at the Bank, to the Big Storm Real Estate account which was, on information and belief, at the Bank, even though the Bank knew the trust nature of the funds.

182.    These are exemplar transactions and not an exhaustive list of the Center's misuse of the SNT funds.

## **Govoni's Shell Game**

183.    The Center allowed Govoni to treat the SNT funds as a piggy bank to support Govoni's other interests. Indeed, Govoni and his agents openly relied on Center funds to meet BFG's other obligations. All of Govoni's transactions between the Center and BFG, and many of his transactions between BFG and his other entities, played out through accounts held at the Bank.

184.    For example, on September 20, 2011, Gregory emailed two colleagues, cc'ing Zsolt Halustyak of the Center. Gregory told her colleagues that "Zsolt might need to transfer funds from Center – Disbursement (PClaw) clients to Boston Finance Group" and directed them to issue a check from the Center's operating account (at the Bank) to the BFG account (at the Bank).

185.    Zsolt Halustyak at the Center replied, confirming "We will need to transfer $246,500 from the Center to BFG today."

186.   Halustyak then forwarded the chain to Brett Walrath at BFG and informed him "I requested this transfer from the Center to BFG today. We should get back $70k principal for a the [sic] M. Alexander loan this week but I did not want to wait with funding the Prospect loan. Also, Broadleaf may need money this week but I didn't get an update on this yet."

187.   In other words, because BFG had to fund the Prospect loan, it reached into the Center for liquidity. This became the modus operandi for all of Govoni's entities, including the Center, where employees "look[ed] for liquidity" to make distributions for Beneficiaries—using "Beneficiary A's" funds to cover "Beneficiary B's" expenses, because Beneficiary B's funds had been stolen as part of the loan scheme.

188.   Of course, the Center would not have had to search for liquidity if each Beneficiary's funds had been separately accounted for, prudently invested, and properly reported to the Beneficiaries on a regular basis. In other words, they would not have had to "look for liquidity" if the Center hadn't stolen from its clients.

189.   The transfer that Halustyak requested and that Gregory directed was from the Center's account at the Bank to the BFG account at the Bank.

*The Medicare Set-Aside Funds*

190.   The facts laid out above describe one way in which the Center breached its fiduciary duties to the Beneficiaries through the purported loan agreements with BFG. But that wasn't the entirety of the scheme.

191.   In other cases, the plundering took a sneakier and even more heinous route, as Govoni targeted funds designated for Medicare Set-Asides ("MSA").

192.   When a person who is on Medicare becomes disabled and secures a settlement for their injury, Medicare will not cover expenses related to that injury, on the premise that the

settlement is intended to pay for it.

193.    When a trust beneficiary on Medicare is awarded a settlement or judgment, experts perform an analysis of future projected costs related to the particular injury and instruct the beneficiary to "set aside" the appropriate amount of funds based on actuarial formulas. These are "MSA" funds.

194.    Those MSA funds could be housed in one of two ways. If the Beneficiary was on Medicaid, the MSA funds would be kept inside of the trust, earmarked for set-aside purposes, to protect the Beneficiary from exceeding asset limits to qualify for Medicaid. If the Beneficiary was not on Medicaid, the MSA funds would be held outside of the trust, through another Govoni-controlled entity, The Center for Medicare Set-Aside Administration. These MSA funds were also held in an account at the Bank.

195.    Govoni also plundered these MSA funds and funneled them to BFG, BSG, and other entities he controlled.

196.    For example, on February 28, 2011, Gregory emailed Sherry Lilly at the Bank and asked her to "transfer $60,000.00 from the Center – MM XII MSA account ending in XXXX0035 to Boston Finance Group account ending in XXXX0013," and within a half hour, Lilly replied that the transaction had been completed.

197.    On September 12, 2011, the Center's accountant at Unnamed Accounting Firm emailed Karen Curran (BFG), Tracey Gregory, and another colleague, and inquired into the MSA funds. He asked about the "significant liability on the books called Loan – MSA" for which there did "not appear to be any interest being calculated or paid on this loan." The accountant specifically asked, "Isn't this borrowing from client MSA accounts?" and flagged a "fiduciary duty concern."

198.    Govoni and the Center were undeterred and continued "lending" the MSA money,

and the SNT money, to BFG—all through the Bank, despite the Bank's knowledge that the funds were subject to fiduciary duties.

199.    In August 2015, Tracey Gregory sent the following then-current figures, totaling BFG's debts owed to the Center, MSA, BSG, and the Center for Fiduciary Services combined, to Carolynn Miller at BFG:

| Date | Total Loan | Increase – Change for Month |
|------|-----------|------------------------------|
| January 2015 | $85,793,144.74 | $1,650,000.00 |
| February 2015 | $86,991,637.15 | $1,198,492.41 |
| March 2015 | $89,677,734.41 | $2,686,097.26 |
| April 2015 | $91,475,577.13 | $1,797,842.72 |
| May 2015 | $92,575,577.13 | $1,100,000.00 |
| June 2015 | $92,883,577.13 | $308,000.00 |
| July 2015 | $94,052,396.56 | $1,168,819.43 |

200.    Gregory's tabulations make plain that the balance of the loan was ever increasing. Govoni made no effort to repay, and the Center made no effort to collect.

201.    After Gregory resigned from the Center, her replacement, Laura Davis, started reviewing the books. In March of 2021, Davis discovered that "they have been doing money transfers that we have not been keeping track of." After conferring with another colleague—who said Gregory "never sent me anything for MSA. She dealt with that herself"—Davis reached the following conclusion that she shared with Witeck and Caitlin Janicki (Govoni's daughter):

> With this being said and Tracey taking full accountability for investing MSA money I am going to pull all MSA money out of BFG. We will have to add this to the deficit to cover. I will need to figure out how much this comes too [sic] but last count we were around 3–4 million. I am sorry but this is not something I want to continue to do as I have been told by outside counsel that MSA money cannot be

invested.

