# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

In re:                                                                     Case No. 8:24-bk-00676-RCT

THE CENTER FOR SPECIAL NEEDS
TRUST ADMINISTRATION, INC.,                                                Chapter 11

          Debtor.

_____

MICHAEL GOLDBERG, *on behalf of* Javier          Adversary Pro. No. 8:25-ap-00347-RCT
Perales; Michael Passino *on behalf of*
Allison Passino; and John Griffith *on behalf of*
Jackson Griffith, individually and on behalf of
all others similarly situated,

          Plaintiffs,                                                       CLASS ACTION

v.

AMERICAN MOMENTUM BANK,

          Defendant.

_____

### DEFENDANT AMERICAN MOMENTUM BANK'S
### MOTION TO STAY LITIGATION AND TO STAY DISCOVERY

---

**NOTICE OF OPPORTUNITY TO OBJECT AND REQUEST FOR HEARING**

    If you object to the relief requested in this paper you must file a response with the Clerk of Court at 801 North Florida Avenue, Tampa, Florida 33602 within twenty-one days from the date of the attached proof of service, plus an additional three days if this paper was served on any party by U.S. Mail.

    If you file and serve a response within the time permitted, the Court will either notify you of a hearing date or the Court will consider the response and grant or deny the relief requested in this paper without a hearing. If you do not file a response within the time permitted, the Court will consider that you do not oppose the relief requested in the paper, and the Court may grant or deny the relief requested without further notice or hearing.

    **You should read these papers carefully and discuss them with your attorney if you have one. If the paper is an objection to your claim in this bankruptcy case, your claim may be reduced, modified, or eliminated if you do not timely file and serve a response.**

---

Defendant, American Momentum Bank ("American Momentum") moves this Court to (1) stay this litigation until the joinder of Michael Goldberg, as Chapter 11 Trustee on behalf of the Estate ("Ch. 11 Trustee"), and (2) stay discovery until the Court rules on American Momentum's pending case dispositive Motion to Dismiss the class action complaint ("Complaint").

## INTRODUCTION

In this adversary proceeding, American Momentum faces class action allegations brought by the Plaintiffs herein. American Momentum has filed a case dispositive motion to dismiss the one count Complaint on the basis of the failure to sufficiently plead actual knowledge and the statute of limitations. American Momentum possesses indemnity claims against the estate directly related to the actions herein and understands that the Ch. 11 Trustee may bring generally identical claims to those set forth in the Complaint. By separate pleading, American Momentum has therefore sought stay relief to join the Ch. 11 Trustee to this adversary complaint.

This Court should stay the instant litigation until that joinder is adjudicated to promote judicial efficiency and avoid duplicative and inconsistent rulings. The Court should also stay any discovery until it rules on the Motion to Dismiss because such case dispositive motions are ideally resolved before potentially sweeping discovery begins.

## BACKGROUND

### American Momentum Bank's Secured Indemnification Claim

American Momentum possesses secured indemnity and setoff claims against the bankruptcy estate that directly relate to the claims asserted by the Plaintiffs and misconduct of the actual "bad actor," the Debtor. American Momentum seeks to join the Debtor for that purpose.

On October 16, 2024, American Momentum timely filed a secured proof of claim in this case, Claim Number 10268 ("POC," Exhibit A), "in excess of $100,000" (the "Claim"). The Claim

is secured by all accounts of the Debtor located at American Momentum as of the Petition Date ("Accounts") pursuant to various agreements entered into between American Momentum and the Debtor, including the ACH Origination Master Agreement executed on September 5, 2013 (the "Agreement," a copy of which is attached to Ex. A). Pursuant to Paragraph 3 of the Agreement, Debtor granted American Momentum a security interest in certain Debtor assets, including "monies, instruments, savings, checking and other accounts" and all proceeds and products of that property to secured Debtor's obligations under the Agreement, which was perfected by American Momentum's possession of funds.  American Momentum held at least $3,792,196 in Debtor's accounts as of the Petition Date according to Debtor's schedules.

American Momentum's security interest remains perfected even though the funds were transferred out of American Momentum's possession post-petition: "For avoidance of doubt, the post-Petition Date transfer of any Debtor funds to any bank from American Momentum Bank . . . is without prejudice to any rights and remedies, if any, of American Momentum that existed as of the Petition Date, including perfection . . . ."  Main Case[1] Doc. 644, at p. 7.

Pursuant to paragraph 25 of the Agreement, Debtor must indemnify American Momentum for certain losses, claims, damages, or expenses, including attorney's fees and expenses, resulting from or arising out of any breach of any of the agreements, representations, or warranties of the Debtor contained in the Agreement, or any act or omission of the Debtor or any other person acting on the Debtor's behalf.  The Plaintiffs' alleged misconduct of the Debtor and persons acting on its behalf trigger these indemnity obligations.  American Momentum is entitled to such indemnity in connection with defending the Action, among other reasons.  American Momentum also has setoff rights against the Accounts.

---

[1] 8:24-bk-00676-RCT.

142473341.1

<u>The Three Classes of Claimants and Their Identical Claims</u>

There are three classes of similar and largely overlapping groups of claimants who purportedly have claims against AMB relating to an identical nucleus of facts and allegations – the Debtor's loan of funds to Boston Finance Group, LLC and the aftermath thereof. The first two groups are beneficiaries of various SNTs: (1) beneficiaries by which Michael Goldberg is pursing claims on their behalf as SNT trustee, and (2) approximately 20 beneficiaries that opted out of Mr. Goldberg's retention. Those are the Plaintiffs in the Action. The third group is the bankruptcy estate, represented by the Ch. 11 Trustee.

As stated by Ch. 11 Trustee's counsel at a September 25, 2025, hearing, it is almost impossible to distinguish the beneficiaries of the trusts from the creditors of the estate:

> And I thought about should I bring in an easel and do a Boolean logic demonstration here where we draw the circle, starting with the entire circle of this estate's creditor constituents, and then say, okay, now let's draw all possible class representatives within that circle.
>
> And I think if I were to do so accurately, you would not be able to distinguish between the lines, because the difference between this estate and those beneficiaries are functionally the same.
>
> Then if you drew another circle within that, you'd find those limited members of the potential class of potential claims as Michael Goldberg is the Trust trustee. There are approximately 20, I think it's mid-20s, mid to low 20s of people who have opted out of thousands of potential trust and beneficiaries that may have claims here.
>
> So your circles would be identical.

September 25, 2025, hearing transcript ("Hearing Tr.," Exhibit B), 18: 12–25, 19:1–7.

When asked by the Court about what types of claims the Ch. 11 Trustee was planning to pursue, counsel explained that there were similar claims that "both hats," the Opt-In/Opt-Out Beneficiaries and Debtor's bankruptcy estate, could pursue against actors like American Momentum and that "an open dialogue and [] cooperation" between lawyers for the estate and

lawyers for the class action would essentially lead to a beneficial harmony of claims, rather than conflict. Hearing Tr. 26:12–25, 27: 1.

The Opt-In Beneficiaries, and potentially the Opt-Out Beneficiaries, asserted their claims in the Complaint. The Ch. 11 Trustee's counsel has also indicated that claims by the Ch. 11 Trustee against American Momentum are forthcoming. However, the Ch. 11 Trustee has not filed his complaint despite an investigation starting over a year ago. Time records for the Ch. 11 Trustee's retained counsel reflect significant analysis of purported claims against American Momentum as far back as October 16, 2024, identifying time to "Gather AMB records to review for potential claim[,]" and thereafter "Strategic advice of litigation re AMB" on November 4, 2024, and "AMB: Strategy and advancement of AMB issues for recover" on November 5, 2024. *See Second Interim Application of Underwood Murray P.A. for Compensation for Servs. Rendered and Reimbursement of Expenses as Counsel for the Off. Comm. of Unsecured Creditors*, Main Case[2] Doc. 754, at p. 47–48. Similarly, Plaintiffs' counsel has engaged in diligence concerning claims against American Momentum since approximately a year ago, including six months working in conjunction with the Ch. 11 Trustee. Hearing Tr 33: 24–25; 34: 1–2. The investigation has included reviewing "tens of thousands of documents . . . interview[ing] witnesses . . . [and] consult[ing] with experts." Hearing Tr. 34:11–13.

The Court approved each proposed plaintiffs' counsel's engagement with a request to preserve judicial economy, asking counsel to make "[litigation] as efficient and as cost effective as possible." Hearing Tr. 60:22–25.

---

[2] 8:24-bk-676-RCT.

The Complaint and Current Litigation Posture

The Complaint alleges a single claim against American Momentum for aiding and abetting breach of fiduciary duty.  The Complaint was filed on behalf of two of the three groups of claimants.  American Momentum will seek to join the Ch. 11 Trustee to the instant action.  Joinder allows American Momentum to pursue a claim in the Action against the Ch. 11 Trustee/Debtor for secured indemnity obligations owed to it by the Debtor that directly relate to the Action and will avoid duplicative costs and inconsistent rulings should the Ch. 11 Trustee bring a separate action.

American Momentum filed a Motion to Dismiss the Complaint. Dkt. 16.  American Momentum's motion is a case dispositive motion as it challenges the Plaintiffs' assertions of actual knowledge and raises a defense based on limitations.

The Plaintiffs refuse to abate this action or abate discovery as requested herein.

## **ARGUMENT**

### I.    **Abating the Class Action Litigation Until the Chapter 11 Trustee's Joinder Achieves Judicial Efficiency and Avoids Inconsistent Decisions and Harm.**

Federal courts "have broad discretion to stay proceedings as part of their inherent authority to control the docket." *Pierce v. State Farm Mut. Auto. Ins. Co.*, No. 14-22691-CIV, 2014 WL 12528362, at *1 (S.D. Fla. Dec. 10, 2014) (citing *Clinton v. Jones*, 520 U.S. 681, 706 (1997)). A decision to stay remains in the court's discretion, as long as the stay is not too long, indefinite, or without proper justification. *Ali v. 7-Eleven, Inc.*, 2022 WL 713665, at *1 (S.D. Fla. Mar. 10, 2022). Courts should stay proceedings when a stay would promote judicial economy and efficiency. *Id.* An action may also be stayed where there are potentially duplicative proceedings. *Gov't of Virgin Islands v. Neadle*, 861 F. Supp. 1054, 1055 (M.D. Fla. 1994).

Courts consider several factors in determining whether to grant a stay, including: (1) whether the litigation is still in early stages, (2) whether a stay could "unduly prejudice or tactically

disadvantage the non-moving party," (3) whether a stay could simplify issues and streamline the overall trial, and (4) whether a stay "will reduce the burden of litigation on the parties and on the court." *Incarcerated Entm't, LLC. v. Cox*, No. 18-21991-CIV, 2018 WL 5807650, at *2 (S.D. Fla. Nov. 6, 2018).  All these factors support the limited stay sought herein.

> A.  *The litigation is in its early stages.*

This litigation is just beginning.  American Momentum has filed a Motion to Dismiss concurrent with this Motion to Stay; it has not filed its answer.  Discovery has not started.

> B.  *Staying the litigation will not prejudice or disadvantage the Plaintiffs.*

American Momentum seeks an abbreviated stay until the Ch. 11 Trustee is joined.  Such a temporary stay will not prejudice or disadvantage the Plaintiffs, who have already spent a year and tremendous estate resources investigating its claims.  There is no "melting ice cube" relative to American Momentum, and the Debtor is not an operating entity that needs immediate relief.  In fact, the stay will benefit the Plaintiffs.  As stated by the Ch. 11 Trustee's counsel, there is "an open dialogue and [] cooperation" between lawyers for Ch. 11 Trustee and the Plaintiffs herein, which may lead to continuity and consistency in the litigation. Hearing Tr. 26:12–25, 27:1.  Moreover, it would remove the costs the parties and Court will incur in connection with disfavored piecemeal litigation. *Gov't of Virgin Islands*, 861 F. Supp. at 1055. ("The power to stay dual proceedings is necessary to avoid the inefficiency of duplication, the embarrassment of conflicting rulings, and the confusion of piecemeal resolutions where comprehensive results are required."); *Colorado River Water Conservation Dist. v. U. S.*, 424 U.S. 800, 817 (1976) (explaining there is a general notion among courts to "avoid duplicative litigation.").

142473341.1

*C.  A stay will simplify issues and streamline proceedings.*

The Ch. 11 Trustee's absence from this proceeding creates the risk of duplicative proceedings and enhances judicial efficiency by ensuring all the stakeholders of this litigation are involved in one proceeding.  The Ch. 11 Trustee has acknowledged as much in prior hearings. Hearing Tr. 20:1–5.

*D.  A stay will reduce the burdens of litigation on the parties and the Court.*

Joining the Ch. 11 Trustee to this action in order to permit the resolution of American Momentum's indemnity claims directly related to the allegations herein and potentially any claim asserted by the Ch. 11 Trustee will reduce the burdens of litigation for all parties and the Court. Future hearings and discovery, should they occur if the complaint survives dismissal, are presumably close to identical.  Staying the litigation now to put all claims arising from or related to the same nucleus of facts and disputes on the same litigation track will greatly reduce the burdens of litigation on all parties and this Court and allow the Court and parties to more sensibly assess the matter with a full appreciation of all the facts and circumstances.

Therefore, American Momentum respectfully submits that the Court should stay this action pending joinder of the Chapter 11 Trustee to the litigation.

II.     **Abating the Discovery Until the Pending Motion to Dismiss is Ruled on Prevents Expensive and Extensive Discovery where Actual Knowledge and a Limitations Defense are Likely to Knock Out the Single Count Complaint.**

In addition to staying the case in its entirety until the Chapter 11 Trustee is added, American Momentum Bank respectfully requests that the Court stay discovery pending resolution of its Motion to Dismiss, Dkt. 16, pursuant to Federal Rule of Civil Procedure 26(c)(1). The Eleventh Circuit has recognized that "[g]ranting a discovery stay until an impending motion to dismiss is resolved is a proper exercise of [a Court's] responsibility" to manage pre-trial discovery properly.

*Rivas v. The Bank of N.Y. Mellon*, 676 F. App'x 926, 932 (11th Cir. 2017) ("[M]otions to dismiss should, ideally, 'be resolved before discovery begins.'" (quoting *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1367 (11th Cir. 1997)). This is because "[m]otions to dismiss for failure to state a claim always present a purely legal question" and, "because the allegations in the pleading are presumed to be true[,] . . . neither the parties nor the [C]ourt has any need for discovery before the [C]ourt rules on the motion." *Id.*

"In deciding whether to stay discovery pending resolution of a pending motion, the Court inevitably must balance the harm produced by a delay in discovery against the possibility that the motion will be granted and entirely eliminate the need for such discovery." *Feldman v. Flood*, 176 F.R.D. 651, 652 (M.D. Fla. 1997). As such, the Court must take a "preliminary peek at the merits of a dispositive motion to see if it appears clearly meritorious and truly case dispositive." *McCabe v. Foley*, 233 F.R.D. 683, 685 (M.D. Fla. 2006). And, importantly, where a pending motion may dispose of the entire action, granting a stay of discovery not necessary for resolution of the motion may be justified. *See Chudasama*, 123 F. 3d at 1367.

American Momentum's Motion to Dismiss takes aim at the sole cause of action pleaded against the Bank by pointing out that Plaintiffs have failed to plausibly allege, with the required "factual matter," that American Momentum had the "actual knowledge" required to state a claim for aiding and abetting breach of fiduciary duty against a financial institution. *See* Dkt.16 at 4–14. The Motion also points out that the Complaint pleads itself into a dispositive and conclusive limitations defense. *Id.* at 14–15. Prevailing on either argument would result in the dismissal of the only claim pending against American Momentum. Thus, while Plaintiffs will undoubtedly dispute the merits of the Motion to Dismiss, they cannot reasonably dispute that the Motion is "truly case dispositive." *McCabe*, 233 F.R.D. at 685; *see also Nankivil v. Lockheed Martin Corp.*,

142473341.1

216 F.R.D. 689, 692 (M.D. Fla. 2003) (explaining that "good cause to stay discovery exists wherein resolution of a preliminary motion may dispose of the entire action.").

Plaintiffs are entitled to an opportunity to address the arguments raised in the Motion to Dismiss. On its face, though, the Complaint lacks allegations of "direct involvement" or knowing misrepresentations Courts have found sufficient to state a claim for aiding and abetting breach of fiduciary duty. *See, e.g., Otto Candies, LLC v. Citigroup Inc.*, 137 F.4th 1158, 1181 (11th Cir. 2025) (actual knowledge plausibly alleged where the bank had fired an employee for being "directly involved in the fraud"). The Complaint's limited mention of the delayed discovery doctrine in anticipation of the glaring limitations issue is also unavailing. *See Davis v. Monahan*, 832 So. 2d 708, 709, 711 (Fla. 2002) (rejecting the extension of the delayed discovery doctrine to claims for breach of fiduciary duty).

A stay of discovery is particularly appropriate here because the Complaint's "shotgun pleading" makes it difficult, if not impossible, to discern the proper scope of relevant and necessary discovery in this case. The Complaint's conclusory assertions conflate the Bank's actions with those of others, while failing to tie American Momentum's conduct to the specific breach(es) of fiduciary duty it alleges or to specific harm. The Complaint contains allegations spanning a decade-and-a-half, albeit without tying specific conduct by the Bank to specific breaches by the Center. Do the Plaintiffs intend to conduct discovery relating to that entire 15–16-year history? Do Plaintiffs want discovery on the Center's accounts? Or do they also want discovery relating to any Govoni-affiliated entity? As drafted, the Complaint would pave the way for a fishing expedition of epic proportions. American Momentum respectfully submits that the scope of discovery can only be addressed in a fair and principled way once the scattershot approach to Plaintiffs' pleading

is addressed, and the expense should only be imposed once Plaintiffs have met their Rule 8/*Twombly* obligations.

American Momentum has proposed a stay on discovery to Plaintiffs. Plaintiffs by contrast, have requested an *accelerated* timeline for discovery, at least compared to the timeline that exists under the Local Rules and the Court's standard practices. That is despite the Plaintiffs having already *received* more than 100,000 pages of pertinent documents and records from the Bank (at considerable expense to American Momentum) and after commissioning the work of forensic accounts who have billed the Estate in excess of $1 million to, *inter alia*, create reconstructions of the bank records of the Center and Boston Finance Group, LLC. In other words, Plaintiffs already *have* the benefit of extensive, incredibly expensive documentary discovery. That discovery and the months-long investigation Plaintiffs have previously described is how Plaintiffs produced the Complaint, deficient as it is. There is no reason to believe that more discovery at even greater expense is the answer.

## <u>CONCLUSION</u>

For the foregoing reasons, American Momentum respectfully requests that the Court enter an order (1) staying this class action litigation until the joinder of the Chapter 11 Trustee to promote judicial efficiency and minimize the threat of duplicative and inconsistent rulings or, in the alternative, enter an order (2) staying discovery until the Court rules on American Momentum's pending Motion to Dismiss which could (and likely will) dispose of the litigation, obviating the need for extensive and expensive discovery.


Dated: November 10, 2025

Marcos Rosales
TX Bar No. 24074979
(Admitted *Pro Hac Vice*)

11

mrosales@beckredden.com
**BECK REDDEN LLP**
1221 McKinney, Suite 4500
Houston, TX  77010-2010
Telephone: (713) 951-3700
Facsimile: (713) 951-3720

*/s/ Donald R. Kirk*
Donald R. Kirk
FL Bar No. 105767
dkirk@carltonfields.com
J. Ryan Yant
FL Bar No. 104849
ryant@carltonfields.com
**CARLTON FIELDS, PA**
4221 W Boy Scout Boulevard, Suite 1000
Tampa, FL 33607
Telephone: (813) 229-4334
Facsimile: (813) 229-4133

***Counsel for Defendant American***
***Momentum Bank***

## CERTIFICATE OF SERVICE

I hereby certify that on November 10, 2025, I electronically filed a true and correct copy

of the foregoing with the United States Bankruptcy Court for the Middle District of Florida using

the Court's CM/ECF system thereby serving all registered users in this case.