. . .

Hope you understand that there can be no other option at this time and if anything were ever to arise TRACEY was completely and solely responsible.

202.    BFG did not repay the MSA loan and never intended to.

203.    Despite the Security Agreement between BFG and the Center, the Center never filed a UCC financing statement to record its interest in BFG's collateral, rendering the loan and promissory notes toothless.

*Illegitimate Interest Payments*

204.    BFG, at best, may have made some periodic interest payments on the outstanding principal. Even this, though, appeared to be treated as optional.

205.    When BFG *did* pay interest to the Center, it was with the Center's own looted funds, laundered through Govoni's other entities.

206.    In March 2017, Brianna Frazee, an employee at another Govoni-controlled Florida entity that purported to provide services to the Center—emailed John Witeck, principal of FTAS, and asked whether Witeck "would like [her] to pay the prospect interest and principal due to BPM, MSA, and CSNT[.]" According to her email, the Center was owed almost $18,000 in interest and the MSA was owed nearly $9,000 in interest.

207.    In October 2017, another Govoni-entity employee, Christopher Ramsey, emailed Frazee, Gregory, and Witeck, subject line: BFG Prime July-September 2017 Interest Payment. The body of the email said "Below are the revolving line interest payments BFG owes for Q3 2017. Please do not hesitate to contact me should you have any questions."

208.     The email included a table identifying the following outstanding interest amounts, along with others:

| Account Name | $ Amount | Action | Description | Time Period |
|---|---|---|---|---|
| Center for SNT Administration, Inc. | 117,646,25 | Center Depository AMB[14] | BFG Prime Interest (.50%) | BFG Payments: April–June 2017 |
| Center Medicare Set-Aside Admin | 10,142.42 | Give check to Tracey Gregory for Deposit | BFG PRIME Interest (.50%) | BFG Payments: April–June 2017 |
| Center Medicare Set-Aside Admin | 1,678.92 | Give check to Tracey Gregory for Deposit | BFG2 Interest and Principal (7%) | BFG Payments: April–June 2017 |
| Center for SNT Administration, Inc. – Corporate | 608.86 | Give check to Tracey Gregory for Deposit | BFG PRIME Interest (.50%) | BFG Payments: April–June 2017 |
| Armando Alvarez SNT | 17,013.71 | Center Depository AMB | BFG PLUS Interest (4.5%) | BFG Payments: April–June 2017 |

209.     Frazee responded and asked Ramsey, "Are you able to provide me with the principal amounts of each loan?"

210.     Tracey replied and told Frazee "I will provide the principal portion of the MSA loan. All the other amounts are interest only."

211.     On information and belief, BFG ceased making even minimal interest payments with any consistency in the second quarter of 2018. As of April 2021, the outstanding interest alone was approximately $1,145,719.19.

212.     Govoni later resumed making interest payments—by laundering Center funds through a variety of his businesses and then returning some to the Center as "interest."

213.     For example, in May 2020, FTAS wired approximately $143,565 of the Center's

---

[14] The Center Depository is the account at the Bank that the Center used for receiving incoming funds. For example, if a Beneficiary were due to receive Social Security funds and Department of Veterans Affairs funds, those deposits would come in via the Center Depository.

money—previously stolen by Govoni and transferred to FTAS—to the BFG account at the Bank. Five days later, BFG wrote a check to the Center, drawn from the account at the Bank, for the same $143,565. The memo field claimed "Interest Payment."

214.    The same pattern played out in January 2021. FTAS wrote a check to BFG for approximately $113,000, drawn on funds originally stolen from the trusts. BFG deposited the check in its account at the Bank and then, the very next day, sent a check to the Center for $112,993, again labeled "Interest Payment."

215.    Again in July 2021, Govoni repeated the same laundering scheme, through the Bank, resulting in a $143,215 payment of the misappropriated trust funds back to the Center as "interest."

216.    All told, neither the $100,000,000 stolen from the Beneficiaries—nor the interest accruing on it—was ever returned.

217.    None of this would have been possible without the knowing assistance of the Bank.

*The Magnitude of the Harm*

218.    In a Chapter 11 bankruptcy filing dated February 9, 2024, the Center stated that the balance on the loan to BFG was "in excess of $105 million." This sum does not account for interest or lost investment growth upon which the Beneficiaries depend to promote the longevity of their trust assets.

219.    While the Center owed more than $100,000,000 to the Beneficiaries, it stated in the same filing that it only had approximately $4,600,000 cash on hand, far less than necessary to even begin to make the Beneficiaries whole.

220.    While the Center claims it ceased making payments under the LOC Agreements in 2020, on information and belief, SNTs established after 2020 have also been compromised and

diminished, casting doubt on the Center's claim that the damage ceased in 2020. All of the SNTs were, at all relevant times, held at the Bank. So too were the BFG account and more than a hundred other Govoni-related accounts, through which the scheme played out.

221.    What did Govoni do with $100,000,000? He bought a private plane. He purchased luxury box tickets to high profile sports events. He opened a brewery in Clearwater, which now maintains a public statement on its website admitting that "Funds meant to support individuals with special needs were misused by the former owner—violating the trust of families and a community that deserved better."

222.    The entire loan scheme was in violation of the Center's fiduciary duties to the Beneficiaries—duties the Bank knew about, witnessed the breach of, and materially assisted in the breach of.