/s/  *Donald R. Kirk*
**Donald R. Kirk**

12

142473341.1

EXHIBIT A

| | |
|---|---|
| United States Bankruptcy Court for the Middle District of Florida | Your Mail ID is            223897252 |

| | |
|---|---|
| **Name of Debtor:**  The Center for Special Needs Trust Administration, Inc. | **For Court Use Only** |
| | Claim Number:     0000010268 |
| **Case Number:**    24-00676 | File Date:         10/16/2024 11:41:15 |

# Proof of Claim (Official Form 410)

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. With the exception of 503(b)(9), do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

04/22

| Part 1: | Identify the Claim |
|---|---|

**1.    Who is the current creditor?**
Name of the current creditor (the person or entity to be paid for this claim):        American Momentum Bank

Other names the creditor used with the debtor: ___NA___

**2.    Has this claim been acquired from someone else?**    ☑ No   ☐ Yes.   From whom? _____

**3.    Where should notices and payments to the creditor be sent?** Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| Name     American Momentum Bank | Name _____ |
| Address  (COUNSEL TO AMERICAN MOMENTUM BANK) | Address _____ |
| ATTN: DONALD R. KIRK | _____ |
| PO BOX 3239 | _____ |
| City     TAMPA | City _____ |
| State    FL           ZIP Code  33601-3239 | State _____  ZIP Code _____ |
| Country (if International): | Country (if International): _____ |
| Phone:   813-223-7000 | Phone: _____ |
| Email:   dkirk@carltonfields.com | Email: _____ |

| **4. Does this claim amend one already filed?** | **5. Do you know if anyone else has filed a proof of claim for this claim?** |
|---|---|
| ☐ No | ☑ No |
| ☑ Yes. | ☐ Yes. |
| Claim number on court claims register (if known) _0000010267_ | Who made the earlier filing? |
| Filed on ___10/16/2024___ | _____ |
| MM / DD / YYYY | |

Page 1 of 3

**Part 2:**   Give Information About the Claim as of the Date the Case Was Filed

**6.  Do you have any number you use to identify the debtor?**

☑ No

☐ Yes.
Last 4 digits of the debtor's account or any number you use to identify the debtor:

____  ____  ____  ____

**7.  How much is the claim?**

$  100,000.00
_____

**Does this amount include interest or other charges?**

☐ No

☑ Yes.  Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8.  What is the basis of the claim?**

Examples:  Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.  Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).  Limit disclosing information that is entitled to privacy, such as health care information.

Bank Debt/Credit Facility
_____

---

**9.  Is all or part of the claim secured?**

☐ No

☑ Yes.    The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate.  If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☑ Other.  Describe:
   All debtor accts at AMB as of Petition

**Basis for perfection:**
   Possession
_____

Attach redacted copies of documents, if any, that show evidence of perfection of security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:                  $_____

Amount of the claim that is secured:    $_____

Amount of the claim that is unsecured: $_____
(The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**    $_____

**Annual Interest Rate** (when case was filed)  _____%
                        ☐ Fixed  ☐ Variable

**10.  Is this claim based on a lease?**

☑ No

☐ Yes.  **Amount necessary to cure any default as of the date of petition.**

$_____

**11.  Is this claim subject to a right of setoff?**

☐ No

☑ Yes.  Identify the property:

   The Accounts
_____

**12.  Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

☑ No

☐ Yes. *Check one:*

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).

☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).

☐ Other.  Specify subsection of 11 U.S.C. § 507 (a) (_____) that applies.

* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

A claim may be partly priority and partly nonpriority.  For example, in some categories, the law limits the amount entitled to priority.

**Amount entitled to priority**

$_____

$_____

$_____

$_____

$_____

$_____

---

**13.  Does this claim qualify as an Administrative Expense under 11 U.S.C. § 503(b)(9)?**

☑ No

☐ Yes.  **Amount that qualifies as an Administrative Expense under 11 U.S.C. § 503(b)(9):** $_____

| **Part 3:** | **Sign Below** |
|---|---|

**The person completing this proof of claim must sign and date it.  FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑  I am the creditor.

☐  I am the creditor's attorney or authorized agent.

☐  I am the trustee, or the debtor, or their authorized agent.  Bankruptcy Rule 3004.

☐  I am a guarantor, surety, endorser, or other co-debtor.  Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

/s/ *Maureen L. Gallagher*                                          10/16/2024 11:41:15

Signature                                                                    Date

Provide the name and contact information of the person completing and signing this claim:

Name        Maureen L. Gallagher, EVP/Chief

Address     American Momentum Bank

                 One Momentum Boulevard

City          College Station

State         TX                                                  Zip  77845

Country (in international)    United States

Phone       813-549-4704

Email        mgallagher@americanmomentum.bank

| | |
|---|---|
| **United States Bankruptcy Court for the Middle District of Florida**<br>**The Center for Special Needs Trust Administration Inc.**<br>**Claims Processing Center**<br>**c/o Epiq Corporate Restructuring, LLC**<br>**P.O. Box 4419**<br>**Beaverton, OR 97076-4419** | To submit your form online please go to<br>https://epiqworkflow.com/cases/CSQ<br><br>Your Mail ID is as follows: 223897252 |

**Name of Debtor:**

**Case Number:**

| | | |
|---|---|---|
| BAR(23) MAILID *** 000223897252 ***<br>CSQ (CREDITOR.DBF,CREDNUM)CREDNUM # 1000002126******<br><br>CARLTON FIELDS P.A<br>(COUNSEL TO AMERICAN MOMENTUM BANK)<br>ATTN: DONALD R. KIRK<br>PO BOX 3239<br>TAMPA, FL 33601-3239 | ☐ Check box if the address on the envelope sent to you by the court needs to be updated. Identify your replacement address in Part 1 (Section 3) below. | For Court Use Only |

## Proof of Claim (Official Form 410)                                              04/22

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case.  With the exception of claims under 503(b)(9), do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503. Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed.  That date is on the notice of bankruptcy (Form 309) that you received.

| **Part 1:** | **Identify the Claim** |
|---|---|

**1.    Who is the current creditor?**
Name of the current creditor (the person or entity to be paid for this claim): ___American Momentum Bank___

Other names the creditor used with the debtor: _____

**2.    Has this claim been acquired from someone else?**    ☒ No    ☐ Yes.    From whom? _____

| **3.    Where should notices and payments to the creditor be sent?** Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | | **4.    Does this claim amend one already filed?** |
|---|---|---|
| **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) | ☒ No<br><br>☐ Yes.    Claim number on court claims register (if known) _____ |
| American Momentum Bank, c/o Donald R. Kirk<br>Name<br>Carlton Fields, P.A., P.O. Box 3239<br>Number    Street<br>Tampa, FL 33601-3239<br>City          State        ZIP Code<br>Country (if International): _____<br>Contact phone:  813-229-4334<br>Contact email:  dkirk@carltonfields.com | Name<br><br>Number    Street<br><br>City          State        ZIP Code<br>Country (if International): _____<br>Contact phone: _____<br>Contact email: _____ | Filed on _____<br>              MM  / DD / YYYY<br><br>**5.    Do you know if anyone else has filed a proof of claim for this claim?**<br>☒ No<br><br>☐ Yes.   Who made the earlier filing? _____ |

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

| **6. Do you have any number you use to identify the debtor?** | **7. How much is the claim?** | **8. What is the basis of the claim?** |
|---|---|---|
| ☒ No<br><br>☐ Yes.<br>Last 4 digits of the debtor's account or any number you use to identify the debtor:<br><br>___ ___ ___ ___ | In excess of $100,000.00; final amount to be determined<br><br>**Does this amount include interest or other charges?**<br>☒ No<br>☐ Yes.  Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c). Limit disclosing information that is entitled to privacy, such as health care information.<br><br>ACH Origination Agreement and other agreements - See Addendum |



**9. Is all or part of the claim secured?**

☐ No

☒ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ **Real estate.** If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (official Form 410-A) with this *Proof of Claim.*

☐ **Motor vehicle**

☒ **Other. Describe:** All accounts ("Accounts") of the Debtor located at American Momentum Bank as of the Petition Date

**Basis for perfection:** Possession

Attach redacted copies of documents, if any, that show evidence of perfection of security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**                          $ _____

**Amount of the claim that is secured:**  $ _____

**Amount of the claim that is unsecured:** $ _____
(The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**  $ _____

**Annual Interest Rate** (when case was filed) _____ %
☐ Fixed  ☐ Variable

**10. Is this claim based on a lease?**

☒ No

☐ Yes. **Amount necessary to cure any default as of the date of petition.**

$ _____

**11. Is this claim subject to a right of setoff?**

☐ No

☒ Yes. Identify the property:

The Accounts

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

☒ No

☐ Yes. *Check one:*

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).

☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).

☐ Other. Specify subsection of 11 U.S.C. § 507 (a)(__) that applies.

* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

**Amount entitled to priority**

$ _____

$ _____

$ _____

$ _____

$ _____

$ _____

**13. Does this claim qualify as an Administrative Expense under 11 U.S.C. § 503(b)(9)?**

☐ No

☐ Yes. Amount that qualifies as an Administrative Expense under 11 U.S.C. § 503(b)(9): $ _____

---

**Part 3:    Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☒ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other co-debtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  10 / 16 / 2024       Signature  *Maureen Gallagher*
           MM / DD / YYYY

Print the name of the person who is completing and signing this claim:

Name  Maureen              L              Gallagher
       First name        Middle name        Last name

Title  EVP / Chief Administrative Officer

Company  American Momentum Bank
         Identify the corporate servicer as the company if the authorized agent is a servicer.

Address  One Momentum Boulevard
         Number        Street
         College Station          TX          77845
         City                    State        ZIP Code

Contact Phone  (813) 549. 4704       Email  mgallagher@americanmomentum.bank

# Official Form 410 - Instructions for Proof of Claim

United States Bankruptcy Court

These instructions and definitions generally explain the law. In certain circumstances, such as bankruptcy cases that debtors do not file voluntarily, exceptions to these general rules may apply. You should consider obtaining the advice of an attorney, especially if you are unfamiliar with the bankruptcy process and privacy regulations.

A person who files a fraudulent claim could be fined up to $500,000 imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157 and 3571

## How to fill out this form

- Fill in all of the information about the claim as of the date the case was filed.

- If the claim has been acquired from someone else, then state the identity of the last party who owned the claim or was the holder of the claim and who transferred it to you before the initial claim was filed.

- Attach any supporting documents to this form. Attach redacted copies of any documents that show that the debt exists, a lien secures the debt, or both. (See the definition of redaction below.) Also attach redacted copies of any documents that show perfection of any security interest or any assignments or transfers of the claim. In addition to the documents, a summary may be added. Federal Rule of Bankruptcy Procedure (called "Bankruptcy Rule") 3001(c) and (d).

- Do not attach original documents because attachments may be destroyed after scanning.

- If the claim is based on delivering health care goods or services, do not disclose confidential health care information. Leave out or redact confidential information both in the claim and in the attached documents.

- A Proof of Claim form and any attached documents must show only the last 4 digits of any social security number, individual's tax identification number, or financial account number, and only the year of any person's date of birth. See Bankruptcy Rule 9037.

- For a minor child, fill in only the child's initials and the full name and address of the child's parent or guardian. For example, write A.B., a minor child (John Doe, parent, 123 Main St, City, State). See Bankruptcy Rule 9037.

## Confirmation that the claim has been filed

To receive confirmation that the claim has been filed, either enclose a stamped self-addressed envelope and a copy of this form or you may access the Claims Agent's website (https://dm.epiq11.com/CenterforSpecialNeedsTrustAdministration) to view your filed form under "Claims."

## Where to File Proof of Claim Form

First Class Mail:
The Center for Special Needs Trust Administration, Inc.
Claims Processing Center
c/o Epiq Corporate Restructuring, LLC
PO Box 4419
Beaverton, OR 97076-4419

Hand Delivery or Overnight Mail:
The Center for Special Needs Trust Administration, Inc.
Claims Processing Center
c/o Epiq Corporate Restructuring, LLC
10300 SW Allen Blvd
Beaverton, OR 97005

Electronic Filing:
By accessing the E-filing Claims link at
https://epiqworkflow.com/cases/CSQ

## Understand the terms used in this form

Administrative expense: Generally, an expense that arises after a bankruptcy case is filed in connection with operating, liquidating, or distributing the bankruptcy estate. 11 U.S.C. § 503.

Claim: A creditor's right to receive payment for a debt that the debtor owed on the date the debtor filed for bankruptcy. 11 U.S.C. §101 (5). A claim may be secured or unsecured.

Claim Pursuant to 11 U.S.C. §503(b)(9): A claim for the value of any goods that were sold to the Debtor in the ordinary course of its business and were received by the Debtor within 20 days before the date of commencement of the above case. Attached documentation supporting such claim.

Creditor: A person, corporation, or other entity to whom a debtor owes a debt that was incurred on or before the date the debtor filed for bankruptcy. 11 U.S.C. §101 (10).

Debtor: A person, corporation, or other entity who is in bankruptcy. Use the debtor's name and case number as shown in the bankruptcy notice you received. 11 U.S.C. § 101 (13).

Evidence of perfection: Evidence of perfection of a security interest may include documents showing that a security interest has been filed or recorded, such as a mortgage, lien, certificate of title, or financing statement.

Information that is entitled to privacy: A Proof of Claim form and any attached documents must show only the last 4 digits of any social security number, an individual's tax identification number, or a financial account number, only the initials of a minor's name, and only the year of any person's date of birth. If a claim is based on delivering health care goods or services, limit the disclosure of the goods or services to avoid embarrassment or disclosure of confidential health care information. You may later be required to give more information if the trustee or someone else in interest objects to the claim.

Priority claim: A claim within a category of unsecured claims that is entitled to priority under 11 U.S.C. §507(a). These claims are paid from the available money or property in a bankruptcy case before other unsecured claims are paid. Common priority unsecured claims include alimony, child support, taxes, and certain unpaid wages.

Proof of claim: A form that shows the amount of debt the debtor owed to a creditor on the date of the bankruptcy filing. The form must be filed in the district where the case is pending.

Redaction of information: Masking, editing out, or deleting certain information to protect privacy. Filers must redact or leave out information entitled to privacy on the Proof of Claim form and any attached documents.

Secured claim under 11 U.S.C. §506(a): A claim backed by a lien on particular property of the debtor. A claim is secured to the extent that a creditor has the right to be paid from the property before other creditors are paid. The amount of a secured claim usually cannot be more than the value of the particular property on which the creditor has a lien. Any amount owed to a creditor that is more than the value of the property normally may be an unsecured claim. But exceptions exist; for example, see 11 U.S.C. § 1322(b) and the final sentence of 1325(a).

Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment may be a lien.

Setoff: Occurs when a creditor pays itself with money belonging to the debtor that it is holding, or by canceling a debt it owes to the debtor.

Uniform claim identifier: An optional 24-character identifier that some creditors use to facilitate electronic payment.

Unsecured claim: A claim that does not meet the requirements of a secured claim. A claim may be unsecured in part to the extent that the amount of the claim is more than the value of the property on which a creditor has a lien.

## Offers to purchase a claim

Certain entities purchase claims for an amount that is less than the face value of the claims. These entities may contact creditors offering to purchase their claims. Some written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court, the bankruptcy trustee, or the debtor. A creditor has no obligation to sell its claim. However, if a creditor decides to sell its claim, any transfer of that claim is subject to Bankruptcy Rule 3001(e), any provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.) that apply, and any orders of the bankruptcy court that apply.

Do not file these instructions with your form.



## ADDENDUM TO PROOF OF CLAIM FOR
## AMERICAN MOMENTUM BANK
## IN RE:  THE CENTER FOR SPECIAL NEEDS TRUST ADMINISTRATION, INC.
## CASE NO.:  8:24-BK-00676-RCT

The claim ("Claim") of American Momentum Bank ("Claimant") arises under and in relation to agreements entered into by and between Claimant and The Center for Special Needs Trust Administration, Inc. ("Debtor"), including the ACH Origination Master Agreement (the "Agreement") executed on or about September 5, 2013.  The Agreement sets forth certain terms and conditions of Debtor's use of account(s) with Claimant.  A copy of this Agreement is attached. Other agreements with similar rights include: (1) ACH Origination Agreements dated August 5, 2014, September 5, 2013, October 23, 2013, March 10, 2021, and November 4, 2022; (2) Funds Transfer agreements dated July 28, 2008 and January 24, 2012; (3) Hold Harmless Agreements dated June 15, 2011, July 27, 2011, and October 6, 2011; (4) Internet Cash Management Master Agreements dated February 9, 2016 and October 16, 2020; (5) Remote Deposit Capture Services Agreement dated May 19, 2017; and (6) Loan Agreement and Borrower's Cert dated April 21, 2020.  These agreements are available upon request.

Pursuant to Paragraph 3 of the Agreement, Debtor granted to Claimant a Security Interest in certain assets of the Debtor including "monies, instruments, savings, checking and other accounts" and all proceeds and products of that property to secure Debtor's obligations under the Agreement.  The security interest is perfected by Claimant's possession of the assets that existed as of the Petition Date.  The funds in the Debtor's account(s) at Claimant were at least $3,792,196.00 as of the Petition Date according to the Debtor's February 27, 2024 Summary of Assets and Liabilities (DE 66), which lists a "DDA" account ending 1640.  By agreement with the Chapter 11 Trustee, approved by the Court, these rights, including perfection, are not altered or impaired should those monies transfer to another financial institution during this Bankruptcy case.

Pursuant to paragraph 25 of the Agreement, Debtor is responsible to indemnify Claimant for certain losses, claims, damages, penalties or liabilities imposed on, incurred by, or asserted against Claimant.  That provision states: "The Debtor shall defend, indemnify, and hold harmless American Momentum Bank, and its officers, directors, agents, and employees, from and against any and all actions, costs, claims, losses, damages, or expenses, including attorney's fees and expenses, resulting from or arising out of (aa) any breach of any of the agreements, representations, or warranties of the Debtor contained in this Agreement; or (bb) any act or omission of the Debtor or any other person acting on the Debtor's behalf." Claimant hereby asserts a claim with respect to such rights to indemnification for such claims whether having accrued prepetition or having accrued or accruing postpetition.  For example, Claimant is subject of a class action lawsuit styled *Clark Chamberlain by and through Kelli Chamberlin, et at. V. Boston Finance Group, LLC, et al.*, Case No. 8:24-cv-00438-SDM-AEP, pending in the Middle District of Florida.  The claims asserted therein relate to the Debtor and its obligations under the Agreement.  AMB has incurred expenses including attorney's fees in connection with such claims.

**Reservation of Rights**

1

136041180.1

1. Claimant expressly reserves (a) all rights and claims against any assignor, assignee, agent, representative, administrator, related party, guarantor, or affiliate of the Debtor including, without limitation, any rights and claims under applicable law, (b) all other rights and claims, including constructive trust, equitable lien, specific performance, recoupment, setoff, or other legal or equitable remedies to which Claimant may be entitled.

2. Claimant further expressly reserves all rights accruing to it under applicable law and principals of equity, and the filing of a proof or proofs of claim in this case is not intended to be and shall not be construed as: (a) an election of remedy; (b) a waiver of any past, present or future event of default; or (c) a waiver or limitation of any rights of Claimant under the Agreement or applicable laws, including the right to take action against third parties with respect to the Claim.

3. Claimant further expressly reserves the right to otherwise amend or supplement this proof of claim if Claimant should deem it necessary and appropriate for any reason including, without limitation, to add documentation and to provide an updated statement of amounts then due or for any other purpose for which a proof of claim filed in this case may be amended or to add any amount for accrued and unpaid obligations to Claimant under its Agreement with the Debtor and/or to seek priority and/or administrative expense treatment regarding all or any part of the Claim. Without limiting the foregoing, Claimant specifically reserves the right to amend the Claim to add additional damages, costs, attorney's fees and expenses incurred by Claimant arising from the Debtor, and any agent, representative, trustee, administrator, related party, responsible party, guarantor, assignor, assignee or affiliate's failure to perform the terms of the Agreement, and to assert any claims resulting from or with respect to any rejection of the Agreement. AMB reserves its right to assert an unsecured claim for any portion of this claim that is found by a court of competent jurisdiction to be unsecured, either by way of amendment, supplement, or other means. Nothing herein should be construed as a waiver of Claimant's rights to payment of interest, fees and reimbursement expenses, including attorneys' fees, which rights are expressly preserved hereby.

4. The filing by Claimant of any proofs of claim in this case is not intended as should not be interpreted as: (a) a waiver or release of the Claimant's rights against any non-debtors, person, entity or property; (b) a consent by Claimant to the jurisdiction of this Court with respect to the subject matter of this Claim, any objections or other proceedings commenced with respect thereto, or any other proceedings commenced in this case or otherwise involving Claimant; (c) a waiver of the right to challenge the jurisdiction of this Court with respect to the subject matter of this Claim, any objection or other proceedings commenced with respect thereto or any other proceeding commenced in this case or otherwise involving Claimant; (d) a waiver of the right to seek to withdraw the reference, any objection, or other proceedings commenced with respect thereto or any other proceeding commenced in this case against, or otherwise involving, Claimant; (e) a waiver of any past, present, or future, failure to perform; or (f) a waiver or release of the right of Claimant to have any and all final orders in any and all non-core matters or proceedings entered on after de novo review by a United States District Judge.