223.    The Center's loan of the Beneficiaries' trust funds to BFG was not in good faith because the purported "investment" was not in keeping with the purpose of the trust instruments and was not in the Beneficiaries' interest—Center leadership knew that BFG would use the loan proceeds to make risky investments, funnel money to cover BFG's affiliates' investment losses, and fund Govoni's lavish lifestyle. Center leadership continued to fund the loans, putting the interest of BFG and Govoni over the beneficiaries they were legally and ethically bound to serve.

224.    The Center's loan of the Beneficiaries' trust funds was not in accordance with the SNTs' purposes or the interests of the Beneficiaries because the Beneficiaries did not stand to benefit from the loan, nor did the loan serve any purpose in prolonging the assets of the SNTs.

225.    The Center's loan to BFG violated the duty of loyalty for the Center's failure to administer the trusts solely in the Beneficiaries' interest and to avoid self-interested conflicts.

226.    The Center violated its duty of prudent administration to the Beneficiaries by failing

to exercise reasonable skill, care, and caution. Even if there had been any legitimate trust-focused purpose to the original $2,500,000 loan—and there was not—the Center raised the limit of the LOC Agreement at least four more times, giving Govoni and BFG access to a total of $100,000,000 despite never receiving repayment on the previous principal.

227.    And, on information and belief, the Center failed to examine or inquire into the purpose or health of the LOC Agreement at any time from 2009 until the Chapter 11 filing in 2024, demonstrating an extraordinary lack of care and caution for the Beneficiaries' SNTs.

228.    The Center breached its duty to delegate trust-related functions only to agents selected through reasonable skill, care, and caution. The Center permitted its agents, including Govoni, Staunton, Belisle, and the Board of Directors, to redirect $100,000,000 of the Beneficiaries' SNT funds to Govoni's own personal use.

229.    The Center failed to monitor these agents' performance as required, as evidenced by the Center's claim that it only discovered the loan shortly before the 2024 Chapter 11 filing.

230.    The Center breached its duty to control and protect the trust property by allowing the property to be loaned out to BFG and used for Govoni's own purposes. By the Center's own admission, it "owes approximately $105 million to the trust beneficiaries for exposure to the BFG loan," which does not include the lost interest that the looted sums would have generated for the Beneficiaries' benefit.

231.    The Center breached its duties of recordkeeping by failing to accurately track the funds pulled from each SNT or pooled SNT sub-account.

232.    The Center breached its duty of identification of trust property by commingling trust funds with any other funds in BFG's accounts.

233.    The Center breached its duty to inform and account by failing to report the loan

movement to the Beneficiaries in their annual accountings.

234.    Indeed, the Center—which claims to have learned of the loan in 2022, despite the executed documents all bearing Center-officer signatures—waited nearly two years to notify the Beneficiaries of their breach.

235.    The Bank aided and abetted in these breaches by facilitating the transactions, skirting normal restrictions and regulations, and treating Govoni's companies and the Center as "one big company" with no formalities.

**Govoni and the Bank**

236.    The Center funneled the stolen loan money through an elaborate network of accounts held at the Bank, often arranging transactions through the same employee, Sherry Lilly. The Bank, through its willingness to facilitate improper transactions, skirt policies, and cut corners, substantially assisted the Center's breach by making the impossible possible.

237.    Sherry Lilly was an Assistant Vice President and Management Sales Officer at the Tampa branch of American Momentum Bank and served as a relationship manager to the Center and to Govoni's entities.

238.    On information and belief, Govoni maintained more than 140 accounts at the Bank, including those for the Center, BFG, BAM, BSG, and FTAS.

239.    Tracey Gregory maintained full practical control over many or all of Govoni's and his entities' accounts and caused most of the Center's transactions to be executed at the direction of Leo Govoni. She corresponded regularly with Lilly and shared a friendly, informal relationship with her.

240.    Back in the earliest years of running the Center, Govoni had conversations with the Bank's President, Sam Davis, regarding his plan to set up a trust company. That is, the Bank

knew—at a high, managerial level—what industry Govoni was involved in. In August of 2008,

Davis emailed Govoni, saying:

> Leo,
>
> We have completed quite a bit of research on the needs we discussed, and are waiting for a couple of final answers. I did want to share what has been identified to date.
>
> Our chairman has a close contact at a significant Texas trust company in Houston that is not affiliated with a bank.  He is contacting the principal of the company to arrange a conference call where we can describe the exact details of the service you need to be provided.  We will coordinate with your schedule to arrange the call.
>
> We are also researching a second Texas trust company and hope to have that contact qualified by early next week.
>
> Our Florida regulatory legal counsel has indicated that they can form a trust company for you if you decide to take that route. They are currently forming trust companies for both financial and non-financial institutions and have a lot of experience in this area. They indicated it took a little time, but that it was very doable.
>
> We contacted our Texas regulatory counsel who also works on the acquisition side to determine if they have any shell trust charters that are for sale. Our specialist is out until Monday, and we expect to hear from them at that time.  Should you wish to form the trust company in Texas, this is a firm you would want to consider using for that option.
>
> When you return next week, please give me a call so that we can discuss the other information I am obtaining and what direction you would like to pursue.

241.    It was no secret that the CNSTA was one of the largest trust companies in the

country.

242.    By 2016, the Bank had come to value Govoni's business so much that the Bank

President of the Tampa market reached out for a meeting "just to personally introduce ourselves

in person with Leo and thank him for his business. He has an outstanding relationship[.]"

243.    Lilly and the Bank's Tampa Market President, Porter Smith, also RSVP'd to this

meeting with their highly valued customer.

244.    On another occasion in 2017, Lilly told Gregory that because "the relationship has grown so much, I can certainly look into some possible reductions" to the Govoni-entity bank fees.