136041180.1

TAACC 78

# AMERICAN ✖ MOMENTUM BANK

**ACH ORIGINATION AGREEMENT**          *Master Agreement*

This agreement is made this the ____**5th**____ day of ____**September**____, **2013**  between: **American Momentum Bank** ("Financial Institution") and ___**The Center for Special Needs Trust**___ (the "Customer").

Customer wishes to initiate credit and/or debit Entries through the Financial Institution to accounts maintained at Financial Institution and in other depository financial institutions by means of the Automated Clearing House Network ("ACH") pursuant to the terms of this Agreement and the rules of the National Automated Clearing House Association ("NACHA") and Financial Institution's operating rules and procedures for electronic entries, including any exhibits or appendices thereto now in effect, or as may be amended from time to time, (the "Rules"), and Financial Institution is willing to act as an Originating Depository Financial Institution ("ODFI") with respect to such Entries. This Agreement sets forth the terms and conditions pursuant to which Financial Institution will provide to Customer the ACH Services outlined herein ("Services"). Customer hereby requests Financial Institution to provide the Service described in this Agreement. By executing this Agreement and/or using the Services described in this Agreement, Customer accepts and agrees to all terms, conditions, and provisions of this Agreement and agrees that this Agreement sets forth the terms and conditions pursuant to which Financial Institution will provide to Customer the Service outlined herein. To the extent that Customer transmits Entries via the Internet, Customer must execute the Internet Banking System agreement which is hereby incorporated by reference and made a part hereof. In the event of inconsistency between a provision of this Agreement, the Uniform Commercial Code ("UCC"), the Internet Banking System agreement, and/or the Depository Agreement, the provisions of this Agreement shall prevail. Terms not otherwise defined in this Agreement shall have the meaning ascribed to those terms in the Rules. The term "Entry" shall have the meaning provided in the Rules and shall also mean the data received from Customer hereunder from which Financial Institution initiates each Entry.

Therefore, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Financial Institution and Customer, intending to be legally bound, do hereby agree as follows:

## AGREEMENT

1.        **COMPLIANCE WITH RULES AND LAWS.** Customer acknowledges it has a copy or has access to a copy of the Rules. The Rules may also be purchased online at www.nacha.org under the publications tab. Customer agrees to comply with and be subject to the Rules of NACHA in existence at the date of this Agreement, and any amendments to these Rules made from time to time. It shall be the responsibility of the Customer that the origination of ACH transactions complies with U.S. law, including but is not limited to sanctions enforced by the Office of Foreign Assets Control ("OFAC"). It shall further be the responsibility of the Customer to obtain information regarding such OFAC enforced sanctions. (This information may be obtained directly from the OFAC Compliance Hotline at 800-540-OFAC or from the OFAC's home page site at www.ustreas.gov/ofac.) Customer agrees that the performance of any action by Financial Institution to debit or credit an account or transfer funds otherwise required by the Rules is excused from the performance of such action to the extent that the action is inconsistent with United States law, including the obligations of the Financial Institution under OFAC or any program administered by the United States Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN"). Customer agrees generally and warrants to Financial Institution that all actions by Customer contemplated by this Agreement, including the preparation, transmittal, and settlement of Entries and payment orders, shall comply in all material respects with United States laws, regulations, regulatory guidelines and guidance, and official commentaries, including without limitation all such regulations, guidelines, and commentaries issued by the Board of Governors of the Federal Reserve and the Federal Financial Institutions Examination Council ("FFIEC"). Financial Institution will charge the Customer with any fines or penalties imposed by OFAC, NACHA or any organization which are incurred as a result of non-compliance by the Customer and the Customer agrees to fully reimburse and/or indemnify Financial Institution for such charges or fines. The specific duties of the Customer provided in the following paragraphs of this Agreement in no way limit the foregoing undertaking. The duties of the Customer set forth in the following paragraphs of this Agreement in no way limit the requirement of complying with the Rules.

**2.     UNDERWRITING.** Customer approval for use of this Service may be subject to underwriting criteria established by Financial Institution from time to time. If Financial Institution requires application of underwriting criteria to Customer approval for use of this Service, Financial Institution will communicate to Customer the nature and content of that criteria and the information Customer will be required to provide to Financial Institution. Customer agrees to provide Financial Institution such financial, business and operating information as Financial Institution may reasonably request in connection with Financial Institution's underwriting and approval process. Financial Institution may require the personal guarantee of a principal or an owner of company. **Schedule I** should be executed if such a guarantee is required.

**3.     SECURITY INTEREST.** To secure the payment and performance of Customer's obligations set forth herein, Customer grants to Financial Institution a security interest in and pledges and assigns to Financial Institution all of Customer's right, title, and interest in the following described property, whether now owned or hereafter existing or acquired and wherever located: (a) all monies, instruments, savings, checking and other accounts of Customer (excluding IRA, Keogh, trust accounts and other accounts subject to tax penalties if so assigned) that are now or in the future in Financial Institution's custody or control; (b) any other collateral described in any security instrument securing the obligations of Customer to Financial Institution under this Agreement or any other obligation of Customer to Financial Institution; and (c) all proceeds and products of the property as well as any replacements, accessions, substitutions, and additions to any of the above.

**4.     DESIGNATION OF ADMINISTRATOR.** In order to originate ACH Entries, Customer must designate at least one Administrator. Administrator(s) shall be responsible for designating "Users" who Customer authorizes to issue Entries on its behalf. For the purposes of this Agreement, the term User shall also include the Administrator. The Financial Institution shall be entitled to rely on the designations made by the Customer's Administrator(s) and shall not be responsible for matching the names of the company Users designated by the Administrator(s) to names or titles listed in Customer's banking resolutions. Customer agrees that any such online Entries shall comply with Financial Institution's Security Procedures, which are subject to change without notice to Customer. Although Financial Institution is only required to act upon the instructions of the User(s), the Financial Institution may, in its sole discretion, execute debit or credit Entries initiated by any individuals authorized by Customer to sign checks on Customer accounts. The signature cards establishing the authorized signatories for Customer deposit accounts are hereby incorporated by reference and made a part hereof.

**5.     TRANSMISSION OF ENTRIES BY CUSTOMER.** User(s) shall initiate the debit or credit Entries in **Schedule A** hereunder on behalf of and selected by Customer. Financial Institution shall be entitled to deem any person having knowledge of any Security Procedure, defined below in Section 8 of this Agreement and required to initiate Entries under this Agreement, to be a User. User(s) shall transmit Entries to Financial Institution in computer readable form in compliance with the formatting and other requirements set forth in the NACHA file specifications or as otherwise specified by Financial Institution. Entries shall be transmitted to Financial Institution no later than the time and the number of days prior to the Effective Entry Date specified in the Processing Schedule attached hereto and made a part hereof as **Schedule B.** For the purposes of this Agreement, "Business Day" means Monday through Friday, excluding federal holidays and the "Settlement Date" with respect to any Entry shall be the Business Day when such Entry is debited or credited in accordance with instructions of the Customer. A federal holiday calendar is attached as **Schedule G.** Entries received after the cut off time shall be deemed to have been received on the next Business Day. The total dollar amount of Entries transmitted by Customer to Financial Institution on any one Business Day shall not exceed the lesser of the amount of collected funds in Customer's account or the ACH Processing Limit set forth as part of this Agreement.

"*Entry Settlement Limit*" means the maximum aggregate amount of In-Process Entries permitted to be outstanding at any time, which amount shall be separately communicated to Customer by Financial Institution in writing from time to time.

"*In-Process Entries*" means the aggregate dollar amount of all credit or debit Entries initiated by Customer and in process on any date for which settlement has not occurred with respect to credit Entries, or the applicable period for the return of items has not expired with respect to debit Entries.

"*Overlimit Entry*" means an Entry the amount of which would cause the aggregate amount of In-Process Entries to exceed the Entry Settlement Limit. Customer agrees that Financial Institution will not process an Overlimit Entry. Financial Institution will suspend any Overlimit Entry submitted by Customer and may, following its receipt of an Overlimit Entry; suspend all In-Process Entries. Customer acknowledges that any Overlimit Entry or other In-Process Entries suspended by Financial Institution will not settle on their scheduled Settlement Date. If Customer wishes to initiate an Entry that would cause the amount of In-Process Entries to exceed the Entry Settlement Limit, Customer may submit to Financial Institution its request to initiate an Entry that otherwise would be an Overlimit Entry. Customer must submit its request at least 2 banking days prior to the date on which Customer wishes to initiate the Entry that otherwise would be an Overlimit Entry. Financial Institution may require from Customer financial or other information in connection with Financial Institution's consideration of the request. Financial Institution may grant or deny Customer's request at its sole discretion. In addition to the foregoing, Financial Institution generally reserves the right to limit the nature and amount of the preauthorized debit/credit Entries processed under this Agreement or to refuse to process any debit/credit Entries under this Agreement if, in Financial Institution's sole judgment (i) there is reasonable cause to believe that any Entry will be returned or will not settle in the ordinary course of the transaction for any reason, (ii) to do otherwise would violate any limit set by the applicable clearing house association or any governmental authority or agency to control payment system risk, or (iii) a preauthorized credit Entry or the return of a

preauthorized debit Entry would create an overdraft of Customer's Accounts. If any of the foregoing actions are taken by Financial Institution with respect to a particular preauthorized debit/credit Entry, Financial Institution will notify Customer as promptly as practicable, but in no event later than 2 banking days after its decision. Customer may not reinitiate entries except as prescribed by the Rules.

**6.      THIRD PARTY SERVICE PROVIDERS.**   Customer may be using special equipment, services or software provided by a third party to assist it in processing Files hereunder ("Service Provider").  Customer agrees not to use a Service Provider to transmit files to Financial Institution without first entering into Financial Institution's Third Party Service Provider Agreement.  If Customer uses Service Provider to transmit Files to Financial Institution and Customer and Service Provider have not entered into a Third Party Service Provider Agreement, Customer (a) agrees that Service Provider is acting as Customer's agent in the delivery of Files to Financial Institution, and (b) agrees to assume full responsibility and liability for any failure of Service Provider to comply with the laws of the United States, the Rules and this Agreement.  Financial Institution will not be liable for any losses or additional costs incurred by Customer as a result of any error by Service Provider or a malfunction of equipment provided by Service Provider. Customer is solely responsible for maintaining compliance with the requirements of Service Provider, including obtaining any software updates. Financial Institution's sole responsibility shall be to transmit Financial Institution approved transactions to the ACH Operator and Financial Institution shall not have any responsibility for any File handled by Service Provider until that point in time when Financial Institution accepts and approves a File from such Service Provider for processing.  If Financial Institution authorizes Customer to use a Service Provider, the terms and conditions governing the relationship between Customer and the Service Provider shall be governed by a separate agreement between Customer and Service Provider ("Service Provider Agreement").  All of Customer's obligations and responsibilities under this Agreement will apply to the Service Provider, and Customer's separate agreement with the Service Provider must so provide.  At Financial Institution's request, Customer will provide to Financial Institution a true and exact copy of such agreement. Customer shall designate the Service Provider as a User and the Service Provider must also enter into a Service Provider Agreement before the Service Provider sends Files to Financial Institution.  Notwithstanding the foregoing, Customer hereby authorizes Financial Institution to accept any File submitted by the Service Provider even if the Service Provider has not been designated as a User or if the Third Party Service Provider has not executed the Service Provider agreement. Customer hereby indemnifies and holds Financial Institution harmless for any losses, damages, fines, assessments, costs and expenses incurred or suffered by Financial Institution or any other person as a result of or arising from Customer's use of Service Provider, including fines or assessments incurred under or pursuant to the Rules and attorneys' fees.

**7.      SECURITY PROCEDURES.**

    (a)     The Customer shall comply with the "Security Procedures" described in Schedule C attached hereto and made a part hereof, and Customer acknowledges and agrees that the Security Procedures, including (without limitation) any code, password, personal identification number, user identification technology, token, certificate, or other element, means, or method of authentication or identification used in connection with a Security Procedure ("Security Devices") used in connection therewith, constitute commercially reasonable security procedures under applicable law for the initiation of ACH entries. Customer authorizes Financial Institution to follow any and all instructions entered and transactions initiated using applicable Security Procedures unless and until Customer has notified Financial Institution, according to notification procedures prescribed by Financial Institution, that the Security Procedures or any Security Device has been stolen, compromised, or otherwise become known to persons other than User(s) and until Financial Institution has had a reasonable opportunity to act upon such notice. Customer agrees that the initiation of a transaction using applicable Security Procedures constitutes sufficient authorization for Financial Institution to execute such transaction notwithstanding any particular signature requirements identified on any signature card or other documents relating to Customer's deposit account maintained with Financial Institution, and Customer agrees and intends that the submission of transaction orders and instructions using the Security Procedures shall be considered the same as Customer's written signature in authorizing Financial Institution to execute such transaction. Customer acknowledges and agrees that Customer shall be bound by any and all Entries initiated through the use of such Security Procedures, whether authorized or unauthorized, and by any and all transactions and activity otherwise initiated by User(s), to the fullest extent allowed by law.  Customer further acknowledges and agrees that the Security Procedures are not designed to detect error in the transmission or content of communications or Entries initiated by Customer and that Customer bears the sole responsibility for detecting and preventing such error.

    (b)     Customer agrees to keep all Security Procedures and Security Devices protected, secure, and strictly confidential and to provide or make available the same only to User(s). Customer agrees to instruct each User not to disclose or provide any Security Procedures or Security Devices to any unauthorized person.  Financial Institution shall distribute Security Devices to the Administrator and Financial Institution shall otherwise communicate with the Administrator regarding Security Procedures.  Customer's Administrator shall have responsibility to distribute Security Devices to User(s) and to ensure the proper implementation and use of the Security Procedures by User(s).  Where Customer has the ability to change or modify a Security Device from time to time (e.g., a password or PIN), Customer agrees to change Security Devices frequently in order to ensure the security of the Security Device.  Customer agrees to notify Financial Institution immediately, according to notification procedures prescribed by Financial Institution, if Customer believes that any Security Procedures or Security Device has been stolen, compromised, or otherwise become known to persons other than User(s) or if Customer believes that any ACH transaction or activity is unauthorized or in error.  In the event of any actual or threatened breach of security,

Financial Institution may issue Customer a new Security Device or establish new Security Procedures as soon as reasonably practicable, but Financial Institution shall not be liable to Customer or any third party for any delay in taking such actions.

     (c)     Customer agrees to notify Financial Institution immediately, according to notification procedures prescribed by Financial Institution, if the authority of any Administrator(s) shall change or be revoked. Customer shall recover and return to Financial Institution any Security Devices in the possession of any User(s) whose authority to have the Security Device has been revoked.

     (d)     Financial Institution reserves the right to modify, amend, supplement, or cancel any or all Security Procedures, and/or to cancel or replace any Security Device, at any time and from time to time in Financial Institution's discretion. Financial Institution will endeavor to give Customer reasonable notice of any change in Security Procedures; provided that Financial Institution may make any change in Security Procedures without advance notice to Customer if Financial Institution, in its judgment and discretion, believes such change to be necessary or desirable to protect the security of Financial Institution's systems and assets. Customer's implementation and use of any changed Security Procedures after any change in Security Procedures shall constitute Customer's agreement to the change and Customer's agreement that the applicable Security Procedures, as changed, are commercially reasonable and adequate for the purposes intended.

**8.**     **PHYSICAL AND ELECTRONIC SECURITY.**

     (a)     Customer is solely responsible for providing for and maintaining the physical, electronic, procedural, administrative, and technical security of data and systems in Customer's possession or under Customer's control. Without limiting the generality of the foregoing, Customer specifically acknowledges and agrees that as part of the foregoing obligation Customer shall comply with the provisions of Section 1.6 of the Rules, entitled "Security Requirements," for the safeguarding of Protected Information, as that term is defined in the Rules. Financial Institution is not responsible for any computer viruses (including, without limitation, programs commonly referred to as "malware," "keystroke loggers," and/or "spyware"), problems or malfunctions resulting from any computer viruses, or any related problems that may be associated with the use of an online system or any ACH Origination services. Any material downloaded or otherwise obtained is obtained at Customer's own discretion and risk, and Financial Institution is not responsible for any damage to Customer's computer or operating systems or for loss of data that results from the download of any such material, whether due to any computer virus or otherwise. Customer is solely responsible for maintaining and applying anti-virus software, security patches, firewalls, and other security measures with respect to Customer's operating systems, and for protecting, securing, and backing up any data and information stored in or on Customer's operating systems. Financial Institution is not responsible for any errors or failures resulting from defects in or malfunctions of any software installed on Customer's operating systems or accessed through an Internet connection.

     (b)     Customer acknowledges and agrees that it is Customer's responsibility to protect itself and to be vigilant against e-mail fraud and other internet frauds and schemes (including, without limitation, fraud commonly referred to as "phishing" and "pharming"). Customer agrees to educate User(s), agents, and employees as to the risks of such fraud and to train such persons to avoid such risks. Customer acknowledges that Financial Institution will never contact Customer by e-mail in order to ask for or to verify Account numbers, Security Devices, or any sensitive or confidential information. In the event Customer receives an e-mail or other electronic communication that Customer believes, or has reason to believe, is fraudulent, Customer agrees that neither Customer nor its User(s), agents, and employees shall respond to the e-mail, provide any information to the e-mail sender, click on any links in the e-mail, or otherwise comply with any instructions in the e-mail. Customer agrees that Financial Institution is not responsible for any losses, injuries, or harm incurred by Customer as a result of any electronic, e-mail, or Internet fraud.

     (c)     In the event of a breach of the Security Procedure, Customer agrees to assist Financial Institution in determining the manner and source of the breach. Such assistance shall include, but shall not be limited to, providing Financial Institution or Financial Institution's agent access to Customer's hard drive, storage media and devices, systems and any other equipment or device that was used in breach of the Security Procedure. Customer further agrees to provide to Financial Institution any analysis of such equipment, device, or software or any report of such analysis performed by Customer, Customer's agents, law enforcement agencies, or any other third party. Failure of Customer to assist Financial Institution shall be an admission by Customer that the breach of the Security Procedure was caused by a person who obtained access to transmitting facilities of Customer or who obtained information facilitating the breach of the Security Procedure from Customer and not from a source controlled by Financial Institution.

**9.**     **CREDIT AND DEBIT ENTRIES; RECORDS RETENTION.** Customer shall obtain an authorization ("Authorization Agreement") as required by the Rules from the person or entity whose account will be debited or credited as the result of a debit or credit Entry initiated by Customer and Customer shall retain the Authorization Agreement in original form while it is in effect and the original or a copy of each authorization for two (2) years after termination or revocation of such authorization as stated in the Rules. Upon request, Customer shall furnish the original or a copy of the authorization to any affected Participating Depository Financial Institution, as defined in the Rules.

The following table shows the proper SEC Codes to use depending on how you obtained the authorization to debit/credit an individual or company's account:

| SEC Code | Debit / Credit | Authorization Method |
|---|---|---|
| PPD | Debit or Credit | Document signed by individual or similarly authenticated |
| CCD | Debit or Credit | Document signed or verbal agreement by Customer* |

* *All transactions from a business account must be CCD. Please see the CCD and definition in Schedule A or refer to the NACHA Rules for a detailed explanation.*

**10.    RECORDING AND USE OF COMMUNICATIONS.** Customer and Financial Institution agree that all telephone conversations or data transmissions between them or their agents made in connection with this Agreement may be electronically recorded and retained by either party by use of any reasonable means. Financial Institution shall not be obligated to make such recordings.

**11.    PROCESSING, TRANSMITTAL, AND SETTLEMENT BY FINANCIAL INSTITUTION.** Except as otherwise provided for in this Agreement and if Financial Institution elects to accept Entries, Financial Institution shall:

(a)    (i) use commercially reasonable efforts to comply with the instructions of Customer, (ii) process Entries received from Customer to conform with the file specifications set forth in the Rules, (iii) transmit such Entries as an ODFI to the "ACH" processor selected by Financial Institution, (iv) settle for such Entries as provided in the Rules, and (v) in the case of a credit Entry received for credit to an account with Financial Institution ("On-Us Entry"), Financial Institution shall credit the Receiver's account in the amount of such credit Entry on the Effective Entry Date contained in such credit Entry provided such credit Entry is received by Financial Institution at the time and in the form prescribed by Financial Institution in Section 5.