245.    It comes as no surprise that the Bank was willing to cater to Govoni. As of 2013, Govoni held at least 141 accounts at the Bank. The signers for the majority of accounts were some combination of Govoni, Staunton, Witeck, Belisle, and Govoni's children (LJ Govoni and Caitlin Govoni Janicki).

246.    Beyond meetings and fee reductions, the Bank was willing to bend much further to keep Govoni happy, willfully supporting the Center's breaches of fiduciary duty.

### Applicable Banking Regulations

247.    The Bank is bound to comply with the Bank Secrecy Act ("BSA"), a federal statute designed to detect and prevent money laundering.

248.    In accordance with their federal and state regulatory compliance obligations, banks must develop, administer, and maintain a program that ensures compliance with the BSA.  The program must be approved by the bank's board of directors and noted in the board meeting minutes.  It must: (1) provide for a system of internal controls to ensure ongoing BSA compliance, (2) provide for independent testing of the bank's compliance, (3) designate an individual to coordinate and monitor compliance, and (4) provide training for appropriate personnel.

249.    Banks must develop a customer due diligence program that assists in predicting the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, which provides the bank with a way to identify unusual or suspicious transactions for each customer.  The customer due diligence program allows the bank to maintain awareness of the financial activity of its customers and the ability to predict the type and frequency of transactions in which its customers are likely to engage.

250.    Customer due diligence programs should be tailored to the risk presented by individual customers, such that the higher the risk presented, the more attention is paid. Where a customer is determined to be high risk, banks should gather additional information about the customer and accounts, including determining: (1) purpose of the account; (2) source of funds; (3) proximity of customer's residence to the bank; and (4) explanations for changes in account activity.

251.    Banks must also identify a BSA compliance officer who is a senior bank official responsible for coordinating and monitoring compliance with the BSA. The compliance officer must designate an individual at each office or branch to monitor the bank's day-to-day BSA compliance.

252.    The federal government established the Federal Financial Institutions Examinations Council ("FFIEC") in 1979 to prescribe uniform principles, standards, and report forms and to promote uniformity in the supervision of financial institutions. The FFIEC's Bank Secrecy Anti-Money Laundering Manual contains an overview of BSA and anti-money laundering compliance program requirements, risks and risk management expectations, industry sound practices, and examination procedures. The FFIEC manual is based on BSA laws and regulations and BSA and anti-money laundering directives issued by federal banking agencies such as the Federal Reserve, Federal Deposit Insurance Corporation (FDIC), and the Office of the Comptroller of Currency. *See* FFIEC BSA/AML Examination Manual p. 5 (2010).

253.    Banks must also ensure that their employees follow BSA guidelines. Banks make compliance a condition of employment and incorporate compliance with the BSA and its implementing regulations into job descriptions and performance evaluations. Accordingly, banks are required to train all personnel whose duties may require knowledge of the BSA on the requirements under the BSA.

254.     Banks and their personnel must be able to identify and take appropriate action once put on notice of any of a series of money laundering "red flags" set forth in the FFIEC BSA/AML Examination Manual, including: (1) repetitive or unusual fund transfer activity; (2) fund transfers sent or received from the same person to or from different accounts; (3) transactions inconsistent with the accountholder's business; (4) transfers of funds among related accounts; (5) loans that are secured by account deposits; (6) loans that lack a legitimate business purpose, provide the bank with excessive fees for assuming little or no risk, or obscure movement of funds; (7) multiple accounts established in various corporate names that lack sufficient business purpose to justify the account complexities; and (8) transacting businesses sharing the same address.

### The Bank's Aiding and Abetting

The Bank's Actual Knowledge of the Center's Breaches of Fiduciary Duty

255.     The Bank knew that the Center was a fiduciary holding trust funds on behalf of the Beneficiaries.

256.     For some SNTs, the Bank co-signed trust instruments identifying itself as custodial trustee of the accounts where trust funds were held. Sam Davis signed these instruments as President and Chief Operating Officer of the Bank.

257.     While the role of custodial trustee does not impose any duty to examine disbursements or make decisions regarding the assets, it plainly established the Center's knowledge that the SNTs were, in fact, trust funds.

258.     The same documents, executed by the Bank, identify the Center as trustee for the SNTs, erasing any doubt that the Bank knew that the accounts in question were trust accounts or that the Center owed fiduciary duties to the trust Beneficiaries.

259.     Legions of email communications further confirm the Bank's knowledge that the

Center held the SNT funds in trust and, therefore, owed fiduciary duties to the Beneficiaries.

260.    In a 2014 email exchange with the subject line "Texas Trusts," Lilly wrote to

Gregory as follows:

> Tracey,
>
> Maureen and I met with our Risk Officer Yesterday to review the 3 Texas Trust agreements. I am not sure if you know this or not but AMB does not have Trust Powers in Texas or Florida. We signed the other Trusts because the way [sic] they were outlined and specified AMB's role as a Custodial Trustee. Our Risk Officer stated that we would sign as Custodial Trustee only if it was outlined and defined like the ones I have attached from the Trusts that Sam Davis signed and Maureen. Please review the attached samples and we can discuss further next week on how to handle. Thank you.

261.    In 2020, Gregory revived that old email chain to ask Lilly the following:

> We are working on another new trust in Texas that we wanted to check to see if AMB would be Custodial Trustee. The last time the bank signed was back in 2014. Per the bank's request we changed the wording on trust documents to specifically outline AMB's role as Custodial Trustee. You had sent over samples on what you would like in the trust document. . . . Can you check to see if AMB would still be able to sign?

262.    And, making the Bank's knowledge even more clear, the Bank's Account

Agreements for each SNT and Pooled SNT sub-account title the accounts "Florida Pooled Trust

f/b/o [the Beneficiary]."