(b)    transmit such Entries to the ACH processor by the deposit deadline of the ACH processor, provided: (i) such Entries are completely received by Financial Institution's cut-off time at the location specified by Financial Institution to Customer from time to time; (ii) the Effective Entry Date satisfies the criteria provided by Financial Institution to Customer; and (iii) the ACH processor is open for business on such Business Day. Customer agrees that the ACH processor selected by Financial Institution shall be considered to have been selected by and designated by Customer. The Customer will receive immediately available funds for any electronic debit entry initiated by it on the Settlement Date applicable thereto.

**12.    SETTLEMENT OF CREDIT ENTRIES AND RETURNED DEBIT ENTRIES.** Customer agrees to settle for all credit Entries issued by Customer, User(s), or credit Entries otherwise made effective against Customer. Customer shall make settlement at such time on the date of transmittal by Financial Institution of such credit Entries as Financial Institution, in its discretion, may determine, and the amount of each On-Us Entry at such time on the Effective Date of such credit Entry as Financial Institution, in its discretion, may determine. Customer shall settle with Financial Institution for the amount of each debit Entry returned by a Receiving Depository Financial Institution ("RDFI") or debit Entry dishonored by Financial Institution. Settlement shall be made by Customer to Financial Institution in any manner specified by Financial Institution. Notwithstanding the foregoing, Financial Institution is hereby authorized to charge the account(s) ("Authorized Account(s)") designated in **Schedules E & F,** as settlement for credit Entries issued by Customer or returned or dishonored debit Entries. If Financial Institution requires pre-funding, Customer shall maintain sufficient collected funds in the Authorized Account(s) to settle for the credit Entries at the time the credit Entries are issued by Customer. In the event the Authorized Account or any other Customer bank account does not have collected funds sufficient on the Settlement Date to cover the total amount of all Entries to be paid on such Settlement Date, Financial Institution may take any of the following actions:

(a) Refuse to process all Entries, in which event Financial Institution shall return the data relating to such credit Entries to Customer, whereupon Financial Institution shall have no liability to Customer or to any third party as a result thereof; or

(b) Process that portion of the credit Entries as Customer has sufficient available funds in the Authorized Account to cover, in whatever order Financial Institution in its sole discretion shall elect to process, in which event Financial Institution shall return the data relating to such credit Entries as are not processed to Customer, whereupon Financial Institution shall have no liability to Customer or any third party as a result thereof; or

(c) Process all credit Entries. In the event Financial Institution elects to process credit Entries initiated by Customer and Customer has not maintained sufficient available funds in the Authorized Account with Financial Institution to cover them, the total amount of the insufficiency advanced by Financial Institution on behalf of Customer shall be immediately due and payable by Customer to Financial Institution without any further demand from Financial Institution. If Financial Institution elects to pay Customer's account in the overdraft on any one or more occasions, it shall not be considered a waiver of Financial Institution's rights to refuse to do so at any other time nor shall it be an agreement by Financial Institution to pay other items in the overdraft.

**13.    PRE-FUNDING.** Financial Institution reserves the right to require Customer to pre-fund an Account maintained at Financial Institution prior to the Settlement Date of the ACH file. Financial Institution shall determine whether pre-funding is

required based on criteria established from time to time by Financial Institution. Financial Institution will communicate directly to Customer if pre-funding is required and, if requested by Customer, will provide Customer with an explanation of its pre-funding criteria. If it is determined that pre-funding is required, Customer will provide immediately available and collected funds sufficient to pay all Entries initiated by Customer (a) not later than 8:00 a.m. Eastern Standard Time two (2) days before each Settlement Date, and (b) prior to initiating any Entries for which pre-funding is required.

**14.    ON-US ENTRIES.** Except as provided in Section 16, Rejection of Entries, or in the case of an Entry received for credit to an account maintained with Financial Institution (an "On-Us Entry"), the Financial Institution shall credit the Receiver's account in the amount of such Entry on the Effective Entry Date contained in such Entry, provided the requirements set forth in Section 11 (b) (i), (ii), and (iii) are met. If any of those requirements are not met, the Financial Institution shall use reasonable efforts to credit the Receiver's account in the amount of such Entry no later than the next Business Day following such Effective Entry Date.

**15.    RESERVES.** From time to time, Financial Institution shall evaluate Customer's transaction activity for the purpose of establishing averages for transaction frequency, amount, returns and adjustments. These evaluations will occur at least annually and may occur more frequently at Financial Institution's discretion. In connection with these evaluations, Financial Institution reserves the right to require Customer to establish reserves with Financial Institution calculated by Financial Institution to cover Customer's obligations to Financial Institution arising from ACH activities under this Agreement. Reserves may be expressed as a fixed dollar amount or as a "rolling reserve" calculated based on "rolling" averages determined by Financial Institution's periodic evaluations. The amount of reserves required by Financial Institution, if any, will be communicated directly to Customer from time to time. Customer agrees to establish reserves as required by Financial Institution within two (2) banking days after receipt of a communication from Financial Institution setting forth the amount of required reserves and the basis of calculation used to determine the amount of reserves. Financial Institution may suspend ACH processing activity for Customer if Customer fails to establish the required amount of reserves within the time period specified by Financial Institution in its communication to Customer.

**16.    REJECTION OF ENTRIES.** Customer agrees that Financial Institution has no obligation to accept Entries and therefore may reject any Entry issued by Customer. Financial Institution has no obligation to notify Customer of the rejection of an Entry but Financial Institution may do so at its option. Financial Institution shall have no liability to Customer for rejection of an Entry and shall not be liable to pay interest to Customer even if the amount of Customer's payment order is fully covered by a withdrawable credit balance in an Authorized Account of Customer or the Financial Institution has otherwise received full payment from Customer.

**17.    CANCELLATION OR AMENDMENT BY CUSTOMER.** Customer shall have no right to cancel or amend any Entry after its receipt by Financial Institution. However, Financial Institution may, at its option, accept a cancellation or amendment by Customer. If Financial Institution accepts a cancellation or amendment of an Entry, Customer must comply with the Security Procedures provided in Section 7 of this Agreement. If such a request is received by the Financial Institution before the affected Entry has been transmitted to the ACH (or, in the case of an On-Us Entry, before the Receiver's account has been credited or debited), the Financial Institution will use reasonable efforts to cancel or amend the Entry as requested, but the Financial Institution shall have no liability if the cancellation or amendment is not effected. If Financial Institution accepts a cancellation or amendment of an Entry, Customer hereby agrees to indemnify, defend all claims and hold Financial Institution harmless from any loss, damages, or expenses, including but not limited to attorney's fees, incurred by Financial Institution as the result of its acceptance of the cancellation or amendment.

**18.    REVERSALS OF ENTRIES.**

(a)    General Procedure. Upon proper and timely request by the Customer, the Financial Institution will use reasonable efforts to effect a reversal of an Entry or File. To be "proper and timely," the request must (i) be made within five (5) Business Days of the Effective Entry Date for the Entry or File to be reversed; (ii) be made immediately, not to exceed ten (10) hours, upon discovery of the error; and (iii) be accompanied by a Reversal/Cancellation Request form and comply with all of the Rules. In addition, if the Customer requests reversal of a Debit Entry or Debit File, it shall concurrently deposit into the Customer Account an amount equal to that Entry or File. The Customer shall notify the Receiver of any reversing Entry initiated to correct any Entry it has initiated in error. The notification to the Receiver must include the reason for the reversal and be made no later than the Settlement Date of the reversing Entry.

(b)    No Liability; Reimbursement to the Financial Institution. Under no circumstances shall the Financial Institution be liable for interest or related losses if the requested reversal of an Entry is not effected. The Customer shall reimburse the Financial Institution for any expenses, losses or damages it incurs in effecting or attempting to effect the Customer's request for reversal of an Entry.

**19.    ERROR DETECTION.** Financial Institution has no obligation to discover and shall not be liable to Customer for errors made by Customer, including but not limited to errors made in identifying the Receiver, or an Intermediary or RDFI or for errors in the amount of an Entry or for errors in Settlement Dates. Financial Institution shall likewise have no duty to discover and shall not be liable for duplicate Entries issued by Customer. Notwithstanding the foregoing, if the Customer discovers that any Entry it has initiated was in error, it shall notify the Financial Institution of such error. If such notice is

received no later than four (4) hours prior to the ACH receiving deadline, the Financial Institution will utilize reasonable efforts to initiate an adjusting Entry or stop payment of any On-Us" credit Entry within the time limits provided by the Rules. In the event that Customer makes an error or issues a duplicate Entry, Customer shall indemnify, defend all claims, and hold Financial Institution harmless from any loss, damages, or expenses, including but not limited to attorney's fees, incurred by Financial Institution as result of the error or issuance of duplicate Entries.

**20.     PROHIBITED TRANSACTIONS.**  Customer agrees not to use or attempt to use the Services (a) to engage in any illegal purpose or activity or to violate any applicable law, rule or regulation, (b) to breach any contract or agreement by which Customer is bound, (c) to engage in any internet or online gambling transaction, whether or not gambling is legal in any applicable jurisdiction, or (d) to engage in any transaction or activity that is not specifically authorized and permitted by this Agreement. Customer acknowledges and agrees that Financial Institution has no obligation to monitor Customer's use of the Services for transactions and activity that is impermissible or prohibited under the terms of this Agreement; provided, however, that Financial Institution reserves the right to decline to execute any transaction or activity that Financial Institution believes violates the terms of this Agreement.

**21.     PRENOTIFICATION.**  Customer, at its option, may send prenotification that it intends to initiate an Entry or Entries to a particular account within the time limits prescribed for such notice in the Rules. Such notice shall be provided to the Financial Institution in the format and on the medium provided in the media format section of such Rules. If Customer receives notice that such prenotification has been rejected by an RDFI within the prescribed period, or that an RDFI will not receive Entries without having first received a copy of the Authorization signed by its customer, Customer will not initiate any corresponding Entries to such accounts until the cause for rejection has been corrected or until providing the RDFI with such authorization within the time limits provided by the Rules.

**22.     NOTICE OF RETURNED ENTRIES AND NOTIFICATIONS OF CHANGE.**   Financial Institution shall notify Customer by e-mail, facsimile transmission, US mail, or other means of the receipt of a returned Entry from the ACH Operator. Except for an Entry retransmitted by Customer in accordance with the requirements of Section 5, Financial Institution shall have no obligation to retransmit a returned Entry to the ACH Operator if Financial Institution complied with the terms of this Agreement with respect to the original Entry. Customer shall notify the Receiver by phone or electronic transmission of receipt of each return Entry no later than one Business Day after the Business Day of receiving such notification from Financial Institution. Financial Institution shall provide Customer all information, as required by the Rules, with respect to each Notification of Change ("NOC") Entry or Corrected Notification of Change ("Corrected NOC") Entry received by Financial Institution relating to Entries transmitted by Customer. Financial Institution must provide such information to Customer within two (2) banking days of the Settlement Date of each NOC or Corrected NOC Entry. Customer shall ensure that changes requested by the NOC or Corrected NOC are made within six (6) banking days of Customer's receipt of the NOC information from Financial Institution or prior to initiating another Entry to the Receiver's account, whichever is later.

**23.     ACCOUNT RECONCILIATION.**  The Customer agrees to notify the Financial Institution promptly of any discrepancy between the Customer's records and the information shown on any periodic statement. If the Customer fails to notify the Financial Institution within ten (10) calendar days of receipt of a periodic statement containing such information; the Customer agrees that the Financial Institution shall not be liable for any other losses resulting from the Customer's failure to give such notice or any loss of interest or any interest equivalent with respect to any Entry shown on such periodic statement. If the Customer fails to notify the Financial Institution within thirty (30) calendar days of receipt of such periodic statement, the Customer shall be precluded from asserting any discrepancy against the Financial Institution.

**24.     PROVISIONAL SETTLEMENT.**  Customer shall be bound by and comply with the Rules as in effect from time to time, including without limitation the provision thereof making payment of an Entry by the RDFI to the Receiver provisional until receipt by the RDFI of final settlement for such Entry; and Customer acknowledges that it has received notice of that Rule and or the fact that, if such settlement is not received, the RDFI shall be entitled to a refund from the Receiver of the amount credited and Customer shall not be deemed to have paid the Receiver the amount of the Entry.

**25.     CUSTOMER REPRESENTATIONS AND WARRANTIES; INDEMNITY.**  With respect to each and every Entry transmitted by Customer, Customer represents and warrants to Financial Institution and agrees that (a) each person or entity shown as the Receiver on an Entry received by Financial Institution from Customer has authorized the initiation of such Entry and the crediting or debiting of its account in the amount and on the Effective Entry Date shown on such Entry, (b) such authorization is operative at the time of transmittal or crediting or debiting by Financial Institution as provided herein, (c) Entries transmitted to Financial Institution by Customer are limited to those types of credit and debit Entries set forth in **Schedule A**, (d) Customer shall perform its obligations under this Agreement in accordance with all applicable laws, regulations, and orders, including, but not limited to, the sanctions laws, regulations, and orders administered by OFAC; laws, regulations, and orders administered FinCEN; and any state laws, regulations, or orders applicable to the providers of ACH payment services, and (e) Customer shall be bound by and comply with the provision of the *Rules* (among other provisions of the *Rules*) making payment of an Entry by the RDFI to the Receiver provisional until receipt by the RDFI of final settlement for such Entry. Customer specifically acknowledges that it has received notice of the rule regarding provisional payment and of the fact that, if such settlement is not received, the RDFI shall be entitled to a refund from the Receiver of the amount credited and Customer shall not be deemed to have paid the Receiver the amount of the Entry. The Customer shall defend,

indemnify, and hold harmless the Financial Institution, and its officers, directors, agents, and employees, from and against any and all actions, costs, claims, losses, damages, or expenses, including attorney's fees and expenses, resulting from or arising out of (aa) any breach of any of the agreements, representations or warranties of the Customer contained in this Agreement; or (bb) any act or omission of the Customer or any other person acting on the Customer's behalf.

**26.     FINANCIAL INFORMATION AND AUDIT.** Financial Institution may from time to time request information from Customer in order to evaluate a continuation of the Service to be provided by Financial Institution hereunder and/or adjustment of any limits set by this Agreement. Customer agrees to provide the requested financial information immediately upon request by Financial Institution, in the form required by Financial Institution. Customer authorizes Financial Institution to investigate or reinvestigate at any time any information provided by Customer in connection with this Agreement or the Service. Upon request by Financial Institution, Customer hereby authorizes Financial Institution to enter Customer's business premises for the purpose of ensuring that Customer is in compliance with this Agreement and Customer specifically authorizes Financial Institution to perform an audit of Customer's operational controls, risk management practices, staffing and the need for training and ongoing support, and information technology infrastructure. Customer hereby acknowledges and agrees that Financial Institution shall have the right to mandate specific internal controls at Customer's location(s) and Customer shall comply with any such mandate. In addition, Customer hereby agrees to allow Financial Institution to review available reports of independent audits performed at the Customer location related to information technology, the Service and any associated operational processes. Customer agrees that if requested by Financial Institution, Customer will complete a self-assessment of Customer's operations, management, staff, systems, internal controls, training and risk management practices that would otherwise be reviewed by Financial Institution in an audit of Customer. If Customer refuses to provide the requested financial information, or if Financial Institution concludes, in its sole discretion, that the risk of Customer is unacceptable, if Customer violates this Agreement or the Rules, or if Customer refuses to give Financial Institution access to Customer's premises, Financial Institution may terminate the Service and this Agreement according to the provisions hereof.

**27.     LIMITATION OF LIABILITY.**

(a)     IN THE PERFORMANCE OF THE SERVICES REQUIRED BY THIS AGREEMENT, FINANCIAL INSTITUTION SHALL BE ENTITLED TO RELY SOLELY ON THE INFORMATION, REPRESENTATIONS, AND WARRANTIES PROVIDED BY CUSTOMER PURSUANT TO THIS AGREEMENT, AND SHALL NOT BE RESPONSIBLE FOR THE ACCURACY OR COMPLETENESS THEREOF. FINANCIAL INSTITUTION SHALL BE RESPONSIBLE ONLY FOR PERFORMING THE SERVICES EXPRESSLY PROVIDED FOR IN THIS AGREEMENT, AND SHALL BE LIABLE ONLY FOR ITS GROSS NEGLIGENCE OR WILLFUL MISCONDUCT IN PERFORMING THOSE SERVICES. FINANCIAL INSTITUTION SHALL NOT BE RESPONSIBLE FOR CUSTOMER'S ACTS OR OMISSIONS (INCLUDING, WITHOUT LIMITATION, THE AMOUNT, ACCURACY, TIMELINESS OF TRANSMITTAL OR AUTHORIZATION OF ANY ENTRY RECEIVED FROM CUSTOMER) OR THOSE OF ANY OTHER PERSON, INCLUDING, WITHOUT LIMITATION, ANY FEDERAL RESERVE BANK, ACH OPERATOR OR TRANSMISSION OR COMMUNICATIONS FACILITY, ANY RECEIVER OR RDFI (INCLUDING, WITHOUT LIMITATION, THE RETURN OF ANY ENTRY BY SUCH RECEIVER OR RDFI), AND NO SUCH PERSON SHALL BE DEEMED FINANCIAL INSTITUTION'S AGENT. CUSTOMER AGREES TO INDEMNIFY FINANCIAL INSTITUTION AGAINST ANY LOSS, LIABILITY OR EXPENSE (INCLUDING ATTORNEYS' FEES AND COSTS) RESULTING FROM OR ARISING OUT OF ANY CLAIM OF ANY PERSON THAT THE FINANCIAL INSTITUTION IS RESPONSIBLE FOR ANY ACT OR OMISSION OF CUSTOMER OR ANY OTHER PERSON DESCRIBED IN THIS SECTION 27(a).

(b)     FINANCIAL INSTITUTION SHALL BE LIABLE FOR CUSTOMER'S ACTUAL DAMAGES DUE TO CLAIMS ARISING SOLELY FROM FINANCIAL INSTITUTION'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT; IN NO EVENT SHALL FINANCIAL INSTITUTION BE LIABLE FOR ANY CONSEQUENTIAL, SPECIAL, INCIDENTAL, PUNITIVE OR INDIRECT LOSS OR DAMAGE WHICH CUSTOMER MAY INCUR OR SUFFER IN CONNECTION WITH THIS AGREEMENT, WHETHER OR NOT THE LIKELIHOOD OF SUCH DAMAGES WAS KNOWN OR CONTEMPLATED BY THE FINANCIAL INSTITUTION AND REGARDLESS OF THE LEGAL OR EQUITABLE THEORY OF LIABILITY WHICH CUSTOMER MAY ASSERT, INCLUDING, WITHOUT LIMITATION, LOSS OR DAMAGE FROM SUBSEQUENT WRONGFUL DISHONOR RESULTING FROM FINANCIAL INSTITUTION'S ACTS OR OMISSIONS PURSUANT TO THIS AGREEMENT.

(c)     WITHOUT LIMITING THE GENERALITY OF THE FOREGOING PROVISIONS, FINANCIAL INSTITUTION SHALL BE EXCUSED FROM FAILING TO ACT OR DELAY IN ACTING IF SUCH FAILURE OR DELAY IS CAUSED BY LEGAL CONSTRAINT, INTERRUPTION OF TRANSMISSION OR COMMUNICATION FACILITIES, EQUIPMENT FAILURE, WAR, EMERGENCY CONDITIONS OR OTHER CIRCUMSTANCES BEYOND FINANCIAL INSTITUTION'S CONTROL. IN ADDITION, FINANCIAL INSTITUTION SHALL BE EXCUSED FROM FAILING TO TRANSMIT OR DELAY IN TRANSMITTING AN ENTRY IF SUCH TRANSMITTAL WOULD RESULT IN FINANCIAL INSTITUTION'S HAVING EXCEEDED ANY LIMITATION UPON ITS INTRA-DAY NET FUNDS POSITION ESTABLISHED PURSUANT TO PRESENT OR FUTURE FEDERAL RESERVE GUIDELINES OR IN FINANCIAL INSTITUTION'S REASONABLE JUDGMENT OTHERWISE WOULD VIOLATE ANY PROVISION OF ANY PRESENT

OR FUTURE RISK CONTROL PROGRAM OF THE FEDERAL RESERVE OR ANY RULE OR REGULATION OF ANY OTHER U.S. GOVERNMENTAL REGULATORY AUTHORITY.