263.    These same Account Agreements include a field of checkboxes identifying the

ownership of the account. For the SNTs and Pooled SNT subaccounts, the "Trust-Separate" box is

selected.

264.    In a box setting forth "Non Individual Owner Information," the name on the

accounts reads "Florida Pooled Trust f/b/o," and the field for Type of Entity reads "Trust

Agreement."

265.    The Bank's account statements for the SNT and Pooled SNT subaccounts, similarly,

label the accounts as trusts.

266.    Because a bank is a corporate entity that can only acquire knowledge through its agents, Lilly and Davis's knowledge is imputed to the Bank. And they are not the only employees who corresponded with the Center about the specific trust nature of the SNTs and Pooled SNT subaccounts. Other Bank employees, including Sandy Green (Treasure Management Sales & Service Associate) and Karen Jones (Commercial Sales & Service Associate), communicated directly with Gregory and other Center agents regarding the trusts.

267.    Accordingly, the Bank knew that all of the funds held by the Center, and in the SNT accounts and Pooled SNT subaccounts, were trust funds and that the Center was a fiduciary.

268.    Despite this knowledge, the Bank affirmatively and substantially assisted the Center's breaches by allowing, enabling, and aiding in transactions that it knew violated both the law and standard banking policies and practices, and which it knew were in furtherance of the Center's breach of fiduciary duty.

*Improper Transactions*

269.    The Bank transferred the Beneficiaries' funds from Center bank accounts to Govoni-controlled bank accounts—all held at the same American Momentum branch and all managed by Sherry Lilly—despite knowing that the Center held trust funds subject to fiduciary duties.

270.    For example, as set forth in paragraph 153, the Bank processed the following transactions in just a few months' time:

      a.  August 6, 2012: $300,000 from the Center Acct. 1722 to BFG Acct. 0013;

      b.  August 15, 2015: $240,000 from the Center Acct. 1722 to BFG Acct. 0013;

      c.  August 30, 2012: $300,000 from the Center Acct. 1722 to BFG Acct. 0013;

      d.  September 6, 2012: $362,500 from the Center Acct.1722 to BFG Acct. 0013;

      e.  September 14, 2012: $3,000,000 from the Center Acct. 1722 to BFG Acct.

0013; and

    f.   September 21, 2012: $1,500,000 from the Center Acct. 1722 to BFG Acct. 0013.

271.    The Bank then facilitated the movement of these funds to other Govoni-controlled entities, despite its knowledge that the funds belonged to SNT Beneficiaries.

272.    The Bank knew that each and every transfer was for Govoni's benefit. The Bank's own website describes its obligations under Section 326 of the PATRIOT Act, including the requirement that the Bank obtain, verify, and record information to identify each person who opens an account or changes an existing account—for the express purpose of combatting terrorism and, as relevant here, money laundering.

273.    In compliance with these legal requirements, the Bank states on its website that "when you open an account or change an existing account, we will ask each person for their name, physical address, mailing address, date of birth, and other information that will allow us to identify them. We will ask to see each person's driver's license and other identifying documents and copy of record information for each of them."

274.    Accordingly, no matter how many of his accounts Govoni used to pilfer and clean the trust funds, the Bank knew that all of the transactions were connected to him and inured to his benefit.

*The Bank's Imprimatur on False Account Statements*

275.    The Bank gave the Center approval to use their logo on false account statements to be sent to Beneficiaries, duping Beneficiaries into thinking that the documents they received were official and sanctioned by the Bank.

276.    Instead, the account statements were generated by FTAS, the accounting firm controlled by Govoni and Witeck. The statements misrepresented to Beneficiaries the amounts on

deposit in their individual names, giving the false impression that each Beneficiary's funds were held segregated in a unique account at the Bank (when, in fact, they were not) and that no funds deposited in their accounts had been misdirected (when, in fact, they had).

277.    The Bank permitted this to go on for years, and only rescinded its permission in 2018, one week after the successor trustee for a former Center Beneficiary filed a complaint with a demand for accounting. Immediately after that lawsuit was filed, the Bank emailed Gregory attaching a purported "Account Statement" for the beneficiary involved in the lawsuit. In the email, from Sandy Green, the Bank said: "Please see attached, I believe this statement is being created by The Center and Maureen is asking if you can remove the banks [sic] name since they are not generated by American Momentum Bank."

278.    Govoni's daughter, Caitlin Janicki, was a settlement coordinator at the Center. She forwarded the email that Gregory received from Sandy Green to Allyson Lazzara, an attorney barred in Florida who worked for Govoni's entities, and to Staunton. Janicki wrote:

> I want to make you both aware that Tracey Gregory just got the attached e-mail from American Momentum Bank. She then reached out to our rep. at the bank who stated someone went through the Naples American Momentum branch asking for account information to be verified. They confirmed that no information was released but given that someone reached out to them to verify the statement they no longer feel comfortable with us producing these statements. They confirmed that they previously approved of statements such as this but they have asked we no longer produce statements with their name on it.

279.    Janicki's email makes perfectly clear that she and the Center were more concerned with the Bank *not* releasing accurate account information than with the impropriety of their own falsified statements on the Bank's letterhead.

280.    Even after being confronted with evidence of the Center leveraging the Bank's name and professional reputation as part of its scheme, the Bank took no steps to end the banking relationship. Nor did the Bank make any effort prevent—and instead continued to aid and abet—

the Center's breaches of fiduciary duty.

*Lack of Formalities*

281.    Throughout the duration of Govoni's relationship with the Bank, the Bank knew that all of Govoni's 100+ bank accounts were connected. The Bank corresponded with the same contact person, Tracey Gregory, to open all of the various accounts under their various corporate names.