(d)     SUBJECT TO THE FOREGOING LIMITATIONS, FINANCIAL INSTITUTION'S LIABILITY FOR LOSS OF INTEREST RESULTING FROM ITS ERROR OR DELAY SHALL BE CALCULATED BY USING A RATE EQUAL TO THE AVERAGE FEDERAL FUNDS RATE AT THE FEDERAL RESERVE BANK OF NEW YORK FOR THE PERIOD INVOLVED.  AT FINANCIAL INSTITUTION'S OPTION, PAYMENT OF SUCH INTEREST MAY BE MADE BY CREDITING THE ACCOUNT.

**28.    INCONSISTENCY OF NAME AND ACCOUNT NUMBER.**  The Customer acknowledges and agrees that, if an Entry describes the Receiver inconsistently by name and account number, payment of the Entry transmitted by the Financial Institution to the RDFI may be made by the RDFI (or by the Financial Institution in the case of an On-Us Entry) on the basis of the account number supplied by the Customer, even if it identifies a person different from the named Receiver, and that the Customer's obligation to pay the amount of the Entry to the Financial Institution is not excused in such circumstances. Customer is liable for and must settle with Financial Institution for any Entry initiated by Customer that identifies the Receiver by account or identifying number or by name and account or identifying number.

**29.    PAYMENT FOR SERVICES.**  The Customer shall pay the Financial Institution the charges for the services provided in connection with this Agreement, as set forth in **Schedule D**.  All fees and services are subject to change upon thirty (30) days prior written notice from the Financial Institution.  Such charges do not include, and the Customer shall be responsible for payment of, any sales, use, excise, value added, utility or other similar taxes relating to such services, and any fees or charges provided for in the Depository Agreement between the Financial Institution and the Customer with respect to the Account.

**30.    AMENDMENTS.**  Except as provided in Section 29, the Financial Institution may amend this agreement from time to time upon written notice to the Customer.  In the event that performance of services under this Agreement would result in a violation of any present or future statute, regulation or governmental policy to which the Financial Institution is subject, then this Agreement shall be amended to the extent necessary to comply with such statute, regulation or policy.  Alternatively, the Financial Institution may terminate this Agreement if it deems such action necessary or appropriate under the circumstances. The Financial Institution shall have no liability to the Customer as a result of any such violation, amendment or termination. Any practices or course of dealings between the Financial Institution and the Customer, or any procedures or operational alterations used by them, shall not constitute a modification of this Agreement or the Rules, nor shall they be construed as an amendment to this Agreement or the Rules.

**31.    NOTICES, INSTRUCTIONS, ETC.**

(a)     Except as stated herein, the Financial Institution shall not be required to act upon any notice or instruction received from the Customer or any other person, or to provide any notice or advice to the Customer or any other person with respect to any matter.

(b)     The Financial Institution shall be entitled to rely on any written notice or other written communication believed by it in good faith to be genuine and to have been signed by an authorized representative of Customer, and any such communication shall be deemed to have been signed by such person.  Such notice shall be effective on the second Business Day following the day received by the Financial Institution.

(c)     Except as stated herein, any written notice or other written communication required or permitted to be given under this Agreement shall be delivered or sent by US mail, if to Customer, at the address of Customer on the books of Financial Institution and if to Financial Institution, at the following address:

> **American Momentum Bank**
>
> **Attn: ACH Department**
>
> **4830 W. Kennedy Blvd. Suite 200**
>
> **Tampa, FL 33609**

unless another address is substituted by notice delivered or sent as provided heron.  Except as otherwise stated herein, any such notice shall be deemed given when received.

**32.    DATA RETENTION.**  The Customer shall retain data on file adequate to permit the remaking of Entries for five (5) Business Days following the date of their transmittal by the Financial Institution as provided herein, and shall provide such Data to the Financial Institution upon its request.

**33.    DATA MEDIA AND RECORDS.**  All data media, Entries, security procedures and related records used by the Financial Institution for transactions contemplated by this Agreement shall be and remain the Financial Institution's property. The Financial Institution may, at its sole discretion, make available such information upon the Customer's request.  Any

expenses incurred by the Financial Institution in making such information available to the Customer shall be paid by the Customer.

**34.    COOPERATION IN LOSS RECOVERY EFFORTS.** In the event of any damages for which Financial Institution or Customer may be liable to each other or to a third party pursuant to the services provided under this Agreement, Financial Institution and Customer will undertake reasonable efforts to cooperate with each other, as permitted by applicable law, in performing loss recovery efforts and in connection with any actions that the relevant party may be obligated to defend or elects to pursue against a third party.

**35.    TERMINATION.** Either party may terminate this Agreement upon thirty (30) calendar days written notice to the other; provided however that Financial Institution may terminate this agreement immediately upon its determination that Customer is in violation of this Agreement, the ACH Rules or applicable laws or if Customer initiates any bankruptcy proceeding or is otherwise declared insolvent. Any termination of this Agreement shall not affect any of Financial Institution's rights or Customer's obligations with respect to any Entries initiated by Customer prior to such termination, or the payment obligations of Customer with respect to services performed by Financial Institution prior to termination, or any other obligations that survive termination of this Agreement. Customer's obligation with respect to any Entry shall survive termination of this Agreement until any applicable statute of limitation has elapsed.

**36.    ENTIRE AGREEMENT.** This Agreement (including the Schedules attached) together with the Depository Agreement, is the complete and exclusive statement of the agreement between the Financial Institution and the Customer with respect to the subject matter hereof and supersedes any prior agreement(s) between the Financial Institution with respect to such subject matter. In the event of any inconsistency between the terms of this Agreement and the Depository Agreement, the terms of this Agreement shall govern. In the event performance of the services provided herein in accordance with the terms of this Agreement would result in a violation of any present or future statute, regulation or government policy to which the Financial Institution is subject, and which governs or affects the transactions contemplated by this Agreement, then this Agreement shall be deemed amended to the extent necessary to comply with such statute, regulation or policy, and the Financial Institution shall incur no liability to the Customer as a result of such violation or amendment. No course of dealing between the Financial Institution and the Customer will constitute a modification of this Agreement, the Rules, or the security procedures, or constitute an agreement between the Financial Institution and the Customer regardless of whatever practices and procedures the Financial Institution and the Customer may use.

**37.    NON-ASSIGNMENT.** The Customer may not assign this Agreement or any of the rights or duties hereunder to any person without the Financial Institution's prior written consent.

**38.    WAIVER.** The Financial Institution may waive enforcement of any provision of this Agreement. Any such waiver shall not affect the Financial Institution's rights with respect to any other transaction or modify the terms of this Agreement.

**39.    BINDING AGREEMENT; BENEFIT.** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, successors, and assigns. This Agreement is not for the benefit of any other person, and no other person shall have any right against the Financial Institution or the Customer hereunder.

**40.    HEADINGS.** Headings are used for reference purposes only and shall not be deemed part of this Agreement.

**41.    SEVERABILITY.** In the event that any provision of this Agreement shall be determined to be invalid, illegal, or unenforceable to any extent, the remainder of this Agreement shall not be impaired or otherwise affected and shall continue to be valid and enforceable to the fullest extent permitted by law.

**42.    GOVERNING LAW.** This Agreement shall be construed in accordance with and governed by the laws of the State of Florida, without reference to its conflict of laws provisions, and applicable federal law.

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed by their duly authorized officers.

*Financial Institution*                                    *Customer*

American Momentum Bank                    The Center for Special Needs Trust

By: _Sherry Lilly_                                    By: _____

Name: _Sherry Lilly_                              Name: _Todd S. Belisle_

Title: _AVP-Treasury Sales Officer_        Title: _President_

CIF #: _____

# Schedule A
## Customer Selected
## Standard Entry Class Code

As used in the Agreement, the following* are ACH Standard Entry Class Codes (SEC) approved for use by Customer (check all that apply), subject to any specific restrictions on the types of ACH transactions that may be originated, which are identified by Financial Institution below:

- ☐ **CCD – *Corporate Credit or Debit*** – Either a credit or debit where funds are either distributed or consolidated between corporate entities.
- X  **PPD - *Prearranged Payment and Deposit***
  - o **Direct Deposit** - The transfer of funds into a consumer's account. Funds being deposited can represent a variety of products, such as payroll, interest, pension, dividends, etc.
  - o **Direct Payment** - Preauthorized payment is a debit application. This includes recurring bills that do not vary in amount -- insurance premiums, mortgage payments, charitable contributions, and installment loan payments or standing authorizations where the amount does vary, such as utility payments.

*The above SEC Codes are the most commonly-used and not an all-inclusive list.

Financial Institution has identified the following ACH transaction restrictions:

_____

# Schedule B
## Processing Schedule

### Delivery of ACH Files:

- Internet transmissions
  The Company may electronically transmit files to the Financial Institution via our Online Banking system – Momentum Connect.

- Format and content of entries
  All files must be submitted in NACHA format. The Company should refer to Appendix Two in the NACHA Rulebook for specific formatting details.

- Timing of delivery
  Processing Deadline for all files is 4:30 PM EST, two (2) business days prior to the Effective Date* of the file.

*"Effective Date" must be a Business Day or the file will be processed on the first business day following the effective date.

# Schedule C
## Security Procedures

Customer is responsible to strictly establish and to maintain procedures to safeguard against unauthorized transactions. Customer warrants that no individual will be allowed to initiate transfers in the absence of proper supervision and safeguards, and agrees to take reasonable steps to maintain the confidentiality of the security procedures and any passwords, codes, security devices, and related instructions provided by Financial Instituion.  If Customer believes or suspects that any such information has been accessed by an unauthorized individual, Customer will verbally notify Financial Institution immediately, followed by written confirmation.  The occurrence of such notification will not affect any transfers made in good faith by Financial Institution prior to the notification and within a reasonable time period to prevent unauthorized transfers.

**Data Security:**
Limiting access and securely storing ACH data used in the routing and settlement of ACH transactions is a critical data security precaution.  Customer's ability to limit access to production data can be done through commercially available software products.  Access can be limited to specific programs, user IDs, or read-only or read-and-edit-only access functionality.  Files can also be transmitted between ACH participants using the following data protection methods: encryption and authentication.

- **Encryption** is a process of scrambling data content through hardware or software in order to protect the confidentiality of a file's contents.  This information should remain encrypted between all parties in the ACH Network using commercially reasonable procedures and must be transmitted using security technology that is 128-bit RC4 technology (minimum standards).
- **Authentication** is a process of ensuring that files and data content have not been altered between the Orginator and receiving points.  Like encryption, this can be done using hardware or software to ensure data integrity.

**Transmittal of Files:**
- Customer will only transmit files on the dates specified in the agreed upon transmittal schedule (see **Schedule H**). Changes to this schedule must be made in writing and signed by an authorized contact of the Customer.
- Customer will transmit files to Financial Institution via pre-arranged access to ACH system utilizing agreed upon logon procedures and proper access identification.
- Files will be encrypted by Customer before being transmitted to Financial Institution.

Should any of the above procedures not be met, the file will be rejected by Financial Institution and Customer will be notified.

CIF #:

# Schedule D
### Fees

<u>Fee Schedule*:</u> Company authorizes Financial Institution to debit any of the following fees from Company's Account.

*If fees are not outlined below, they are provided separately as part of a fully analyzed account package.

| | |
|---|---|
| **Transmittal Fee (per file):** | $ |
| **Transaction Item Fee (per item):** | $ |
| **Return Item Fee:** | $ |
| **Notification of Corrections (per NOC):** | $ |
| **ACH Monthly Maintenance Fee:** | $ |
| **Deletions or Reversals** | $ |
| **Corporate Rules Book** | $ |
| | |
| | |
| | |
| **Account Number to be debited for Fees:** | |

## Schedule E
## ACH Implementation Form

| Company Information | | | |
|---|---|---|---|
| Date: | 9/5/2013 | CIF Number: | ██████ |
| Company Name: | The Center for Special Needs Trust | Tax ID: | ██████ |
| Address: | ██████████████ | | |

**Contact Information (For File Validation)**

| | | | |
|---|---|---|---|
| Contact Name: | Tracey Gregory | Phone: | ██████ |
| Contact Email: | ████ @centersmail.com | | |

| | |
|---|---|
| Company Name (as it appears in ACH file): | Center for SNT |
| Company ID (as it appears in ACH file): | █████████ |
| Offset Account Number: | ████████ |
| Settlement Account Number: | ████████ |

**\*\*The settlement account is used to validate the balance when the file is originated.**

| | |
|---|---|
| Return Account Number: | ████████ |

**\*\*The ACH item return will auto-settle to the return account listed in this field.**

| Settlement account balance to use: | Collected | File Method: | Momentum Connect |
|---|---|---|---|
| Daily Total Dollar Limit During Origination: | | $100,000 | |

| Treasury Management Officer: | Sherry Lilly | Ext: | 4723 |
|---|---|---|---|

**\*\*NOTE: The Operational Client Risk Profile must be approved and attached.**

Faxing Instructions:  American Momentum Bank

Attention: Electronic Banking Department   Fax #: 813-549-4834

| Internal Use | Received On: | Submitted By: |
|---|---|---|
| OCR Attached & Approved: | Completed On: | Assoc. Initials: |

CIF #:

# Schedule F
## ACH Originating Company Information

| | |
|---|---|
| **Company Name:** | The Center for Special Needs Trust "Center for SNT" |
| **Street Address:** | ███████████ |
| **City, State, Zip** | Clearwater, FL  33760 |
| **Company ID:** | ██████ |
| **Company Phone Number:** | ███████ |
| **Company Fax Number:** | |
| **Primary Contact Name & Phone Number:** | Tracey Gregory ███████ |
| **Secondary Contact Name & Phone Number:** | |
| **Authorized Account Number:** | ██████ |
| **Authorized Account Number:** | |
| **Authorized Account Number:** | |
| **Authorized Account Number:** | |
| **Authorized Account Number:** | |

# Schedule G
## Holidays

<u>Holiday Calendar:</u>  Financial Institution will be closed on the following standard holidays observed by the Federal Reserve Bank.  Financial Institution will not accept files for processing on the following days, as well as all Saturdays and Sundays.  Be careful to make sure that these dates are not used as Effective Entry Dates:

New Year's Day  (January 1)
Martin Luther King, Jr. Day  (Third Monday in January)
Presidents' Day  (Third Monday in February)
Memorial Day  (Last Monday in May)
Independence Day  (July 4)
Labor Day  (First Monday in September)
Columbus Day  (Second Monday in October)
Veterans' Day  (November 11)
Thanksgiving Day  (Fourth Thursday in November)
Christmas Day  (December 25)

Note:  For holidays falling on Saturday, Federal Reserve Banks and Branches will be open the preceding Friday. For holidays falling on Sunday, all Federal Reserve Banks and Branches will be closed the following Monday.

# Schedule H
# 2013 Calendar

| CIF #: |
|---|

Complete this calendar below by circling all of the dates you will be transmitting or initiating files to the bank.  Please note the holidays below.

### Holidays (non-processing days)
| | | |
|---|---|---|
| Jan 21: M Luther King Day | Feb 18: Presidents' Day | May 27: Memorial Day |
| Jul 04: Independence Day | Sep 02: Labor Day | Oct 14: Columbus Day |
| Nov 11: Veterans Day | Nov 28: Thanksgiving Day | Dec 25: Christmas Day |

S  M  T  W  T  F  S    S  M  T  W  T  F  S    S  M  T  W  T  F  S    S  M  T  W  T  F  S



**Schedule I –** (Only if required by the Credit Department)

## Principal/Owner Guaranty

The undersigned hereby guarantees the prompt payment and performance of all amounts, fees, and obligations of
_____ (Company) due and owing to <u>American Momentum Bank</u> (Financial
Institution) arising under or in connection with the Company Agreement for ACH Origination (the "Agreement"),
dated of even date herewith between Company and Financial Institution.  This Guaranty is intended to cover all
obligations of Company under the Agreement, including, but not limited to, (a) the payment of fees and amounts
arising under the Agreement or in connection with any deposit account maintained by Company with Financial
Institution, (b) the compliance by Financial Institution with all laws, regulations and rules related to Company's
origination and processing of ACH Entries under the Agreement, (c) Company's obligations with respect to
Reserves and the return of ACH Entries under the Agreement and (d) the accuracy and performance of Company's
warranties under the Agreement.

In order to secure the payment and performance of this Guaranty, the undersigned hereby grants to Financial
Institution a security interest in and to all deposit accounts owned by the undersigned and maintained at Financial
Institution.

The undersigned hereby agrees and acknowledges that this Guaranty is a guarantee of performance and not of
collection, and that Financial Institution may, upon default or violation by Company of any terms of the
Agreement, proceed directly against the undersigned for satisfaction and performance of the obligations of
Company under the Agreement without first proceeding against Company.

Executed this _____ day of _____, 20__ .

_N/A_____
Signature of Principal/Owner

_____
Signature of Principal/Owner

_____
Signature of Principal/Owner

_____
Signature of Principal/Owner

EXHIBIT B

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO.:  8:24-BK-00676-RCT


IN RE:

THE CENTER FOR SPECIAL NEEDS
TRUST ADMINISTRATION, INC.,

     DEBTOR.
_____/


HEARING


BEFORE:            THE HONORABLE ROBERTA COLTON

DATE:              SEPTEMBER 25, 2025

TIME:              2:00 p.m. – 3:08 p.m.

LOCATION:          UNITED STATES BANKRUPTCY COURT
                   801 NORTH FLORIDA AVENUE
                   TAMPA, FL 33602

1            A P P E A R A N C E S

2    APPEARANCES IN PERSON:

3    JOHN DICKS, ESQUIRE, on behalf of the Chapter 11
     Trustee
4
     TAL LIFSHITZ, ESQUIRE; BENJAMIN WIDLANSKI, ESQUIRE,
5    Kozyak Tropin & Throckmorton

6    MEGAN MURRAY, ESQUIRE; SCOTT UNDERWOOD, ESQUIRE,
     on behalf of the Unsecured Creditors Committee
7
     RYAN YANT, ESQUIRE, on behalf of the Arena entities
8
     CAROLINE HERTER, ESQUIRE, on behalf of the Chamberlin
9    creditors

10   APPEARANCES BY ZOOM:

11   MICHAEL GOLDBERG, ESQUIRE, Chapter 11 Trustee

12   STEVEN WIRTH, ESQUIRE, on behalf of the Chapter 11
     Trustee
13
     MEGAN GOLDSTEIN, ESQUIRE, Kozyak Tropin & Throckmorton
14
     ADAM GILBERT, ESQUIRE, Underwood Murray
15
     TERESA DORR, ESQUIRE, on behalf of the U.S. Trustee
16

17

18

19

20

21

22

23

24

25

1              I N D E X

2   SALE OF OHIO PROPERTY BY MR. DICKS ..............7

3   RULING BY THE COURT ...........................10

4   MOTION TO EMPLOY AND MOTION FOR STAY RELIEF  ...11

5        BY MR. DICKS

6   ARGUMENT BY MR. UNDERWOOD ......................13

7   PRESENTATION BY MR. LIFSHITZ ...................33

8   ARGUMENT BY MS. HERTER ........................40

9   RULING BY THE COURT ...........................53

10  MOTION FOR RELIEF FROM STAY BY MS. HERTER ......53

11  RESPONSE BY MR. UNDERWOOD .....................59

12  RULING BY THE COURT ...........................61

13  CERTIFICATE OF REPORTER .......................64

14

15

16

17

18

19

20

21

22

23

24

25

```
1            P R O C E E D I N G S

2            THE CLERK:  The United States Bankruptcy

3    Court for the Middle District of Florida is back

4    in session, the Honorable Roberta A. Colton

5    presiding.

6            Calling cases from the Court's 2:00

7    calendar.  Case 24-676, The Center for Special

8    Needs Trust Administration, Inc.

9            The Court will take appearances.

10           THE COURT:  Please be seated.

11           THE CLERK:  All interested parties please

12   come forward and enter your appearance.

13           MR. DICKS:  Good afternoon, Your Honor.

14   John Dicks on behalf of the Chapter 11 Trustee,

15   Michael Goldberg.  I understand that

16   Mr. Goldberg, I think is on Zoom.  I can't see

17   him in the panels that are available, but I think

18   that was his intention.  And I believe my

19   colleague Mr. Worth may also be on Zoom.

20           THE COURT:  I see Mr. Goldberg.  I didn't

21   see -- oh, yes, there's Mr. Wirth.  Very good.

22   Thank you.

23           MR. LIFSHITZ:  Good afternoon, Your Honor.

24   Tal Lifshitz with Kozyak Tropin & Throckmorton.

25   And I'm joined by me colleague, partner Ben
```

1    Widlanski.  I believe on the Zoom we have my
2    colleague Megan Goldstein, as well, putative
3    class counsel and here on the application to be
4    trained by Mr. Goldberg in this matter.  Thank
5    you.
6         THE COURT:  Okay.
7         MS. MURRAY:  Good afternoon, Your Honor.
8    Megan Murray on behalf of the Official Committee
9    of Unsecured Creditors.  In the courtroom with me
10   is Scott Underwood, my partner; and Adam Gilbert
11   of Underwood Murray is on Zoom.
12        THE COURT:  Very good.
13        MR. YANT:  Good afternoon, Your Honor.  Ryan
14   Yant on behalf of the Arena entities.
15        MS. HERTER:  Good afternoon, Your Honor.
16   Caroline Herter on behalf of the Chamberlin
17   creditors.
18        THE CLERK:  And counsel on Zoom.  Ms. Dorr?
19        MS. DORR:  Good afternoon, Your Honor.
20   Teresa Dorr on behalf of the United States
21   Trustee.
22        THE CLERK:  Do you want the other three to
23   make their appearances?
24        THE COURT:  Sure.  Go ahead and make
25   appearances.