282.    For example, in 2013, Gregory emailed Lilly and asked:

Sherry,

Can you open up a new bank account for the following?

Orvis Entertainment LLC

Leo Govoni is the authorized signor.

EIN # [XX-XXX]0579

Can you add this to the remote deposit scanner for both John Burns and myself? Can you add this to the Center for Lien Resolution online access? Can I get a wire transfer agreement and hold harmless agreement?

The type of business holds liquor licenses.

Attached is the Articles of Organization and the IRS letter confirming the EIN number.

Thank you.

Tracey

283.    Lilly replied, "Ok. We will open in the am." She did not ask why a liquor license holding company would share access with the Center for Lien Resolution online; or about Gregory or John Burns's authority to make remote deposits to an account in Govoni's name. Just "We will open in the am."

284.    Gregory sent Lilly similar requests for accounts in the names of Seaboard Craft Beer Holdings, Broadleaf Warner LLC, Intergritas Management LLC, and more.

285.    On another occasion in 2018, Gregory emailed Sandy Green, Treasury Management Sales & Service Associate at the Tampa branch of the Bank, with a request to open new accounts in the names of North American Kegs, BCL Partners Fund, Boston Capital Leasing Management, LJG Management, Big Storm Brewery, Big Storm Brewery Tax Account, Fat Point, Fat Point Tax Account, Big Storm Canteen, Big Storm Coffee, and Big Storm Creamery.

286.    All of these emails came from Gregory at her "@centersmail.com" email address, but the Bank treated Gregory as a representative of all Govoni entities and treated the entities as interchangeable.

287.    Because all of the SNT and Pooled SNT accounts, MSA accounts, BFG accounts, and BSG accounts were held at the Bank, all improper transfers from the SNTs to Govoni's other entities occurred at the Bank, with the Bank's knowledge and facilitation.

*Lifting Restrictions*

288.    But the Bank was not merely turning a blind eye. It went out of its way to skirt policies and enable the Center's breach.

289.    For example, on May 29, 2015, Lilly, with the assistance of a colleague, lifted normal wire restrictions and allowed BFG to send funds it didn't have based on the promise of incoming funds from the Center to BFG.

290.    Lilly emailed two colleagues, Maureen Gallagher and Spencer Micklitsch, with the following request for BFG:

Please allow a wire for approximately $354,765.00 to initiate a wire on uncollected funds account #704100000013. User Carolyn Miller to initiate this wire today. The check that was deposited in the amount of $500,000 is an on-us check from the Center for Special Needs. Please approve and let me know if you have any questions.

291.    Lilly attached two documents to her email: a scanned check from the Center to BFG in the amount of $500,000; and a screenshot of BFG's online banking interface showing that it

only had $221,514.82 as its current balance.

292.    To facilitate BFG's desire to wire out $354,765 against its $221,514 balance, the Bank agreed to allow BFG to issue the wire from its "available funds" instead, which included the not-yet-cleared check from the Center.

293.    Maureen Gallagher, Executive Vice President and Chief Administrative Officer, had no objection to this deviation of procedures. Instead, she wrote back asking only "When the wire has been received and processed, please maintenance the account back to wire on collected." In other words, she permitted the special favor to Govoni but insisted the trail be covered back up afterwards.

294.    On another occasion in 2022, the Bank allowed employees of another Govoni entity—*not* Center employees—to "delete" a check that the Center had presented for deposit, even though the other employees were not signatories on the Center account.

295.    Miki Parks, an employee of a Govoni entity, received an email from Lilly stating "we can delete the check from the deposit today," apparently confirming an earlier conversation with Parks. Witeck was cc'd on the email.

296.    Parks forwarded the email to Laura Davis, a Director at the Center, saying:

A check is being presented to the bank today for CSNT from BFG. Apparently, the check was given to you too early and we need for you [to] hold off a day on depositing this check. John was going to give you a call.

Per Sherry Lilly with the Treasury Department you would need to delete this check from your deposit today. I have copied it [sic] Karen Jones and Lisa Weber with AMB so that they may walk you through how to do that if you have never done it in the past.

297.    Davis from the Center responded, "I went to void this and it was already done, can you tell me who voided this?"

298.    Davis wrote to Lisa Weber at the Bank: "Someone did delete this and I need to know who. No one should have access or authority to delete CSNT deposits."

299.     Weber replied and confirmed that the Bank had deleted the check without the Center's knowledge or consent. She stated, "Found it was done by one of my team members per Sherry. All good."

300.     But this was not all good—it was not "all good" that the Bank was willing to delete a deposit into a Center account, based on a Govoni employee from a different entity asking for a favor. And, as Davis pointed out in response, she "was only made aware by BSG and not AMB." The Bank had not even informed the account administrator of the change to its deposit.

*"One Big Company"*

301.     For over a decade, the Bank charged the monthly account fees for all of Govoni's accounts to the Center's corporate account because, by the Bank's own admission, it thought Govoni's hundred-plus accounts—and the Center—were all "one big company."

302.     The funds in the Center's corporate account (which paid for Govoni's account fees) were commingled with the administrative fees collected from each Beneficiary.

303.     In February 2017, for one example, the Bank deducted $1,607.34 from the Center's corporate account to cover bank fees for 81 different entities, including BFG, BSG, Big Storm Brewery, Gravitas, and Prospect.

304.     The Bank charged the Center's corporate account fees labeled as "Account Analyses," under which all of the various transaction fees for an account are totaled, but the Center was not receiving those Analyses. When a Center director reached out to Karen Jones at the Bank to inquire after discovering this issue in 2021, Jones stated that all Analyses were delivered to Govoni—even though he was not a signatory on the Center accounts and had not been a Center officer, director, or employee in a decade.