1          THE CLERK:  Mr. Gilbert?

2          MR. GILBERT:  Good afternoon, Your Honor.

3    Adam Gilbert of Underwood Murray on behalf of the

4    same parties as Ms. Murray.

5          THE CLERK:  Ms. Goldstein?

6          MS. GOLDSTEIN:  Good morning, Your Honor.

7    Megan Goldstein of Kozyak Tropin.  I'm joining

8    Mr. Lifshitz and Mr. Widlanski from Kozyak

9    Tropin.

10          THE CLERK:  And Mr. Wirth.

11          MR. WIRTH:  Good afternoon, Your Honor,

12    Steven Wirth of Akerman on behalf of Michael

13    Goldberg, the Chapter 11 Trustee; and I'm here

14    with my partner John Dicks, who's in the

15    courtroom.

16          THE COURT:  All right, is that everyone who

17    needs to make an appearance?  Very good.

18          We've got a number of things on the docket

19    today.  The first is the application to employ

20    Kozyak Tropin & Throckmorton.  So, Mr. Dicks, you

21    can present that?

22          MR. DICKS:  Your Honor, I do want to give an

23    overview on that and the stay relief motion, but

24    I'd also like to defer to Mr. Underwood and

25    Mr. Lifshitz about the sort of the substance of

1      those.

2          THE COURT:  Okay.

3          MR. DICKS:  If it pleases the Court, though,

4     since Mr. Yant is here and item number 4 is going

5     to be the least controversial thing that we do

6     today, I thought maybe we could take that up

7     first.

8          THE COURT:  Okay.  That's fine.  Item

9     number 4, then, is the Motion to Sell Property

10    Free and Clear.  It's property in Ohio?

11         MR. DICKS:  Yes, Your Honor.  The --

12    Mr. Govoni, through two different entities, one

13    called BFG Columbus and one called Seaboard Real

14    Estate, invested and was the majority member of

15    an entity called BFG Columbus Ohio.  And BFG

16    Columbus Ohio owned a strip mall in Columbus that

17    -- and, again, he had the majority.  So he had

18    about 70 percent, roughly, of this strip mall in

19    Ohio.

20         And once we found out about that, that was

21    part of the, as the Court will no doubt recall,

22    was part of the ongoing asset searches and

23    gathering control of those.

24         Once we found out about the property, got

25    control of the property, we learned that,

1    interestingly, unlike many of the other deals

2    that Mr. Govoni had done, he did this one with a

3    professional property manager, a guy named

4    Lawrence Solomon, so is unrelated to Mr. Govoni

5    in any other way, but he facilitated this deal,

6    sourced the -- raised some money, found the

7    property, managed the property, was doing a good

8    job managing the property.  So we allowed him to

9    do that.  But he agreed to participate in a sale

10   whereby we could hire a broker, sell the

11   property, and pay out all of the equity holders,

12   with the estate getting, again, the bulk of that.

13       Initially when we hired the broker, a firm

14   out of Columbus, they -- the broker's opinion of

15   value was in the neighborhood of 1.6 million --

16   1.5, 1.7, something like that.  And we knew that

17   the property had a mortgage of about 1.2.

18       At the end of the day, after a robust

19   marketing period and some negotiations with folks

20   who had submitted offers, we ended up with an

21   all-cash, no-contingency offer of 2.4 million.

22       And so we were thrilled about the equity

23   that we found in this property.  The waterfall of

24   the distribution of proceeds to the equity

25   holders of this company, some of which, again,

1    have nothing to do with this case, other than

2    they were tied up in an investment vehicle with

3    the Govoni entities.  But the waterfall is all

4    there in the motion.  There's been no objection.

5         And the one thing I wanted to flag for the

6    Court to sort of bring this back to a couple of

7    months ago, the Court may recall that we

8    compromised a dispute with Mr. Yant's client,

9    Arena Finance.

10        Arena Finance and Mr. Goldberg were in a

11   race to the courthouse against Mr. Govoni, and

12   Mr. Goldberg obtained a judgment.  And then

13   within 90 days of it being recorded, Arena

14   Finance obtains a judgment and there was going to

15   be some dispute about priority and a bunch of

16   different issues.  And so we compromised that.

17        And what one of the compromises was,

18   Mr. Goldberg took -- took the judgment.  He was

19   assigned the judgment against other entities.

20   And so now Mr. Goldberg hold about an

21   8-million-dollar judgment against some other

22   entities.

23        But we -- we pledged 20 percent of the net

24   sale proceeds that the estate would recover from

25   the sale of this particular property.  And so

1       this is the punctuation mark on that deal.  This

2       results in would-be $750,000, approximately,

3       coming to the estate, but 150 of that, 20

4       percent, is going to go to Mr. Yant's client

5       pursuant to that order granting the 9019 motion

6       that the Court entered earlier this year.

7            And, again, we just think it's an

8       outstanding result for everybody.  And I hope

9       Mr. Yant's client agrees.  But certainly they

10      didn't file an objection to this, so I presume

11      that they do.

12           THE COURT:  Okay.  That -- those numbers are

13      a little bit different than what's in the motion.

14      The waterfall shows 688,487.  And with the

15      bankruptcy a share -- the bankruptcy estate's

16      share being about 550.  Is that -- which is

17      correct?

18           MR. DICKS:  I think that's just a more

19      accurate than the numbers that I gave.  Yes.

20           THE COURT:  Okay.  Very good.  Then those

21      are the actual numbers.

22           MR. DICKS:  That's what's actually on the

23      closing statement.

24           THE COURT:  Okay.  Very good.  Any party

25      object to the proposed sale of these properties?

1      It's actually two properties.  Hearing none, I'll

2      go ahead and enter an order approving that.

3           MR. DICKS:  Thank you, Your Honor.

4           THE COURT:  Thank you.

5           MR. DICKS:  Now I'm going to move on to the

6      other items, which, again, are the Applications

7      to Employ and the motion for -- the Agreed Motion

8      for Stay Relief.

9           I want to set the stage very briefly and

10     then turn it over to Mr. Underwood and

11     Mr. Lifshitz on their respective motions.

12          I think the best place to start with this,

13     Your Honor, is to go back to the Court's order,

14     docket number 314 entered a little over a year

15     ago on August 5, 2024.  And that order, Your

16     Honor, was an order granting the Chapter 11

17     Trustee's motion to enforce the automatic stay.

18     Because I think that sets the stage for what is

19     going on here.

20          The Chamberlins, whose name you'll hear a

21     little later, represented by -- they're the ones

22     who have objected to the stay relief motion and

23     the applications to employ.

24          At the time, Your Honor, you may remember

25     that they had filed their own class action.  And

1    the Chapter 11 Trustee filed a motion to enforce

2    the automatic stay to void that class action

3    because it was interfering with the

4    administration of the estate.

5        And in that order at page 10 you held,

6    quote, "Although the Chapter 11 Trustee has not

7    sued all the parties who are Defendants in the

8    class actions, at some point the Chapter 11

9    Trustee may choose to do so on behalf of the

10   estate for the benefit of all beneficiaries.  The

11   timing and order of pursuing those claims is up

12   to the Chapter 11 Trustee.  Those claims, as well

13   as claims against any D&O policies may be pursued

14   by the Trustee after further investigation or

15   after a final determination the monies are not

16   recoverable from other parties -- from the

17   parties to the loan documents."

18       And then in the next paragraph, the Court

19   held, quote, "The Chamberlin class action has

20   interfered with and jeopardized the Trustee's

21   work and the administration of the Chapter 11

22   case by attempting to exercise control over the

23   recovery of the BFG loan proceeds."

24       I think that sets the stage for what's going

25   on here.  Mr. Goldberg has -- he has been very

1   active, as the Court is well aware, in pursuing

2   various recoveries for the beneficiaries.  And he

3   is at a stage now where he is prepared to file a

4   complaint against new defendants who have not

5   come before the Court yet.

6        He has investigated and interviewed several

7   potential lawyers who he -- who could represent

8   the claims that are intended to be brought.  And

9   he has chosen the KTT firm and the Underwood

10  Murray firm.

11       It's within his purview to do that.  There's

12  been an objection that's been filed.  And the

13  objection that's been filed is by the same folks

14  who we had to move to enforce the automatic stay

15  a year ago.  The district court affirmed that.

16  It's on appeal at the 11th Circuit.

17       But this really ultimately becomes a

18  continuation of that effort to interfere with

19  what Mr. Goldberg is trying to do for the

20  beneficiaries.  And that's sort of the stage that

21  I wanted to set.  That's the way that we see it

22  from our perspective.

23       THE COURT:  Okay.  So which --

24  Mr. Underwood.  You can go first.

25       MR. UNDERWOOD:  Thank you, Your Honor.  And

1      I'm going to try -- is my microphone on?

2      Everyone can hear?  Okay.

3           I'm going to try not to retread over too

4      much of what Mr. Dicks just had to present.  But

5      I'm going to back up for a minute to the outset

6      of this case.  I have appeared before Your Honor

7      in this case, and really almost solely in

8      connection with the class action potential

9      litigation issues.  And I've had that limited

10     role where my partner, Ms. Murray, has handled

11     both that part, but also everything else going on

12     in the case.

13          And so I was here before you, I think first

14     it would have been in May or June of last year

15     when there was a motion to enforce the automatic

16     stay.  And I want to back to even before that

17     point.  Because when we came in, we were

18     representing the committee for possibly a week,

19     maybe less, by the time Mr. Goldberg was

20     appointed as Chapter 11 Trustee.  Obviously

21     that's an unusual circumstance.  And both roles

22     have been maintained.

23          And we came very quickly to the conclusion.

24     We knew there were class action suits

25     outstanding.  And we began discussions with all

1        sides.  And consistent with what I've already

2        said to you Your Honor, and just as a reminder on

3        my position going back a little over a year ago,

4        it was that the primary goal here needs to be to

5        maximize the pot, maximize the total recovery.

6        And that may really take some cooperation.

7             But that as things stood, it was problematic

8        the way the current class action suit was alleged

9        and how those allegations were.  And we spent a

10       great deal of time trying to figure out if there

11       was a way to be cooperative both in how lawsuits

12       were brought, whether Mr. Goldberg as the Trust

13       trustees, which -- so you'll hear probably from

14       myself and Mr. Lifshitz the distinction between

15       the Chapter 11 Trustee role, and it's part of the

16       objection.

17            And maybe the easiest way to phrase it is

18       the retained Trust trustee or the Trust trustee.

19       But that in those capacities maybe --

20            THE COURT:  So -- and I'm just going ahead a

21       little bit.  As I'm understanding it, we've got

22       different types of claims here.  We've got

23       Chapter 11 claims of the Debtor.

24            MR. UNDERWOOD:  Correct.

25            THE COURT:  We've got claims that

1       Mr. Goldberg, in his capacity as the trustee for

2       all of the beneficiaries, not as the Trustee for

3       the bankruptcy estate, retained as part of the

4       wind-down.  And then we have individual claims of

5       -- of beneficiaries, one of which I've already

6       lifted the stay to let them proceed against an

7       attorney.

8           MR. UNDERWOOD:  Correct.

9           THE COURT:  So those are the three

10      categories of claims, which is a little different

11      than most cases.  But go ahead.

12          MR. UNDERWOOD:  That's exactly right.  It's

13      different than many cases.  Though I will say I

14      think there are cases nationally that fall

15      somewhat within this bucket where you have large

16      scale, whether it's a Ponzi scheme case or

17      something like that where you have class action

18      suits.  Maybe the trustee's involved.

19          And so what our plea to the Court -- and

20      candidly, we were sitting with the Trustee, but

21      even when we were concerned with the motion to

22      enforce the stay at the time because our

23      beneficiaries benefit from the class action.  So

24      we were in that odd spot of saying we want some

25      of this to be able to go forward because our

1    beneficiary -- our constituents are also the

2    trust beneficiaries.

3        And so that cooperation was a key goal.  And

4    the whole purpose -- and this is really more

5    focused on the class action suits than the

6    individual, for instance, lawyer claim that Your

7    Honor lifted stay on already.  And we weren't

8    able to get there.  And so we had the motion to

9    enforce the stay.  Your Honor continued it a

10   number of times.

11       We talked about openly in court a further

12   amended complaint.  And so I -- and by the way,

13   I'm going to apologize now -- I'm probably

14   touching on the applications to employ and stay

15   relief at the same time because we were

16   discussing this even pre-hearing, it's chicken

17   and egg, right?  If we don't have stay relief, we

18   don't need the employment.  If we don't have the

19   employment, we don't need stay relief.  So

20   they're very combined.

21       But we weren't able to get that cooperation.

22   Rather that we got litigation over it.  And the

23   cooperation is to maximize the pot first rather

24   than have attribution of who grew what pot and

25   not have two competing interests.

1          And so that's where we came.  And the

2     fundamental objections today to starting with the

3     employment application is that there's a conflict

4     because -- really, it's not even between counsel.

5     But Michael Goldberg, in those two capacities, is

6     going to want a larger recovery in one capacity

7     versus another.  And it's not really suggested

8     why that is.  And it says that -- the reference

9     is this is obviously a conflict because he has

10    two estates.  He has a potential benefit in a

11    class action and this bankruptcy estate.

12         And I thought about should I bring in an

13    easel and do a Boolean logic demonstration here

14    where we draw the circle, starting with the

15    entire circle of this estate's creditor

16    constituents, and then say, okay, now let's draw

17    all possible class representatives within that

18    circle.

19         And I think if I were to do so accurately,

20    you would not be able to distinguish between the

21    lines, because the difference between this estate

22    and those beneficiaries are functionally the

23    same.

24         Then if you drew another circle within that,

25    you'd find those limited members of the potential

1    class or potential claims as Michael Goldberg is

2    the Trust trustee.  There are approximately 20, I

3    think it's mid-20s, mid to low 20s of people who

4    have opted out out of thousands of potential

5    trust and beneficiaries that may have claims

6    here.

7        So your circles would be identical.  And

8    that is the fallacy upon which the Chamberlins'

9    objection relies.  It relies on this fallacy that

10   there's actually an A versus B.  When you realize

11   A and B are the same, A versus A does not exist.

12   And the ability to work together and know the

13   professional duties is not lost on any of the

14   professionals here.  The Chapter 11 Trustee has a

15   fiduciary duty not just to grow the estate as

16   large as possible, but to maximize the recovery

17   for the constituents of the estate.  That can

18   happen in any case.

19      THE COURT:  So would any settlement that

20   involved any type of allocation have to come

21   before the Court for approval?

22      MR. UNDERWOOD:  So that was a key piece of

23   this.  Exactly.  The parties can weigh in on

24   that.  And part of the reason for that is there's

25   so many unknowns.  And as Your Honor said,

1        settlement.  I'll jump ahead to settlement.

2            If there's a settlement, very likely a

3        settling party would be, we believe, willing to

4        pay more if they know I'm settling this somewhat

5        globally.  Right?  We know under Purdue Pharma

6        how global something is may be up for debate

7        later on in this case.  But at least if you're

8        settling the estate claims and the claims being

9        brought by Michael Goldberg as the Trust trustee

10       claims, you're settling a global -- a larger

11       faction.

12           And constituents of all the various

13       locations would be able to be heard and weigh in

14       on how certain settlements should be allocated.

15       And what we don't know today is we don't know if

16       party X, defendant X has litigation brought by

17       Michael Goldberg as a Chapter 11 Trustee, but

18       also brought by the KTT firm in a class action

19       capacity or as the Trust trustee capacity,

20       whether one of those has a really defense for,

21       whether it's standing, whether it's --

22           THE COURT:  *In para delicto*?

23           MR. UNDERWOOD:  I mean, I don't want to say

24       such awful words, Judge, but they may -- someone

25       else may, right?  Someone else may assert that

```
1          type of defense.  And we want to -- that may
2          weigh in on how settlement proceeds are
3          allocated.  And that may -- what we want to do is
4          box as much as possible potential defendants into
5          recovering one way or the other and accept -- and
6          I think both firms knowingly accept -- and this
7          is a key difference -- that there is a risk that
8          some portion that we may not love is allocated to
9          another firm's efforts.  And that just is the
10         nature of how this is going to proceed.
11              But the other piece is that we have a high
12         level of confidence, because of the dual capacity
13         of Michael Goldberg, that certain allegations
14         that were in the Chamberlins' complaint, such as
15         the loan that now is subject to a judgment of
16         this Court is a sham and does not exist as a real
17         loan, which would undermine this estate's biggest
18         asset at the moment, which is a judgment for, I
19         think it's over $120 million or somewhere in that
20         range.
21              So the goals there, why they don't conflict
22         is a Chapter 11 Trustee doesn't merely say "I
23         want to distribute the most in my case."  He
24         wants to distribute the most.  And that can be a
25         lot of ways.  It can be recovering everything in
```

1          this estate, but it can also be objecting to

2          claims that aren't valid claims that gets a

3          larger recovery for the rest of the claimants.

4               It can also be that there's some settlement

5          or there's some other form of income that comes

6          into the estate, whether from a guarantor or some

7          other recovery source.  Maybe a creditor has --

8          one creditor has a potential secured interest and

9          there's a deal to let them go foreclose on that

10         outside of the estate.  And my point is that

11         reduces the overall creditor body.

12              So the recovery from the class helps the

13         beneficiaries of this estate because their claims

14         are also reduced.  It's a dollar-for-dollar

15         benefit for everyone.  And, obviously, they're

16         they same people, as I mentioned.

17              So that's why ultimately we think the

18         objection that there's a conflict here should be

19         overruled.

20              But as to the stay piece, this -- I want to

21         talk about that.  There is a stay relief motion

22         filed.  And the reason is is, as Your Honor said,

23         there are direct claims.  Your Honor's addressed

24         one specific one everyone in the court is aware

25         of.

1          Also, one of the arguments made by the

2     Chamberlins on the prior motion to enforce is

3     these class action claims are direct claims.  I

4     think Your Honor acknowledged at several

5     hearings, and we, as having the beneficiaries

6     within our constituency, said we think some of

7     these class action claims are likely direct

8     claims.

9          Therefore, the Chamberlins say we are trying

10    to do the same thing we blocked the Chamberlins

11    from doing.  And that's where again the opening

12    piece of the Chamberlins' position is a fallacy.

13    And the reason is Your Honor didn't rule there

14    are no class action claims that are distinct from

15    claims of this estate.

16          Rather, Your Honor ruled at page 13 of

17    docket entry 314, the same one that Mr. Dicks

18    cited from, that the Amended Complaint, as

19    currently pled, violates the stay.  Then on

20    appeal, again the appellate court focused on not

21    on the Chamberlins' cause of action violates the

22    automatic stay, rather the complaint does, and

23    the amended complaint, as pled, violates the

24    automatic stay.

25          And the presumption is that the complaint

1       filed by the KTT firm, or to be filed against

2       various parties and complaints, plural, probably

3       is more accurate, would be similarly violating

4       the stay.

5           Well, I'd say two things to that.  One, I

6       have a high level of confidence that Mr. Goldberg

7       will not be supporting, as a client of a class

8       action, a complaint that attacks the loan

9       judgment.  So that's one.  So I think that will

10      -- it will just be different.