305.     In the latter half of 2021, Jones invited the Center director to come into the office

for a meeting where the Bank apologized and explained that, all along, it believed all of the Govoni accounts, and the Center, were related to "one big company" and that Gregory and Govoni were in charge of all of it. The director sat with Jones for several hours, parsing out which accounts were the Center's and which were Govoni's. This was after more than ten years of the Bank treating them as one, granting access and accepting directions from non-signatories, and charging all of the aggregate fees to the Center.

306.    The Bank did not refund the decade's worth of fees improperly assessed to the Center, but the Center did see that its monthly fees, going forward, decreased from about $1600 to about $30.

### Issuing Unauthorized Wires

307.    The Bank regularly approved transfers out of the Center's accounts without getting authorization from a signatory. When someone, either Gregory or Govoni, initiated a wire or transfer out of the Center, the Bank would call or email Todd Belisle and ask his consent. But Todd Belisle was not a signatory on the Center's accounts and had no authority to approve a transfer. Nevertheless, the Bank would solicit, and act on, Belisle's (ineffective) authority and rely on it to remove money from the Center's accounts.

### High Exposure of All Combined Companies

308.    The Bank recognized, at times, that it was engaging in a risky business.

309.    In December 2018, Lilly emailed Gregory explaining that "due to the high exposure of all combined companies, our underwriting department is requesting financials for each company." Lilly explained that the only other alternative would be to "set these up on a prefund basis which means when we receive the files the funds would be debited from the account at that time."

54

310.    Sandy Green wrote to Gregory later in December, again asking "if the credit officer asks for financials on The Center is this something that you can provide?"

311.    The Bank's repeated requests for the Center's financials, and for "all combined companies," reveals their actual, manifest knowledge that they had a problem on their hands. But it did not deter the Bank from continuing to engage in the Center's breach.

312.    The Bank's substantial assistance—transferring funds from special needs trust accounts to BFG; allowing transfers ordered by individuals lacking signatory authority over designated accounts; cancelling Center deposits without authorization or notification; charging exorbitant account fees to the wrong client; granting the Center permission to affix its logo to (false) account statements; and allowing improper financial transfers, facilitated, enabled, aided, and allowed the Center's breach of fiduciary duty to continue for nearly fifteen years before it imploded. The Bank rendered this assistance exclusively for Govoni's benefit, and at the expense of the Beneficiaries, whose life-sustaining funds were compromised, decimated, depleted, and, in the most extreme cases, entirely wiped out.

313.    The Bank was aware of the trust position the Center held.  The Bank knew that each entity was a Florida based, Govoni-related entity and that millions of dollars were being transferred out of trusts and into other Govoni-related entities, including breweries, creameries, and real estate companies.  Govoni did not hide the names on these accounts—each account was held in the name of its corresponding company—but also the Bank's own procedures required it to understand the owner to prevent money-laundering activities.

## TOLLING OR NON-ACCRUAL OF STATUTES OF LIMITATION

314.    The Plaintiffs and the Class members did not discover and could not have discovered the facts constituting the Bank's violations until the Center's bankruptcy filing on February 9, 2024.

315.    The Center concealed its wrongdoing, and the Bank's assistance therein, by carrying out the complex series of transactions through which the Beneficiaries' funds were misappropriated, commingled, and misused.

316.    The Center, with the Bank's permission and assistance, concealed the scheme in part by issuing account statements bearing the Bank's logo, giving Beneficiaries assurances that their funds were safe and accounted for at a financial institution.

317.    The Beneficiaries only learned of the Center's breach of fiduciary duty, and the Bank's role in that scheme, through the Chapter 11 proceedings and the subsequent adversary actions.

318.    Because the Plaintiffs and the Class could not have reasonably discovered the facts constituting Defendants' violations until, at the earliest, February 9, 2024, their claims accrued on that date and any applicable statutes of limitation were tolled until that date.

## CLASS ACTION ALLEGATIONS

319.    The Plaintiffs bring this lawsuit as a Class Action on behalf of themselves and all other persons similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3).

320.    The Class is defined as:

**All persons who, at any time between 2009 and February 9, 2024, were named as Beneficiaries of Special Needs Trusts administered by the Center for Special Needs Trust Administration, or the legal representative of such persons, and who paid trust administration fees to the Center.**

321.    The Plaintiffs reserve the right to modify or amend the definitions of the proposed Class before the Court determines whether certification is appropriate.

322.    The Class satisfies the requirements of Rule 23(a), as well as 23(b)(3).

323.    <u>Numerosity.</u> The Class consists of approximately 6,000 geographically dispersed individuals. Joinder of the Class members is not practicable. The disposition of the claims of the

Class members in a single action will provide substantial benefits to all parties and to the Court.

324.    Ascertainability. The individual Class members are ascertainable, as the names and addresses of all Class members can be identified in the business records maintained by the Center, as well as through an examination of the Bank's records. Notice of this action can thus be provided to all members of the proposed Class.

325.    Commonality. Common questions of law and fact exist as to the Plaintiffs and all members of the proposed Class. The questions of law and fact common to the Class include, but are not limited to:

    a.      Whether the Center owed the Beneficiaries fiduciary duties;

    b.      Whether the Center breached those fiduciary duties by entering into a series of line of credit agreements by which the funds of the Beneficiaries' trusts were loaned out to various corporate entities with no legitimate investment purpose and no intent for repayment;

    c.      Whether the Bank had actual knowledge of the Center's breaches; and

    d.      Whether the Bank substantially assisted the Center's breaches of fiduciary duty.