11          And, two, to the extent that it arguably

12      could be a violation of the stay because the -- I

13      think there's three large stay issues.  One,

14      you're exercising control over property of the

15      estate by saying the loan doesn't exist and the

16      judgment should be -- is void or isn't real.

17          Two, you're actually asserting derivative

18      claims of the estate, like D&O claims.  And those

19      two, I think, were clearly in the Chamberlin

20      complaint.

21          The third one, as well, is the allegations

22      are so close to being alleged against the Debtor

23      that they're functionally claims against the

24      Debtor.  And Your Honor found essentially all

25      three were applicable.

1          As to the third one, there could be some

2     argument down the line that, based on the way

3     these claims are alleged, the Debtor is

4     implicated.  And as to that, that's where we

5     think cause exists to lift the stay, and that the

6     claims in the estate are adequately protected due

7     to Mr. Goldberg's dual role, and that the -- the

8     argument that we are essentially doing the same

9     thing is fundamentally different for those two

10    reasons.

11         One, we're not making the first two stay

12    violation issues.  And, two, there's a completely

13    cooperative process.  And that cooperation and

14    how we got here, rather than continuing to

15    litigate, litigate over -- maybe stay relief is

16    something we see litigation over, but employment

17    applications are rarely litigated over.

18         So the stay relief motion was filed in an

19    abundance of caution.

20         THE COURT:  So let me just ask a question --

21         MR. UNDERWOOD:  Please.

22         THE COURT:  -- because one of the

23    advantages, in fairness to the Chamberlin

24    Plaintiffs was I had the complaint, so I knew

25    what the claims were.  I don't know what the

1    claims are you're seeking to pursue at this

2    point.

3         MR. UNDERWOOD:  That's a fair -- it's a fair

4    point.  It's one we discussed in advance of this

5    hearing.  We think the overall prejudice of

6    filing a complaint that's not yet filed, and

7    saying "Here's what we would propose to file," is

8    really problematic for us.

9         So I want to start with that.  The parties

10   to be sued are -- and the focus here are enabler

11   claims.  You know, it's -- I don't think it's a

12   secret American Momentum Bank is one of the

13   parties that is very much on the radar.  There

14   are enabling law firms, enabling family members,

15   enabling accountants.  There are claims that both

16   -- both hats think they can assert claims against

17   and would like to get the most recovery possible.

18        Even though Your Honor doesn't have the

19   complaint, the protection Your Honor has and the

20   protection -- the adequate protection we think

21   for stay relief that the bankruptcy court process

22   has, is the fact that Mr. Goldberg has that

23   second hat.  Instead of being a conflict, that's

24   actually beneficial.

25        And we know, again, the fact that the

1    beneficiaries are functionally the same.  But we

2    also know that there's an open dialogue and a

3    cooperation between the lawyers for the estate --

4    bankruptcy estate and the lawyers for the class

5    action.  I will tell you that at least as to one

6    complaint, our office has seen a draft.  We've

7    been given a chance to comment on it, as

8    Akerman --

9         THE COURT:  Okay.  And I think you raise a

10   fair point.  I don't need to see the complaint.

11   There's a possibility of pre-litigation,

12   mediation, or settlement that I would not want to

13   interfere with.  But I just need to know the

14   general topics which I'm appointing counsel to

15   pursue.

16        MR. UNDERWOOD:  Correct.

17        THE COURT:  And I think -- I think I've got

18   it.  And it's basically the class -- the third

19   class of claims.

20        MR. UNDERWOOD:  That's right.  It's the

21   third class of claims that -- your Honor has that

22   correct.

23        Now, that doesn't mean that some Defendant

24   may not argue that even the third class, and

25   class being class action, are direct --

1          THE COURT:  I'm not determining what --

2          MR. UNDERWOOD:  -- and we're not getting --

3     you're not determining --

4          THE COURT:  -- claim is in what class at

5     this point.

6          MR. UNDERWOOD:  Correct.

7          THE COURT:  Okay.

8          MR. UNDERWOOD:  Correct.  And so that is

9     what Your Honor is deciding.  And, again, I think

10    if you look at when we filed our objection or

11    supplement brief, Ms. Murray filed a supplement

12    brief at docket entry number 297 before Your

13    Honor enforced the stay.

14         And in it, over five pages, pages 6 through

15    10, cited paragraph after paragraph, in single

16    spacing, of the problems of the allegations in

17    the Chamberlin complaint that would be

18    problematic because they're either stepping

19    directly on derivative D&O claims or they were

20    those allegations about the loan being a sham

21    that mattered a great deal to us then and now.

22         But there was never, even though we talked

23    about it in open court, further amend the

24    complaint.  Further -- ask for further stay

25    relief to amend and say "Hey, I see these five

1    pages now.  We want to amend to eliminate all of

2    this or work around it.  We've shared a draft of

3    our amendment with..."  But none of that

4    happened.

5         But it's not this side of the room's fault

6    that there was never a further amended complaint,

7    there was never a motion for stay relief that

8    asked for stay for cause.  I think Your Honor

9    even said at one of those hearings, "You know,

10   you could ask for stay relief.  Maybe there's

11   cause here."

12        And maybe there would have been within

13   certain parameters, because that's when Your

14   Honor checks stay relief with adequate

15   protection.

16        Here, the wind-down order in that dual

17   capacity and the, I think, near complete

18   alignment of constituents gives Your Honor that

19   adequate protection.

20        And so I appreciate you letting me address

21   in a roundabout way all of the employment

22   applications.  I don't think there's actually as

23   to my firm's employment application, which would

24   be to represent the estate -- the bankruptcy

25   estate side and expand our scope, which was

1    already partially expanded to represent

2    Mr. Goldberg in some conflict situations, I don't

3    think there's a factual or technical objection

4    beyond the fact that essentially arguing

5    Mr. Goldberg has this conflict.

6         And as to that, the last point on that, Your

7    Honor, is that would really be an objection to

8    the wind-down order itself, that all along he

9    should have been barred from having that.  And

10   that wind-down order not only is in existence,

11   but has been in existence for a while.

12        So now, because he's been granted this

13   authority, he needs to get moving on it.  And

14   what we filed yesterday, last evening, was a

15   notice of a retention agreement of the Leeder law

16   firm.  Leeder is one of the two Chamberlin class

17   counsel -- proposed class counsel law firms.

18        And the concern or the reason we filed that

19   one -- and it's redacted -- but I can represent

20   to you the client that is signed up is the mother

21   of a trust beneficiary that is not in an opt-out

22   category.  So we have individuals who are within

23   the -- that their trust should still be being

24   managed in the litigation under the wind-down

25   order is explicitly within Michael Goldberg's

1   authority as the Trust trustee.  And yet they're

2   being solicited by other law firms in really

3   unclear ways while still not opting out without

4   -- it doesn't seem -- we don't know yet without

5   disclosures about what the trustee is doing and

6   that the trustee bring this as well.

7       So it -- I think the beneficiaries are

8   prejudiced if -- by the status quo, as well.

9   This is the last point I would make, Your Honor,

10  unless you have further questions for me.

11      THE COURT:  I do.  In terms of the fee

12  structure that's proposed, I was -- what is it

13  proposed for your firm?  Is it the same hours

14  and --

15      MR. UNDERWOOD:  Both -- no.  For this scope

16  of work we are proposing the exact same fee

17  structure as KTT, which is no more than 33

18  percent.  In part, we have reserved that "no more

19  than" because, depending on the recoveries,

20  right?  We may be coming in here -- this is not a

21  usual case.

22      THE COURT:  So is it contingency fee?

23      MR. UNDERWOOD:  It's -- this is a contingent

24  -- pure contingency for both law firms as to

25  these --

1          THE COURT:  Okay.  It was a little unclear.

2     There was like some we'll talk about alternative

3     fee arrangements.  But contingency fee, I think,

4     kind of eliminates a lot of the issues.

5          MR. UNDERWOOD:  Yeah.  So it's contingency

6     fee, and then it's contingency fee with, I think,

7     some what we believed, if we're talking about

8     this now, some crucial language, which was both

9     firms' applications say that we understand that

10    contingency fee, even from the class action, is

11    all going to be subject to further court order

12    and subject to allocation so that -- we know --

13    we know there's a risk.  And, hopefully, not a

14    risk, but a benefit.  Because, candidly, they've

15    been running faster than us, but the KTT firm

16    gets a great, fantastic recovery and we don't

17    have to do that much.  In which case, from a law

18    firm economics, we may receive substantially

19    less.

20         But we acknowledged that and we said right

21    from the start we know that's the case that this

22    is an unknown we're willing to accept for the

23    benefit of everyone here.

24         KTT has the identical language on the

25    reverse side for the claims they're bringing.

1      And I think all of that, and the fact that Your

2      Honor's oversight and the Chamberlins, as well as

3      any other parties, still maintain an opportunity

4      to come into this court and express why any

5      proposed allocations should not be approved.

6           Because what our candid hope is you recover

7      the maximum amount possible from whatever

8      litigation source, and then there's some type of

9      analysis that happens outside of Your Honor's

10      courtroom, and then there's a proposed allocation

11      and Your Honor hears the rationale for why that's

12      being proposed, and other parties get to say why

13      it should be something else.

14           THE COURT:  Okay.  Mr. Lifshitz, did you

15      want to add anything?

16           MR. LIFSHITZ:  Yes, Your Honor, briefly.

17           THE COURT:  Go ahead.

18           MR. LIFSHITZ:  So, Your Honor, I -- you may

19      know that my law firm does do a substantial

20      amount of bankruptcy work.  I am not a bankruptcy

21      attorney.  I do litigation.  I do class actions.

22      So this is a bit of uncharted territory for me,

23      although I'm getting a crash course, it feels.

24           Uncharted in another way because I don't

25      know of any situation -- and I asked -- where

1       anybody in my firm has ever been retained or been

2       attempted to be retained by a fiduciary and had

3       an objection asserted.  So this is a first for

4       us.

5            I want to talk to you a little bit about

6       what we've been doing since we were first

7       introduced to this very important matter.  It was

8       over six months ago now.  And since that day we

9       have been working in conjunction not only with

10      Mr. Goldberg, Mr. Dicks, and the rest of their

11      team, not only with Mr. Underwood and Mr. [sic]

12      Murray and their team, but our team at KTT, which

13      I'm joined by my partner, Mr. Widlanski.  I have

14      Ms. Goldstein.  And I have another more

15      substantial group of people that have been

16      looking at this very seriously now for the better

17      part of a year.

18           We have looked at tens of thousands of

19      documents.  We have interviewed witnesses.  We

20      have consulted with experts.  There are claims

21      here.  And we are ready to get to work to try to

22      bring, for the benefit of all of the

23      beneficiaries that we hope to represent, as much

24      of a recovery as we possibly can.

25           Our experience in these matters is laid out

1           in Mr. Goldberg's application to retain us.

2           There is one part of that experience that I want

3           to emphasize for the benefit of the Court.  And

4           that is the category of claims, that third

5           category that you raised, Judge.  And that is

6           when there is a fiduciary, there's an estate,

7           whether it's a bankruptcy estate or whether

8           there's an SEC receivership, and there is a

9           parallel class action.

10              And our experience is substantial in this

11          area, as well, and in particular, with

12          Mr. Goldberg and his team.  In fact, I thought

13          about this the other day, but from my first day

14          as a lawyer, I started to work on the Rothstein

15          Ponzi scheme matter along with Mr. Goldberg and

16          his team.  And that lasted for years.

17              And then the next one was the Jay Peak fraud

18          scheme in Vermont.  It was $400 million at issue

19          where he was the SEC equity receiver.  And we

20          prosecuted the class claim in parallel to him,

21          coordinating our efforts to maximize the recovery

22          for the victims.

23              And most recently, in the aftermath of the

24          Surfside condo collapse where Mr. Goldberg was

25          appointed the receiver and we were the co-chair

1        lead counsel overseeing over a dozen law firms

2        for the benefit of those victims.

3            Judge, I would submit to you that we've had

4        success in these matters working with

5        Mr. Goldberg and his team and all of the other

6        law firms that we've coordinated with in the past

7        because we always ask ourselves, "What is the

8        right way to approach these situations?  How do

9        we do it the right way?"

10           Now, we could have just filed a class action

11       with another class representative without coming

12       to the Court or doing anything.  We have another

13       client.  We actually have two additional clients

14       who are going to serve as class representatives

15       potentially, in addition to Mr. Goldberg.

16           But that wasn't the approach that we took

17       because we wanted to ensure the Court that

18       everybody on this side -- I'll refer to it as

19       this side of the V, the other side being the

20       enablers, the ones that we're going to be

21       pursuing.  We wanted to ensure the Court that

22       everybody on this side of the V was united and

23       unified and coordinated in their approach,

24       because we know how important that is to success

25       in these types of situations.

1          We also wanted to ensure in an open and

2     transparent process that all of the victims

3     likewise had the benefit of knowing exactly who

4     we are and exactly what we've been doing for

5     their benefit.  And I hope that we accomplish

6     that today.

7          I want to be very direct about the issue of

8     the conflict, because we take such accusations

9     very, very seriously.  In addition to everything

10    that Mr. Dicks and Mr. Underwood have said, which

11    we a hundred percent agree with, there are three

12    very, very simple reasons why there is no

13    conflict and could be no conflict under these

14    circumstances.

15         First, we, as class counsel under Rule 23,

16    have very specific obligations as fiduciaries to

17    the class that we hope to represent.  Not

18    fiduciary obligations to Mr. Goldberg in his

19    capacity as the Trust trustee.  Obligations to

20    the entire class of beneficiaries.  And we take

21    that very, very seriously.

22         Number two, our class representatives, which

23    are separate from Mr. Goldberg, also have

24    responsibilities and fiduciary obligations under

25    Rule 23 to ensure that they don't put their needs

```
1      over the needs of anybody else in the class.  So

2      not only does Mr. Goldberg have that

3      responsibility, if he moves forward as a class

4      representative, but the additional class

5      representatives that we will have will share that

6      same responsibility.

7           And, finally, and perhaps most importantly,

8      Judge -- and you've already touched on this --

9      the Court is a check on anything that will happen

10     in such a matter.  Whether it's the district

11     court under Rule 23 if all of the parties are in

12     agreement on an allocation, or if there's not an

13     agreement and it needs to come before Your Honor

14     to determine whether an allocation is appropriate

15     or not, either way, a court is going to have to

16     review this after a notice period and an

17     opportunity for everybody to object before

18     anything happens.

19          So, Judge, I'll just conclude by saying that

20     on what I understand to be the very, kind of,

21     narrow and typically not controversial relief

22     that's before Your Honor today, the objectors

23     have not presented any reason why Mr. Goldberg

24     should not be permitted to retain us as his

25     counsel of choice.  Thank you.
```

1          THE COURT:  Okay.  Very good.

2          MR. UNDERWOOD:  One clarifying point, Your

3     Honor?

4          THE COURT:  Sure.

5          MR. UNDERWOOD:  One thing I just want to

6     clarify as Mr. Lifshitz was making his

7     presentation and talked about his experience with

8     Mr. Goldberg, I want it to be abundantly clear to

9     the Court the KTT firm was not the only other

10    firm that was -- that time was spent extensively

11    between the Akerman lawyers, the Underwood Murray

12    lawyers, the class -- excuse me -- the Unsecured

13    Creditors Committee members, there was a vetting

14    of several law firms.  And some of that

15    experience was helpful to that vetting and part

16    of why we thought we could move forward

17    cooperatively.

18         The objector's firm was one of those law

19    firms who, candidly, we spent the most time with.

20    But there was a full vetting of multiple options.

21    It was not -- I just wanted to be really clear

22    that it wasn't because Mr. Goldberg had

23    experience with KTT, that's what happened, or

24    that the Committee was not heavily involved also,

25    if not looked to for its view almost primarily.

1    Thank you.

2         THE COURT:  Okay.  Very good.  Thank you.

3         Ms. Herter.  And it is not unusual for

4    objections based on conflicts to be raised to

5    applications for employment.  So don't --

6         MS. HERTER:  Thank you, Your Honor.

7         THE COURT:  Sure.  But it has to be a real

8    conflict.

9         MS. HERTER:  May it please the Court, I do,

10   as we explained in our objection, there is an

11   actual conflict here.

12        When it comes down to it, no matter what hat

13   or label we are putting on Mr. Goldberg, if

14   Mr. Goldberg, as trustee of the trust, is

15   retaining KTT, and Mr. Goldberg, as Trustee of

16   the bankruptcy estate, is retaining Underwood

17   Murray, it's still Michael Goldberg who is the

18   person retaining both of these firms.

19        THE COURT:  Okay.  And that's how I read

20   your objection.  I didn't read it as the typical

21   objection that this firm has a conflict with

22   something.

23        MS. HERTER:  No.

24        THE COURT:  That you're basically saying

25   that it's the Trustee who has the conflict.

1        MS. HERTER:  Yes.  And that is correct.  And

2    that is because the Court, under Section 327(C),

3    shall disapprove some employment if there is an

4    actual conflict of interest, and that includes --

5    and I'm quoting from the case *Electro-wire*

6    *Products v. Sirote & Permutt*, which is 40 F.3d

7    356 -- "But that includes a situation where as

8    someone acts as an attorney for a person

9    possessing either an economic interest that would

10   tend to lessen the value of the bankruptcy estate

11   or that would create an actual or potential

12   dispute in which the estate is a rival claimant."

13       And we have both of those situations here.

14   We would not --

15       THE COURT:  Right, but not -- not these two

16   firms.

17       MS. HERTER:  No.

18       THE COURT:  You're saying -- so, I mean,

19   you're -- if I'm reading you correctly, then

20   you're saying that Mr. Goldberg shouldn't have

21   been appointed in the first instance.

22       MS. HERTER:  I'm not -- not necessarily

23   saying that Mr. Goldberg shouldn't be appointed.

24   But the fact that Mr. Goldberg is the fiduciary

25   of the bankruptcy estate and he has a fiduciary

1      to this bankruptcy estate, he steps into the

2      shoes of the Debtor, The Center for Special Needs

3      Trust Administration.  We would not be here in

4      this bankruptcy proceeding if there wasn't

5      adversity in interest between the beneficiaries

6      and The Center for Special Needs Trust

7      Administration, the Debtor.  That is the majority

8      -- the large majority of the Debtor's liability

9      in this case.  That's the reason that this

10     bankruptcy case was filed was -- is because of

11     this adversity of interests.

12         That is the reason going back to the motion

13     to enforce the automatic stay, one of the reasons

14     that it was argued our class action was violating

15     the stay is because we had allegations about the

16     Center's wrongdoing in our complaint.

17         And we did that because in order to state

18     certain causes of action that the beneficiaries

19     do have a right to state, including, for example,

20     aiding and abetting breach of fiduciary duty,

21     which we alleged against American Momentum Bank,

22     an element of that claim is that there must be a

23     breach of fiduciary duty and that the aider and

24     abettor must have actual knowledge of the breach

25     of fiduciary duty.

1          One of the breaches of fiduciary duty --

2          THE COURT:  Let me ask a question.  Did

3     Mr. Chamberlin opt out of the wind-down order?

4          MS. HERTER:  No.  And that brings me -- I

5     would like to discuss the wind-down order, as

6     well.

7          If Your Honor recalls, when we came here for

8     a hearing, probably about a year ago on the

9     wind-down motion, at that time we had the pending

10    appeal to the district court of the Court's order

11    on the motion to enforce the stay.  We were

12    concerned that the wind-down order could be read

13    to augment the Chapter 11 Trustee's standing to

14    more than what it would have been without this

15    retention of claims and which is an issue at the

16    heart of our appeal is what -- what claims does

17    the Chapter 11 Trustee have standing to bring.

18         So we negotiated agreed language in the

19    order, which is paragraph 22.  And that language

20    says that nothing in the order shall be read to

21    augment the Chapter 11 Trustee's standing to

22    assert claims that he would not have standing to

23    bring on the petition date.  And that includes

24    direct claims.  That includes the beneficiaries'

25    direct claims.  Because the Chapter 11 Trustee

1    has standing to bring the estate's claims and

2    derivative claims, but not direct claims of

3    creditors.

4         THE COURT:  Okay.  And I think in the

5    typical case, that would be correct.  But one of

6    the roles that Mr. Goldberg had to take over

7    because the Debtor absconded, essentially, was to

8    be the trustee of the trust, in addition to the

9    trustee of the bankruptcy estate.

10        MS. HERTER:  Yes.  And that is true.  And

11   the only reason is because Mr. Goldberg is the

12   Trustee of the bankruptcy estate, which brings us

13   back to the conflict and the, I would say,

14   fallacy of the different hats that he has.