326.    Typicality. The Plaintiffs are beneficiaries of SNTs that were administered by the Center, and their trusts were substantially depleted by the Center's misappropriation of funds and breaches of fiduciary duty, aided and abetted by the Bank. Their claims are typical of the claims of all Class members as all Class members are similarly affected by the Bank's wrongful conduct as set forth in this Complaint.

327.    Adequacy. The Plaintiffs are committed to prosecuting the action, will fairly and adequately protect the interests of the members of the Class, and have retained counsel who is competent and experienced in class action litigation, including litigation relating to financial fraud. The Plaintiffs have no interests antagonistic to or in conflict with other members of the Class.

328.    The Class may be certified under Rule 23(b)(3). Questions of law or fact common

to Class members predominate over any questions affecting only individual members. Class treatment of such common questions of law and fact is a superior method to piecemeal litigation because class treatment will conserve the resources of the courts and will promote efficiency of adjudication. Class treatment will also avoid the substantial risk of inconsistent factual and legal determinations on the many issues in this lawsuit. The Court will face no unusual difficulty in the management of this action as a class action.

**CLAIM FOR RELIEF**

**COUNT I – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**

329.    The Plaintiffs re-allege and incorporate paragraphs 1–328 as if fully set forth herein.

330.    Because the Center served as trustee for all of the Beneficiaries' SNTs, the Center owed fiduciary duties to the Beneficiaries. The fiduciary duties apply by operation of law and the terms of the trusts, which state (in identical or similar language) that the Center "shall exercise these powers at all times in a fiduciary capacity."

331.    The Center breached the fiduciary duties directly owed to the Beneficiaries by purporting to lend, commingling, misappropriating, and misusing the SNT funds that were held in trust for each Beneficiaries' sole benefit.

332.    American Momentum Bank knew that the Center had fiduciary relationships with the Beneficiaries because the account opening agreements and statements labeled the accounts as trust accounts; the Bank frequently discussed the "trust" nature of the accounts with Center representatives including Tracey Gregory; and the Bank at times signed trust instruments as Custodial Trustee.

333.    The Bank had actual knowledge of the Center's breaches of fiduciary duty to the Beneficiaries. The Bank knew, *inter alia*, that:

a)  The Center accounts held at the Bank were SNTs;

b)  the Center routinely transferred funds from SNTs at the Bank to Govoni's private businesses, including BFG;

c)  the Bank held accounts for over 100 other Govoni-owned or related entities which were obviously, on their faces, not trust accounts or trust-related

d)  the Center printed and issued Beneficiary account statements using Bank letterhead;

e)  individuals without signatory authority directed fund transfers from the Center's and Govoni's accounts;

f)  non-Center employees without signatory authority directed the Center to delete deposits from Center accounts;

g)  the Center routinely paid fees for services not rendered to the Center; and

h)  Govoni continued to direct Center funds without signatory authority after he had resigned from the Center.

334.    The Bank provided substantial assistance by, *inter alia*, transferring SNT funds into Govoni's other accounts; lifting wire restrictions to permit improper transactions; accepting wire approvals from individuals who were not authorized signatories; relaxing its own procedures and policies to benefit Govoni and his companies, and allowing the Center to use AMB letterhead to issue false account statements to the Beneficiaries.

335.    The Beneficiaries suffered damages as a result of the Center's breaches of fiduciary duty, as aided and abetted by the Bank.

336.    The specific misconduct that gives rise to this claim for aiding and abetting fiduciary breach was intentional, malicious, deliberate, outrageous, and reprehensible, or so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of the investors, and therefore an award of punitive damages is appropriate. In addition, senior management of American Momentum Bank engaged in such conduct, or knowingly condoned, ratified, or consented to such conduct.

337.    By reason of the foregoing, the Beneficiaries are entitled to a judgment awarding them compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs, on behalf of themselves and all similarly situated individuals, demand judgment against the Defendant as follows:

1.    Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure and declaring the Plaintiffs and their counsel to be representatives of the Class;

2.    Awarding the Plaintiffs and the Class compensatory damages in an amount to be determined at trial, together with appropriate prejudgment interest at the maximum rate allowable by law;

3.    Awarding the Plaintiffs and the Class punitive damages in an amount to be determined at trial, together with appropriate prejudgment interest at the maximum rate allowable by law;

4.    Awarding the Plaintiffs and the Class costs and disbursements and reasonable allowances for the fees of the Plaintiffs' and the Class's counsel and experts, and reimbursement of expenses;

5.    Awarding such other and further relief the Court deems just, proper, and equitable.

## DEMAND FOR A JURY TRIAL

The Plaintiffs and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Respectfully submitted on October 8, 2025.

By: */s/ David L. Rosendorf*
    Tal J. Lifshitz, Esq.
    Florida Bar No. 99519
    tjl@kttlaw.com
    Harley S. Tropin, Esq.
    Florida Bar No. 241253
    hst@kttlaw.com
    Benjamin J. Widlanski, Esq.
    Florida Bar No. 1010644
    bwidlanski@kttlaw.com
    Meaghan Goldstein, Esq.
    Florida Bar No. 1024796
    mgoldstein@kttlaw.com
    Yarden (Jordan) Benatar
    Florida Bar No. 1049274
    jbenatar@kttlaw.com
    **KOZYAK TROPIN &**
    **THROCKMORTON LLP**
    2525 Ponce de Leon Blvd.
    9th Floor
    Coral Gables, Florida 33134
    Telephone:    (305) 372-1800
    Facsimile:    (305) 372-3508

    *Counsel for the Plaintiffs and the*
    *Putative Class*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 8, 2025, a true copy of the foregoing has been filed with the Clerk of the Court using CM/ECF and is served on all counsel or parties of record via transmission of Notices of Electronic Filing generated by CM/ECF.

By: */s/ David L. Rosendorf*
    David L. Rosendorf