15   Because the only reason that we have this

16   wind-down order and the retention of claims to

17   Mr. Goldberg, as trustee of the trust, is because

18   he is the bankruptcy Trustee for the former

19   trustee of the trust.

20        THE COURT:  Well, you don't want me to put

21   Mr. Govoni back in that position, I'm sure.

22        MS. HERTER:  No.  No, but -- we do not.

23        THE COURT:  So I'd much rather -- I'm much

24   more comfortable with Mr. Goldberg there.

25        MS. HERTER:  Yes, that is true.  Although

1        he's not the trustee in a technical sense, other

2        than to the extent he retained any claim -- or

3        ability to bring claims as trustee of the trust.

4             THE COURT:  But he did, under the

5        wind-down --

6             MS. HERTER:  Yes.

7             THE COURT:  -- order that you negotiated and

8        signed off on.

9             MS. HERTER:  Yes, but that is still -- he is

10       -- as I mentioned, he's retaining these claims as

11       -- in his capacity as trustee of the trust as the

12       Chapter 11 Trustee.  And as a Chapter 11 Trustee

13       he has certain enumerated powers under the

14       Bankruptcy Code that he has authorization to act

15       under.  For example, those duties include to

16       collect and reduce to money the property of the

17       estate.

18            But this is not -- retaining KTT in order to

19       bring direct claims of beneficiaries, which is

20       acknowledged that this is not meant to benefit

21       the estate.  This is -- what is being argued is

22       that this is meant to solely benefit the

23       beneficiaries in the beneficiary class.  That is

24       not one of the bankruptcy trustee's powers under

25       the Bankruptcy Code.  So there's not

1     authorization --

2          THE COURT:  Let me ask you a question.  If

3     we were not in bankruptcy and this was a trust

4     and there was a trustee, wouldn't that trustee

5     have the right to bring claims to protect his or

6     her beneficiaries?

7          MS. HERTER:  Yes.

8          THE COURT:  Usually, under the trust

9     documents that's pretty clear.

10         MS. HERTER:  That is correct, under at least

11    Florida trust law where there is a breach of

12    fiduciary or conflict of interest, the

13    beneficiaries themselves would also have standing

14    to bring those claims.

15         THE COURT:  And that's the quandary and

16    that's the issue that, you know, we've litigated

17    and we've talking about and what's on appeal.

18         MS. HERTER:  Yes.

19         THE COURT:  It is a very difficult thing to

20    distinguish between direct claims and indirect

21    claims, and there's a lot of overlap on it.  And

22    I appreciate the difficulties of all sides trying

23    to figure that out.  I don't know that there is

24    any easier answer to that.  But it is what it is

25    and we deal with it the best we can.

1          MS. HERTER:  Yes.  And I do want to -- would

2     also just suggest a hypothetical situation in

3     what is being proposed where Michael Goldberg, as

4     Chapter 11 Trustee, is retaining Underwood

5     Murray, who is also counsel to the Unsecured

6     Creditors Committee who includes the same --

7          THE COURT:  It's the same beneficiaries.

8          MS. HERTER:  -- class of beneficiaries.

9          THE COURT:  Seems to make sense.

10          MS. HERTER:  Yes.  But it -- I does not make

11     sense because of the adversity of interests.

12     Michael Goldberg's duty as the Chapter 11 Trustee

13     is to collect as much money as possible for the

14     estate.  And there are other creditors.  I'm

15     aware that the majority of creditors are

16     beneficiaries.  But there are other creditors,

17     including administrative expenses.

18          THE COURT:  I don't know that there really

19     are at this point.

20          MS. HERTER:  Well, there are --

21          THE COURT:  I guess there's administrative

22     claims, but, I mean, that's going to be involved

23     in any litigation, I would think.  I think

24     there's no secured claims that I know of.

25          MS. HERTER:  I believe there are government

1    claims for Medicare benefits, death benefits

2    pending, as well.

3        THE COURT:  I didn't know if that's

4    significant, but...

5        MS. HERTER:  Yeah, I don't believe it's a

6    significant amount, but that, nonetheless, under

7    the Bankruptcy Code these are part of the general

8    creditor body who Michael Goldberg owes a

9    fiduciary duty to augment the estate for.

10       And at the same time, as class counsel, as

11   any attorney for the beneficiaries, there is a

12   fiduciary duty to those beneficiaries.  And under

13   Rule 23 to be appointed class counsel there's

14   also a requirement that class counsel be adequate

15   without having any conflicting interests to the

16   class.

17       But in this case, in the hypothetical I

18   mentioned, which has been brought up is a

19   situation where there is a global settlement, a

20   global mediation, let's say with American

21   Momentum Bank.  And KTT is there representing the

22   beneficiaries' direct claims, Underwood Murray is

23   potentially representing the estate's claims, and

24   there's a common fund that's contemplated being

25   set up.  And both KTT and Underwood Murray are

1    retained by Michael Goldberg.  As the trustee of

2    the --

3         THE COURT:  But I'm not.

4         MS. HERTER:  As the trustee of the

5    bankruptcy estate --

6         THE COURT:  But I'm not, though.  And,

7    ultimately, anything would have to be filed and

8    would have to be approved.  And you would have an

9    opportunity to object.

10        MS. HERTER:  But Your Honor would not be,

11   for example, at a mediation where the

12   beneficiaries have a right to have someone who

13   represents their interests in this negotiate

14   present.  Because what could happen is a question

15   of how much is going to be allocated to the

16   estate, how much will be allocated to the class

17   of beneficiaries, and --

18        THE COURT:  This was actually just done in

19   the Purdue Pharmacy case when it went back on

20   remand from the Supreme Court.  And that

21   allocation -- there's an allocation.  I don't

22   know -- the plan, I think, is up for confirmation

23   in November, but that was done, and there were

24   direct claims.  And then there were indirect

25   claims.  And then there was an allocation.

1          I do think it's possibly.  And it obviously

2     has to be subject to court approval, too.

3          MS. HERTER:  But I do not believe -- and I

4     may be incorrect -- that in that case the direct

5     claims were not brought by a law firm retained by

6     the bankruptcy estate.

7          THE COURT:  I don't know.  I think they were

8     all settled, actually.

9          MS. HERTER:  So that -- but that is the

10    issue is that we have the Chapter 11 Trustee

11    retaining both sides of the V to represent in a

12    dispute over a common fund, for example.

13         There's all the issue of allegations in the

14    complaint, because, like I mentioned, to state

15    claims to survive a motion to dismiss, to get

16    punitive damages, to potentially have other

17    claims that will not be brought for fear of

18    accusing the Debtor of wrongdoing.  That, a

19    fiduciary duty to the beneficiaries would require

20    stating in the strongest claims possible,

21    including all the relevant facts to make your

22    case as strong as possible.

23         If -- what we have heard is that we have the

24    Chapter 11 Trustee reviewing draft complaints to

25    make sure there's nothing accusing the loan of

1      being a sham or that could potentially implicate

2      the estate.  And that is where the conflict is.

3      Because if there's an interest by the main

4      creditor body and suing non-debtor third parties,

5      if -- there cannot be a consideration for is this

6      going to hurt the Debtor.  Is this going to hurt

7      the bankruptcy estate who they also have claims

8      against.  And that is where the conflict is.

9          The beneficiaries deserve to be represented

10     by someone who is not retained by someone on the

11     other side of the V, by the representative of the

12     Debtor whose wrongdoing is the entire reason that

13     we are here in this bankruptcy case.

14         THE COURT:  So there are differences between

15     individualized claims, which, as I indicated, I

16     have lifted the stay to allow beneficiaries to

17     pursue in general claims that really affect all

18     of the claimants -- all of them.  It's pretty

19     much the same, like pursuing on a D&O policy or

20     something like that.  That's a generalized claim

21     that everybody that was a beneficiary could

22     probably have some interest in.

23         But then there are individualized claims,

24     which I do respect.  And I think I've said this

25     from the beginning that if there is an

1    individualized claim that a beneficiary has that
2    is unique to them, that's different and that's
3    protected.  And Mr. Goldberg may not have that
4    interest unless it's assigned to him for some
5    reason.  In many cases they are assigned to the
6    trustee because that's a very efficient way of
7    getting a collection and ultimately more
8    recovery.
9         I see your point.  And I see it not as an
10   answer to the applications that are before me
11   today whether this law firm has a conflict of
12   interest in pursuing it.
13        I think -- I do think that it really goes to
14   Mr. Goldberg's two hats, which, unfortunately, he
15   has to wear.  That's -- we're not going to have
16   Mr. Govoni come back and step into the role of --
17   or any of the former officers of the Center to
18   come back.
19        Somebody has to step in the role.  And under
20   the order in the wind-down order, the new
21   trustees have just taken everything and moved on
22   and left all of these claims behind for
23   Mr. Goldberg to deal with, probably because they
24   don't want to have to deal with it and represent
25   the interests of the beneficiaries.  And

1    Mr. Goldberg does have to do something.  I mean,

2    he has those claims.  He can't just sit on his

3    hands and hope they go away or abandon them.  I

4    think it's very appropriate for him to hire

5    counsel and pursue those claims.

6        I think the law firms that they're proposing

7    here are, you know, well-known firms.  The Kozyak

8    firm is an extraordinary firm.  I would feel very

9    comfortable hiring them myself to pursue my

10   claims.  They do a great job.

11       And the Underwood firm has performed very

12   admirably in this case in particular.  I don't

13   see that the law firms have an individual

14   conflict of interest that would preclude their

15   appointment by this Court.

16       So I'm going to grant both of the

17   applications.  Now, the stay issue, I want to

18   give Ms. Herter an opportunity to address that

19   one as well.

20       MS. HERTER:  Thank you, Your Honor.  And I

21   will briefly address that.

22       I think it was Mr. Underwood had said if

23   there is no stay relief, we don't need the

24   appointment.  If there's no appointment, we don't

25   need stay relief.  And this does kind of tie into

1     the application again.  They are intertwined.  I

2     would agree with that.

3          But if stay relief is necessary it would be

4     because either an adverse interest to the estate

5     or because these claims are property of the

6     estate.

7          If the claims are property of the estate,

8     then there would be no need to retain KTT to

9     bring them on behalf of the beneficiaries.  If

10    there -- the claims are subject to the stay

11    because of -- they are really disguised claims

12    against the Debtor, then that goes back to that

13    conflict of interest.

14         And that is -- it seems there was really no,

15    that we have been able to recognize.  We are

16    hearing we're going to allege different claims.

17    We haven't really heard what they are.  Enabler

18    claims sound very similar to the aiding and

19    abetting claims that we brought in our class

20    action.  That was held subject to the stay.  It

21    really -- there's no identified change in

22    circumstance that would -- from our class action

23    that would --

24         THE COURT:  I appreciate the confusion,

25    because, to my mind, I'm not sure if there is a

1       stay -- a potential stay violation.  The way I

2       read their motion was more of an abundance of

3       caution.  Because, you know, they're coming to

4       ask permission rather than, I think, what you did

5       and just deal with the consequences afterwards.

6            But I don't know if it is.  But I appreciate

7       the point that it's kind of the same issue.

8            MS. HERTER:  I will add we did file the

9       class action long before the Chapter 11 Trustee

10      was appointed, when at that -- it was a

11      debtor-in-possession case.

12           THE COURT:  I'm agree.  And I'm not faulting

13      you for doing it.  Something needed to be done --

14           MS. HERTER:  Yes.

15           THE COURT:  -- and you did take good action.

16      I don't fault the firm for doing that at all.

17           MS. HERTER:  Thank you.  But the -- I guess

18      the main objection to the stay motion is the fact

19      that if this is really -- if stay relief is

20      really necessary, that would go back to a

21      conflict of interest.  If stay relief is not

22      necessary, then why would it have been necessary

23      for our class action that is asserting the same

24      interest against assumingly the same Defendants.

25      American Momentum Bank enabler claims is one that

1    we know of.  It's --

2         THE COURT:  So again, I go back to the

3    question:  Is there a unique claim that any

4    particular beneficiary has, as opposed to the

5    general enabler claim that the bank -- the

6    allegation that the bank assisted in this

7    process?

8         MS. HERTER:  Well, so let's just take Clark

9    Chamberlin for example, and outside of the class

10   action context.

11        Clark Chamberlin has a unique claim.  He has

12   over a hundred -- or over a million dollars was

13   stolen from his Special Needs trust.  He has a

14   claim against -- individually against American

15   Momentum Bank for American Momentum Bank hiding

16   the red flags.

17        THE COURT:  And how is his claim different

18   from anybody else who has a claim against

19   American Momentum?

20        MS. HERTER:  Well, the injury is different,

21   for example.

22        THE COURT:  Well, the claim, absolutely.

23   Everybody has a different claim.  But it's the

24   same injury.  It's just the amount that's

25   different.

1          MS. HERTER:  Yes.  And that is true.

2    However, again, there --

3          THE COURT:  It's the way of the example is

4    that there was -- I don't know if you were

5    involved in it, but in the case where I did lift

6    the stay, the beneficiary had a direct claim

7    against their law firm who put --

8          MS. HERTER:  Yeah.

9          THE COURT:  -- them in here.  And I did lift

10   the stay.  And that's an individual claim.  I

11   believe it should be pursued.

12         MS. HERTER:  We did, in our amended

13   complaint, which was not some of the allegations

14   that were selected to the UCC's counsel's

15   supplement response.  But we did lay out pages

16   worth of allegations explaining the direct duties

17   that American Momentum Bank owes to Clark

18   Chamberlin as the class representative by virtue

19   of being a trust custodian under Florida trust

20   law and an agent of the trustee, which gives rise

21   to fiduciary duties owed directly to the trust

22   and their beneficiaries, which we had alleged in

23   our complaint as well.

24         So we do have the direct duties here owed by

25   the Defendants.  And I don't want to relitigate

1      the same motion.

2            THE COURT:  I know.

3            MS. HERTER:  I don't want to get into that.

4            THE COURT:  And it's on appeal, so I can't

5      do anything to help you if you think I can

6      reverse myself.

7            MS. HERTER:  Yeah.  And I'm not -- that is

8      not what I'm trying to do.  But I think that is

9      just the confusion that arises with the motion

10     for relief from stay because if this -- I mean,

11     and if relief from stay is so necessary to bring

12     these claims, then it does invalidate the

13     arguments that are currently on -- pending appeal

14     to the 11th Circuit right now that our class

15     action must be stopped because bringing these

16     claims against these non-debtors is interfering

17     with the administration of the estate because

18     they are estate claims.

19            THE COURT:  Okay.  I take your point.  And

20     you've preserved whatever you need to preserve.

21            MS. HERTER:  Thank you.

22            THE COURT:  I appreciate that.  Anybody on

23     this side want to respond?  And I'm focusing more

24     -- I've already ruled on the applications.  I

25     want to -- we're just dealing with the stay.

1          UNIDENTIFIED SPEAKER:  No, Your Honor.  You

2     were exactly right.  It's an abundant of caution

3     thing.

4          THE COURT:  Mr. Underwood?

5          MR. UNDERWOOD:  I'll be very brief.  I think

6     one point is to the stay.  I think there's at

7     least three things -- it was stated there's no

8     new circumstances.  I think there's at least

9     three that are very important here.

10          One, we have the wind-down order now.  So

11     there is a different, more clear capacity of who

12     has what, compared to where when we were here a

13     year ago and there was so much confusion.  And

14     Mr. Kapila was very new on the job in even doing

15     his role.  So just the development of time.

16     There's probably even more than that.  But that's

17     a big difference.

18          The other big one, and probably the one that

19     we were searching for the longest is a -- now

20     employed, based on Your Honor's oral ruling,

21     cooperative process with the punitive class

22     counsel.  From our perspective that is really

23     fundamentally different.

24          And that goes to the third is that there's

25     now actually a stay relief motion.  There never

1    was.  So Your Honor can analyze whether the

2    parameters of the adequate protection are

3    sufficient.  And here, what we think that

4    adequate protection is is the involvement of the

5    two hats and it's actually better.

6         The last point I'll just respond to is the

7    government -- there was reference that the

8    claimants are not identical, and so you may have,

9    for instance, government claims in this estate.

10        It may not be a hundred percent

11   dollar-for-dollar, but even government claims

12   that hypothetically might exist in this estate,

13   provided the allocation that is looked at by

14   court or courts, plural -- there's a good chance

15   there will be multiple courts -- provided the

16   allocation is fair, if the beneficiaries of this

17   estate obtain a 50 percent recovery -- hope so --

18   from a class action suit, the net benefit

19   actually still does flow to the government

20   claims, to the extent they exist, even as small

21   as they are.  There's still a benefit here in

22   this estate.  There is a reduction of the rest of

23   the claims pool and a potential greater recovery

24   for that government claim.

25        And, ultimately, these are things that we

1      deal with in cases -- in bankruptcy cases

2      frequently, that there's those alternative

3      sources.

4           So those are the only two things I wanted to

5      respond to, Your Honor.  Thank you.

6           THE COURT:  Okay.  As I said from the

7      beginning of this case when we first started, my

8      only goal is to make it as efficient and cost

9      effective as possible for the beneficiaries of

10     this estate to get as much recovery as possible.

11          I do see that the potential here for

12     pursuing these claims with firms that are well

13     versed in all of, you know, what has been

14     investigated since the beginning of the case is

15     very important and hopefully will inure to the

16     benefit of the beneficiaries.

17          I think the fact that they're dealing with

18     these claims on a contingency fee basis makes it

19     clear that the compensation will come from

20     recoveries and will not come from any other funds

21     that may be collected for the benefit of the

22     beneficiaries, that the estate will continue on

23     liquidating the 120 or so corporate entities and

24     the properties that Mr. Govoni has now

25     transferred over to the trustee.  And hopefully

1        will get even -- will be even more successful,

2        including with the brewery that keeps chugging

3        along, no pun intended.

4            We want to get as much as we can.  And I

5        think that this is a vehicle that has been well

6        thought of -- thought out.  And I'm going to, to

7        the extent I need to, modify the stay to allow

8        the firms to pursue these claims.

9            I didn't -- I know that in the wind-down

10       order we talk about Chapter 5 claims.  I didn't

11       -- I just wanted to clarify.  Are these claims

12       being pursued on this basis?  Or are those

13       separate claims?  That was my one confusion and

14       clarification I'd like.

15           MR. UNDERWOOD:  The KTT firm is not being

16       engaged to pursue Chapter 5 causes of action.

17           THE COURT:  Okay.  Very good.  Thank you.

18           MR. UNDERWOOD:  And where or who those are

19       brought by within this estate, by whether it's

20       Akerman, Underwood Murray, or some other special

21       counsel is not subject to the stay relief motion.

22           THE COURT:  Okay.  Definitely that would not

23       be required for stay relief.

24           So I'll look to -- Mr. Dicks, you're going

25       to do those orders for me?

1           MR. DICKS:  Happy to do it.

2           THE COURT:  Okay.  So we'll get three

3     orders:  One on docket number 633; one on 7 -- on

4     474; one on docket 666.  We've already dealt with

5     the sale motion.  And then docket number 692, as

6     well.

7           Is there anything else that we need to

8     address today?

9           MR. DICKS:  No, Your Honor.

10          THE COURT:  Okay.  Very good.  Thank you,

11    everybody.  And thank you for the argument.

12          (WHEREUPON, the proceeding was concluded at

13    3:08 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    CERTIFICATE OF REPORTER

2   STATE OF FLORIDA

3   COUNTY OF ORANGE

4

5        I, SANDRA A. BATTAGLIA, NOTARY PUBLIC, CERTIFY

6   THAT I WAS AUTHORIZED TO AND MY OFFICE DID TRANSCRIBE,

7   FROM CD-R, THE FOREGOING PROCEEDINGS AND THAT THE

8   TRANSCRIPT IS A TRUE RECORD.

9        I FURTHER CERTIFY THAT I AM NOT A RELATIVE,

10  EMPLOYEE, ATTORNEY OF COUNSEL OF ANY OF THE PARTIES,

11  NOR AM I FINANCIALLY INTERESTED IN THE ACTION.

12        DATED THIS 21ST DAY OF OCTOBER 2025.

13

14

15  _____

16  SANDRA A. BATTAGLIA, RPR, FPR
    NOTARY PUBLIC - STATE OF FLORIDA
17  MY COMMISSION NO. HH215845
    MY COMMISSION EXPIRES:  5/6/2026
18

19

20

21

22

23

24

25
```