## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

In re:                                                    Case No. 8-24-bk-00676-RCT

THE CENTER FOR SPECIAL NEEDS
TRUST ADMINISTRATION, INC.,                                Chapter 11

      Debtor.

_____

Michael Goldberg, *on behalf of* Javier          Adversary Pro. No. 8-25-ap-00347-RCT
Perales; Michael Passino *on behalf of*
Allison Passino; and John Griffith *on behalf of*
Jackson Griffith, individually and on behalf of
all others similarly situated,

      Plaintiffs,                                   CLASS ACTION

v.

AMERICAN MOMENTUM BANK,

      Defendant.

_____/

## THE PLAINTIFFS' RESPONSE IN OPPOSITION
## TO THE DEFENDANT'S MOTION TO DISMISS

## INTRODUCTION

For more than a decade, American Momentum Bank knowingly facilitated an unconscionable scheme by which the Center for Special Needs Trust Administration engaged in an ongoing breach of fiduciary duty owed to its clients, the beneficiaries of special needs trusts. Through accounts held at the Bank, and with the Bank's knowledge and substantial assistance, the Center pilfered over $100 million worth of life-sustaining trust funds out of the special needs trusts and into the pocket of its founder, Leo Govoni. As alleged in the Complaint, the Bank knew that the Center's accounts held trust funds and the Bank itself served as custodial trustee for some accounts. Despite this, the Bank enabled the Center's tortious conduct by knowingly processing transactions that should have been impermissible; putting the Bank's imprimatur on falsified account statements that the Bank knew would be sent to beneficiaries, knowing the beneficiaries would rely on the statements; and removing money from trust accounts at the direction of people who had *no* lawful or contractual authority to move those precious funds. Now held to account by the victimized beneficiaries, the Bank asks this Court to ignore binding law, torture the legal standard, and immunize the Bank from its misconduct.

The Bank's Motion to Dismiss proceeds along three fronts, all fatally defective. First, they argue the Plaintiffs have failed to allege actual knowledge. But, in doing so, they misstate the law, ignore recent and binding precedent, and ignore overwhelming allegations supporting actual knowledge. In launching this first attack, the Bank invites this Court to commit the same reversible error that the Eleventh Circuit identified and corrected in *Otto Candies*:

> The court failed to engage with the totality of the plaintiffs' allegations, ignored certain claims altogether, and flipped the presumption at the pleading stage on its head by reading inferences and uncertainties against the plaintiffs. The result was that rather than evaluating whether the plaintiffs had sufficiently pleaded their

1

claims, the court effectively asked whether the plaintiffs had proven them. That's not the standard at the motion-to-dismiss stage.

*Otto Candies, LLC v. Citigroup Inc.*, 137 F.4th 1158, 1200–01 (11th Cir. 2025). Perhaps the Bank invites this error because it has no better argument. But that is no reason to apply the wrong law, misread the Complaint, and dismiss a well-pled claim.

Second, the Bank half-heartedly argues that the Complaint is a shotgun pleading. This is demonstrably untrue—indeed, the very allegations the Bank rails against are necessary allegations in support of the elements of the Plaintiffs' claim.

Third, the Bank presents a superficial statute of limitations affirmative defense as a basis for dismissal. This is almost never appropriate and certainly is not warranted here. The Bank falls far short of demonstrating, as required, that the Plaintiffs have facially pled themselves into a time bar. Moreover, the Bank entirely ignores the Complaint's allegations of concealment and of the Bank's ongoing misconduct, giving rise (respectively) to fraudulent concealment tolling and application of the continuing tort doctrine.

The Bank has offered no valid basis for dismissal, and its Motion must be denied.

## I.    Background

### A.    The Center Breached its Fiduciary Duties to the Plaintiffs.

The Plaintiffs are beneficiaries of special needs trusts ("SNTs") that were, at all relevant times, administered by the Center. *See* Compl. ¶¶ 23–37, 77–78. The Center, as trustee of the Plaintiffs' SNTs, owed the Plaintiffs duties of loyalty, prudent administration, control, and protection of trust assets. *See id.* ¶¶ 7, 70, 81–100, 112. In violation of these duties, the Center loaned $100,000,000 of the beneficiaries' trust funds to Boston Finance Group ("BFG"), a company controlled by the Center's founder, Leo Govoni. *See id.* ¶¶ 114–52. The loans were not for any proper investment purpose, but instead for Govoni's personal use and benefit, including

2

funding his other business ventures and personal luxuries like real estate, a private jet, and sporting event suites. *See id.* ¶¶ 9, 153–82, 221. The Center repeatedly increased the loan amount through a series of amended and restated revolving lines of credit, beginning at $2,500,000 and ultimately reaching $100,000,000, without ever receiving repayment of principal. *See id.* ¶¶ 119–52. The Center failed to file a UCC financing statement to secure its interest in BFG's collateral, rendering the loan and promissory notes effectively unenforceable. *See id.* ¶ 203. Throughout the duration of the scheme, the Center allowed Govoni to use the SNT funds as a personal slush fund, commingled trust assets, used one beneficiary's funds to cover another's expenses, and treated the funds as fungible in a Ponzi-like scheme. *See id.* ¶¶ 4, 187–88, 232, 315, 331.

The breach didn't stop with the loan arrangement. The Center further breached its duties by failing to keep separate accounts for each beneficiary, failing to accurately track or identify trust property, and failing to inform or account to the beneficiaries about the misuse of their funds, going so far as to issue false account statements emblazoned with the Bank's logo—with the Bank's permission—concealing the loans and misappropriations. *See id.* ¶¶ 16, 19, 98, 231–34, 275–80. The Center also misused money designated for Medicare Set-Asides ("MSAs"), loaning those trust funds to BFG despite internal warnings that such actions raised fiduciary concerns and were not permitted. *See id.* ¶¶ 190–203. Over the fifteen-year span of the scheme, the Center failed to monitor or inquire into the health or purpose of the BFG loan and did not attempt to collect on the loan. *See id.* ¶¶ 226–29. After the scheme collapsed, the Center delayed notifying beneficiaries of the breach for nearly two years. *See id.* ¶¶ 233–34. As a result, the Center's actions led to the substantial depletion and, in some cases, complete loss, of the beneficiaries' trust assets, in violation of the trusts' purposes and the beneficiaries' interests. *See id.* ¶¶ 5, 13, 29, 33, 37, 335.

3

### B.    American Momentum Bank Aided and Abetted the Breach.

American Momentum Bank aided and abetted the Center's breaches of fiduciary duty by knowingly and substantially assisting in the misappropriation of the beneficiaries' SNT funds. The Bank had actual knowledge that the Center was a fiduciary holding trust funds for beneficiaries, as evidenced by account agreements, statements labeling the accounts as trusts, frequent discussions with Center representatives about the trust nature of the accounts, and, in some cases, the Bank itself *signing trust instruments* as custodial trustee. *See, e.g.*, Compl. ¶¶ 2, 82–83, 101–02, 240, 256–65, 332.

Despite this knowledge, the Bank processed countless transfers of SNT funds from Center accounts to Govoni-controlled accounts, all held at the Bank. *See id.* ¶¶ 153–82, 196, 236, 269–71, 287. The Bank then facilitated the movement of these pilfered trust funds—which the Bank *knew* to be trust funds—to other Govoni entities. The Bank regularly approved transfers and wires out of the Center's accounts without proper signatory authorization, *see id.* ¶¶ 15, 307, 312, 333–34; lifted normal wire restrictions to allow BFG to send funds it did not have, *see id.* ¶¶ 288–93, 334; and even allowed non-Center employees to delete deposits from Center accounts without the Center's knowledge or consent, *see id.* ¶¶ 294–300. The Bank also supported the Center's laundering of trust funds—which were shuttled through BFG and back to the Center as purported interest payments—through accounts at the Bank. *See id.* ¶¶ 13, 15, 204–17. The Bank undertook all of this conduct despite knowing the funds belonged to SNT beneficiaries and were subject to fiduciary duties. *See id.* ¶¶ 2, 82–83, 101–02, 240, 256–65, 332–33.

For more than a decade, the Bank commingled administrative fees and charged the Center for account fees incurred by Govoni's other entities. *See id.* ¶¶ 3, 11, 301–06, 312, 333. In late 2021, when a Center employee discovered the improper fee charges and confronted a Bank

4

executive, the Bank openly admitted that for over a decade it had ignored both corporate formalities and its obligation to "know its customer" by treating all of Govoni's 100-plus accounts, including the Center's, as part of "one big company." *See id.* ¶¶ 10, 118, 235, 301–06. Indeed, the Bank admitted, it had been delivering all "Account Analyses" itemizing the fees to Leo Govoni, who had not been a signatory to the Center's accounts—nor an officer, director, or employee of the Center—in a decade. *See id.* ¶ 304.

All the while, to hide the scheme, the Bank allowed the Center to use the Bank's logo on false account statements sent to beneficiaries and their caretakers, which misrepresented the status of their funds and concealed the misappropriations. *See id.* ¶¶ 3, 98, 275–77, 312, 316.

The Bank's substantial assistance, including facilitating improper transfers, relaxing or breaking internal controls, and providing the appearance of legitimacy to the Center's actions, enabled the Center's breaches to continue for nearly fifteen years, resulting in the depletion of the beneficiaries' trust assets. *See id.* ¶¶ 14–15, 236, 268, 312, 315–16, 334–35.

## II.    <u>Legal Standard</u>

In considering a motion to dismiss, the court "accept[s] the complaint's factual allegations as true and constru[es] them in the light most favorable to the plaintiff." *Gundy v. City of Jacksonville, Florida*, 50 F.4th 60, 69 (11th Cir. 2022). The motion must be denied if, taking the facts in that light, the complaint "'state[s] a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). A claim is facially plausible when the allegations "allow[] the court to draw the reasonable inference that the defendant is liable[.]" *Ibid.* Put differently, the court asks whether the plaintiff has alleged "more than a sheer possibility that a defendant has acted unlawfully." *Ibid.*

5

III.    <u>Argument</u>

The Bank raises three primary contentions: that the Plaintiffs fail to plead actual knowledge; that the Complaint is a shotgun pleading; and that the Plaintiffs' claim is barred by the statute of limitations. All three arguments are wrong.

A.    **The Bank Forfeited the Opportunity to Challenge Any Element Other Than Actual Knowledge.**

As a preliminary matter, a claim for aiding and abetting breach of fiduciary duty requires four elements: "(1) a fiduciary duty on the part of a primary wrongdoer; (2) a breach of that fiduciary duty; (3) knowledge of the breach by the alleged aider and abettor; and (4) the aider and abettor's substantial assistance or encouragement of the wrongdoing." *Fonseca v. Taverna Imps., Inc.*, 212 So. 3d 431, 442 (Fla. 3d DCA 2017). The Bank's Motion challenges only the third element. *See generally* Motion. The Bank has, therefore, forfeited any argument for dismissal based on the other three elements. *See United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) (en banc) ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court *sua sponte* [only] in extraordinary circumstances[.]"); *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue [forfeits] it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented . . . are deemed [forfeited].").

B.    **The Complaint Alleges Actual Knowledge of the Breach of Fiduciary Duty.**

1.    *The Standard Requires a Plaintiff to Plead Facts Giving Rise to a Reasonable Inference that the Defendant was Generally Aware of an Improper Activity.*

The Bank advances its central argument—that the Plaintiffs have failed to plead actual knowledge—from ill-fated footing. *See* Motion at 4–6 (relying on unpublished, nonbinding cases

6

and ignoring *Otto Candies*). The Eleventh Circuit spoke recently and plainly about the appropriate

pleading standard for actual knowledge in an aiding and abetting case:

> [A] plaintiff rarely will be able to plead a defendant's actual state of mind—
> particularly before it has access to discovery. In assessing a defendant's knowledge,
> we therefore ask whether the plaintiff pleads factual content that allows the court
> to draw the reasonable inference that a defendant knew about the alleged fraud.

*Otto Candies*, 137 F.4th at 1179–80 (cleaned up). In other words, a defendant "'has knowledge of

an underlying fraud if it has a general awareness that its role was part of an overall improper

activity.'" *Id.* at 1178 (quoting *Gilison v. Flagler Bank*, 303 So. 3d 999, 1003 (Fla. 4th DCA

2020)). What's more, the court reached this conclusion in an aiding and abetting *fraud* case, where

the heightened pleading standard under Rule 9(b) imposes more stringent requirements than here,

where only Rule 8 pleading is required. *See ibid.* ("Rule 9(b) requires more particularity than the

normal Rule 8(a) standard.").

The standard is clear: a plaintiff successfully pleads actual knowledge in an aiding and

abetting case by alleging facts that allow the court to draw the "reasonable inference" that the

defendant had a "general awareness" of an "overall improper activity." *Id.* at 1178, 1180. In saying

so, the Eleventh Circuit expressly rejected the "strong inference of actual knowledge" standard

imposed by the district courts.[1] *Id.* at 1178 ("That [strong inference] standard was improper.").

### 2. The Bank Misrepresents the Standard in its Motion.

The Bank disregards this binding precedent and instead relies on outdated and unpublished

cases to argue that the Complaint fails to plead actual knowledge.[2] In doing so, they encourage

---

[1] While a "strong inference" is not required here, the Plaintiffs would prevail even if it were.

[2] Despite omitting *Otto Candies* from its discussion of the legal standard, the Bank is, no doubt, aware of the opinion. *See* Motion at 6 n.1 (attempting to distinguish *Otto Candies* factually).

precisely the type of "confusion" demonstrated across district courts that led the Eleventh Circuit to "get [its] house in order" in *Otto Candies*. *Id.* at 1178. Taking guidance from the Eleventh Circuit, one must "start by pointing out that unpublished cases are not precedential and do not bind [the courts]." *Johnson v. Reliance Standard Life Ins. Co.*, -- F.4th --, 2025 WL 3251015, at *7 (11th Cir. Nov. 21, 2025). For this reason, the Bank errs in its reliance on *B-Smith Enterprises, LP v. Bank of America, N.A.*, 2023 WL 2034419 (11th Cir. Feb 16, 2023); *Perlman v. Wells Fargo Bank, N.A.*, 559 F. App'x 988 (11th Cir. 2014); and *Lawrence v. Bank of America, N.A.*, 455 F. App'x 904 (11th Cir. 2012)—all of which are unpublished and, therefore, carry no weight.

> 3. *The Plaintiffs' Allegations Give Rise to a Reasonable Inference of General Awareness of an Overall Improper Activity.*

Read under the proper *Otto Candies* standard, the Complaint plainly satisfies pleading requirements. The knowledge element of an aiding and abetting claim may be pled generally and can be satisfied—even under heightened Rule 9(b) standards, which do not apply here[3]—by allegations supporting a reasonable inference that the defendant had "a general awareness that its role was part of an overall improper activity." *Otto Candies*, 137 F.4th at 1178 (quoting *Gilison*, 303 So. 3d at 1003); *see also* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). And it is well established that a bank, as a corporation, gains its knowledge through its employees. *See, e.g.*, *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1095 (11th Cir. 2017) ("Under Florida law, knowledge an agent or employee acquires within the scope of her authority generally may be imputed to her principal or

---

[3] Because this case does not involve fraud claims, sufficiency is measured under Rule 8, which calls only for "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"

employer."); *Beck v. Deloitte & Touche, Deloitte, Haskins & Sells, Ernest & Young, L.L.P.*, 144 F.3d 732, 736 (11th Cir. 1998) ("Under Florida law, the knowledge of a corporate officer whose fraud or misbehavior brings short-term gain to the corporation, or merely injures a third party, is imputed to the corporation, even if the officer's misbehavior ultimately causes the corporation's insolvency."). Accordingly, because the Complaint alleges facts that support a reasonable inference that Bank employees were generally aware of some improper Center activity affecting the Plaintiffs' funds, the Plaintiffs have successfully pled the "knowledge" element and the Motion must be denied.

The Bank identifies many of the allegations supporting a reasonable inference of its general awareness of an overall improper purpose. The Bank knew that the Center's accounts were SNTs and, therefore, were fiduciary accounts. Among other things, the Complaint alleges that the Bank possessed the trust instruments and, often, requested additional supporting documents from the Center. *See, e.g.*, Compl. ¶¶ 82–83, 101–02. The Bank's own labelling of the relevant accounts as "trusts" confirms this knowledge. *See, e.g.*, *id.* ¶¶ 82, 101, 240, 260–65, 332. And, as the Complaint sets forth, the Bank executed certain trust instruments as Custodial Trustee and engaged in extensive communications with the Center regarding the exact wording of these instruments. *See, e.g.*, *id.* ¶¶ 2, 101, 256–61, 332. All of this not only supports an inference that the Bank knew of the fiduciary nature of the funds, but directly proves as much. Wisely, the Bank has not challenged this ineluctable conclusion. *See generally* Motion.

With no doubt the Bank knew of the fiduciary relationship between the Plaintiffs and the Center, the analysis turns to whether the Bank knew of the Center's breach. It did. The Complaint pleads a multitude of specific facts relating to the Bank and its employees—whose knowledge is imputed to the Bank as a matter of law—demonstrating actual knowledge of the basic mechanics

9

of the Center's breach. While the Bank would have the Court read each allegation in a vacuum, this is not how pleading works. Instead, when ruling on a Rule 12(b)(6) motion to dismiss, the court "must consider the complaint *in its entirety*" and ask "whether *all* of the facts alleged, taken collectively," satisfy the knowledge element—"not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007) (emphasis added);[4] *see also Otto Candies*, 137 F.4th at 1200 (reversing dismissal where "[t]he court failed to engage with the totality of the plaintiffs' allegations"); *Wells v. Brown*, 58 F.4th 1347, 1357 at n.2 (11th Cir. 2023) ("Of course, when we refer to the 'face' of the complaint and the 'allegations in the complaint,' we mean 'the complaint in its entirety.'" (quoting *Tellabs*, 551 U.S. at 322)). Thus, the Court does not read the Complaint bit-by-bit as the Bank wishes, nor is knowledge assessed on each individual allegation in isolation. Instead, the Complaint is read holistically, drawing all reasonable inferences in the Plaintiffs' favor.

The Complaint sets forth how the Bank affirmatively permitted the Center to affix the Bank's logo to falsified account statements, designed to obscure the ongoing breach-scheme from the beneficiaries and their caretakers. *See* Compl. ¶¶ 3, 98, 275–77, 312, 316, 334. Underscoring the Bank's culpable knowledge, the Complaint details how the Bank only ceased this practice after inquiries that arose in relation to other litigation. *See, e.g.*, *id.* ¶¶ 275–80. The Complaint alleges that the Bank's relationship manager, Sherry Lilly, and other Bank employees repeatedly and knowingly processed transfers from the Center's fiduciary accounts to Govoni-controlled entities

---

[4] *Tellabs* was a § 10(b) case, so it required "a strong inference of scienter," which this case does not call for. *Compare Tellabs*, 551 U.S. at 322–23, *with Otto Candies*, 137 F.4th at 1178 ("That [strong inference] standard was improper.").

(e.g., BFG) and then onward to other Govoni entities—all within the Bank—while acknowledging that "all combined companies" presented "high exposure." *See, e.g.*, *id.* ¶¶ 269–74, 281–300, 308–13. This conduct supports a reasonable inference of institutional knowledge that trust funds were being funneled through a web of non-trust, Govoni-controlled companies.

The Complaint further alleges that the Bank authorized wires and withdrawals from the trust accounts based on directions from individuals without signatory authority, including non-Center personnel, and solicited "approval" from a non-signatory (Todd Belisle) to move trust funds. *See, e.g.*, *id.* ¶ 307; *see also id.* ¶¶ 294–300. Likewise, the Bank deliberately lifted normal wire restrictions to allow BFG to wire funds that it *did not have*, based on a pending "on-us" check drawn from a Center account—and then "maintenance[d] the account back to wire on collected" to erase the trail. *See id.* ¶¶ 293–98. That sequence of events demonstrates not only knowledge of the specific flow of trust funds to BFG, but also awareness that the Bank's standard controls inhibited the flow, prompting overrides to facilitate it.

Finally, the Complaint alleges that Bank employees—after more than a decade of this conduct—apologized and confessed that they had treated the Center and over one hundred Govoni entities as "one big company," acknowledging the Bank's longstanding practice of disregarding formal account separations. *See id.* ¶¶ 304–05. This is an admission that the Bank knew it was collapsing the legal separateness of a trustee and third-party borrowing entities while moving funds across lines that should have been firm.

All of this far surpasses *Otto Candies*'s requirement that the plaintiff set forth facts from which one can draw a "reasonable inference" of "general awareness." There, the Eleventh Circuit found a reasonable inference of general awareness of an overall improper purpose where the complaint alleged employee knowledge of "discrepancies between the cash-advance values and

11

the underlying [ ] contracts," an employee's "help[ ] to oversee the processing of cash-advance requests," and another employee's "approv[al of] increases in the cash advance limit[.]" *Otto Candies*, 137 F.4th at 1181–82. Reading these allegations as a whole, the Eleventh Circuit observed that, when "the numbers [do] not add up," it "strains credulity" to claim that a "sophisticated financial institution . . . lacked awareness." *Id.* at 1182; *see also Gilison*, 303 So. 3d at 1003 (holding the complaint alleged general knowledge of a scheme where, "[s]imply put, the numbers did not add up"). So too here.[5]

## C.    The Complaint Is Not a Shotgun Pleading.

The Bank claims—unsupported by any legal analysis—that the Complaint is a shotgun pleading under *Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313 (11th Cir. 2015). *See* Motion at 12–14. Not so. In *Weiland*, the Eleventh Circuit identified "four rough types or categories of shotgun pleadings": (1) "a complaint containing multiple counts where each count adopts the allegations of all preceding counts," *id.* at 1321; (2) "a complaint . . . replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action," *id.* at 1322; (3) "[a complaint] that commits the sin of not separating into a different count each

_____

[5] This outcome is consistent with *Chang*, despite the Bank's attempt to distinguish that case. *See* Motion at 6 (citing *Chang*, 845 F.3d at 1091, 1097). In *Chang*, the district court "rejected Chang's allegations as insufficient because it concluded the allegations showed nothing more than that the Bank and [the employee] engaged in routine banking services." *Chang*, 845 F.3d at 1097. The Eleventh Circuit rejected this conclusion, reasoning that "[e]ven if Chang has no explicit allegation that [the employee] knew about Gordon's fraud, such a direct allegation was unnecessary because Chang's allegations *support an inference* that [the employee] knew that Gordon was misappropriating money." *Ibid* (emphasis added). The *Lamm* case does not change the outcome, either. *See* Motion at 5 (citing *Lamm v. State Street Bank and Trust*, 749 F.3d 938 (11th Cir. 2014)). In *Lamm*, the plaintiff failed to state a claim because he alleged only that the "bank disregarded red flags" while carrying out routine transactions. *Lamm*, 749 F.3d at 950 (cleaned up). Here, the Complaint specifically alleges both the Bank's actual knowledge and its affirmative acts of substantial assistance, including atypical and improper transactions contrary to law and contract.

cause of action or claim for relief," *id.* at 1323; and (4) "[a complaint that asserts] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions," *ibid.* The Bank appears to be arguing that the Complaint here falls into the second bucket. *See* Motion at 14. If that is, indeed, the Bank's position, the Bank fundamentally misunderstands the Plaintiffs' obligations at the pleading stage.

The underlying breach of fiduciary duty is a necessary element to an aiding and abetting claim. *See Fonseca*, 212 So. 3d at 442. The Plaintiffs are, therefore, required to plead sufficient facts to demonstrate the Center's breach of fiduciary duty. *See Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683 (11th Cir. 2001) (It is "necessary that a complaint contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." (cleaned up)). And the Bank tacitly concedes that the Plaintiffs have done so, because it fails to challenge the pleading of this element. *See generally* Motion. To be sure, had the Plaintiffs *not* alleged facts to substantiate the Center's underlying breach— including those the Bank derides as "simply irrelevant," Motion at 12—*that* would have been a basis for dismissal. Satisfying the pleading standard for all elements does not transform a well-crafted complaint into a shotgun pleading, and the Bank cites no law to the contrary.

### D.    The Complaint Is Timely.

The Bank's thin statute-of-limitations argument amounts to this: "our misconduct was hidden so well, for so long, that we should get away with it." The law does not support such an absurd result. Statutes of limitations are intended to prevent unfair awards to "one who has willfully or carelessly slept on his legal rights," *Major League Baseball v. Morsani*, 790 So. 2d 1071, 1075 (Fla. 2001) (cleaned up), and not to "protect defendants who are directly responsible for the delays of filing because of their own willful acts," *Vargas v. Glades Gen. Hosp.*, 566 So.

2d 282, 285 (Fla. 4th DCA 1990) (cleaned up). At least four different doctrines militate against a

statute of limitations defense in this case: fraudulent concealment, continuing tort, equitable

estoppel, and equitable tolling.[6] But, in any event, statute of limitations is an affirmative defense

for a defendant to plead and is rarely appropriate for resolution on a motion to dismiss. *See Rigby*

*v. Liles*, 505 So. 2d 598, 601 (Fla. 1st DCA 1987). For any or all of these reasons, the Bank is not

entitled to dismissal based on the statute of limitations.

1.     *Statute of Limitations Is an Affirmative Defense to Be Pleaded and Is Rarely a Basis for Dismissal. This Is Not One of Those "Extraordinary" Cases.*

The statute of limitations is an "affirmative defense[ ] which should be raised by answer

rather than by a motion to dismiss the complaint." *Rigby*, 505 So. 2d at 601; *see also Prudential*

*Ins. Co. of America v. Gardina*, 759 F. Supp. 3d 1230, 1241 (M.D. Fla. 2024) ("Under Florida law,

the statute of limitations is an affirmative defense."). A purported time bar is a basis for dismissal

"only in extraordinary circumstances where the facts constituting the defense affirmatively appear

on the face of the complaint and establish conclusively that the statute of limitations bars the action

as a matter of law[.]" *Rigby*, 505 So. 2d at 601. Moving to dismiss based on a statute of limitations

is "inappropriate" where—as here—"resolution would depend either on facts not yet in evidence

or on construing factual ambiguities in the complaint in [the] Defendants' favor[.]" *Omar ex rel.*

---

[6] Both fraudulent concealment and the continuing tort doctrine operate to toll the statute of limitations for breach of fiduciary duty—the underlying tort at issue—and the same principles extend to this aiding and abetting claim. The Bank's Motion is silent on both tolling doctrines, even though they are plain from the face of the Complaint. *See generally* Compl. (pleading continuing tortious conduct by the Bank through at least 2022); *id.* ¶¶ 314–18 (pleading fraudulent concealment through February 9, 2024). The Bank's failure to brief the relevant issues is reason enough to deny the Motion on statute of limitations grounds. *See, e.g.*, *Campbell*, 26 F.4th at 873 ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue[.]"); *In re Egidi*, 571 F.3d at 1163 ("Arguments not properly presented . . . are deemed [forfeited].").

*Cannon v. Lindsey*, 334 F.3d 1246, 1251 (11th Cir. 2003). What's more, because an affirmative defense may be avoided by facts alleged in a reply, "the allegations of the complaint must also conclusively negate any ability on the part of the plaintiff to allege facts in avoidance[.]" *Rigby*, 505 So. 2d at 601. The Bank has not shown, and cannot show, that the statute of limitations "conclusively" bars this litigation as a matter of law, nor that the Complaint "conclusively negate[s]" the Plaintiffs' ability to avoid the affirmative defense. The opposite is true: the Complaint pleads fraudulent concealment and warrants application of the continuing tort doctrine, equitable estoppel, and equitable tolling. Taking the allegations as true, and drawing all inferences in the Plaintiffs' favor, dismissal based on the statute of limitations is impossible here.

2.    *The Bank Is Wrong About the Date of Accrual.*

The Bank unilaterally declares that the Plaintiffs' injuries accrued in either 2009 or 2015. *See* Motion at 14. This is nonsensical, and it requires one to ignore the bulk of the allegations and draw unreasonable inferences in the Bank's favor.

Florida courts assessing breach of fiduciary duty claims routinely pin accrual to the injured person's knowledge of the wrong. *See, e.g.*, *Patten v. Winderman*, 965 So. 2d 1222, 1224 (Fla. 4th DCA 2007) (tying accrual of a breach of fiduciary duty claim to the plaintiff's knowledge that trust funds had been misused); *Brooks Tropicals, Inc. v. Acosta*, 959 So. 2d 288, 295 (Fla. 3d DCA 2007) (breach of fiduciary duty claim accrued when the plaintiff's lawyer had sufficient knowledge). The Complaint explicitly alleges ongoing tortious conduct through, at least, 2022, and concealment of such conduct through the filing of the Center's bankruptcy petition on February 9, 2024. *See, e.g.*, Compl. ¶¶ 301–06, 314–18. The Plaintiffs' claim could not have accrued any sooner than that date.

15

Nevertheless, the Bank assumes without support that the Plaintiffs' claim accrued either in 2009 or 2015, with both dates pinned purely to Govoni's loan payments. *See* Motion at 14. Here, the Bank ignores (for example) the allegation that "SNTs established after 2020 have also been compromised and diminished . . . . All of the SNTs were, at all relevant times, held at the Bank." Compl. ¶ 220. The Bank seems to forget that this Complaint is about *its* aiding and abetting of an ongoing breach—not the discrete act of theft at the center of the scheme. The Bank's artificial timeline also ignores, for example, allegations that it aided and abetted the breach by allowing Govoni employees to control Center transactions in 2022, *see* Compl. ¶¶ 294–300, and charging all of Govoni's account fees to the Center under the belief that they were "one big company" until the end of 2021, *see id.* ¶¶ 301–06. That is to say, *even if* the clock started ticking when the Bank committed its final act causing damage to the Plaintiffs—regardless of whether the Plaintiffs knew of their injury at the time—the statute of limitations would still be running as of the date of this filing. *See* Fla. Stat. § 95.11(3)(o).

3.    *Fraudulent Concealment Applies to Breach of Fiduciary Duty Claims and Tolled the Statute of Limitations Here.*

The fraudulent concealment doctrine tolls the statute of limitations if a defendant undertakes "subsequent actions to keep the improper conduct shrouded from sight." *W. Brook Isles Partner's 1, LLC v. Com. Land Title Ins. Co.,* 163 So. 3d 635, 639 (Fla. 2d DCA 2015); *see also In re Palm Ave. Partners, LLC*, 611 B.R. 457, 467 (M.D. Fla. Bankr. 2019) ("The fraudulent concealment doctrine tolls the statute of limitations if the defendant keeps its improper conduct shrouded from sight." (cleaned up)). "For this doctrine to apply, a plaintiff must establish: (1) the defendant's successful concealment of the cause of action and (2) fraudulent means to achieve that concealment." *Cramer v. Palm Ave. Partners, LLC*, 672 B.R. 517, 547 (M.D. Fla. 2025).

Fraudulent concealment tolling applies to breach of fiduciary duty cases. *See, e.g.*, *Nardone v. Reynolds,* 333 So. 2d 25, 39 (Fla. 1976); *First Union Nat. Bank v. Turney*, 824 So. 2d 172, 190–91 (Fla. 1st DCA 2001) (collecting cases); *Kleiman v. Wright*, 2021 WL 5447110, at *8 (S.D. Fla. Nov. 22, 2021).

In *Cramer*, the district court (acting in appellate capacity) affirmed a decision from then-Chief Bankruptcy Judge Williamson, determining that fraudulent concealment applied to toll the statute of limitations in a breach of fiduciary duty case. *See Cramer*, 672 B.R. at 547–48. There, the defendant "actively stop[ed] the Investors from gaining information," "fail[ed] to specifically disclose [the relevant details] when he did finally let some information out," and "never answer[ed] one Investor who directly asked" about a purchase price. *Id*. at 548. Here, the Plaintiffs allege that the Bank permitted the Center to affix its logo to fraudulent account statements, intentionally misleading beneficiaries and their caretakers as to the balances and activity of their trusts; refused to reveal account information to beneficiaries' representatives; scrambled to cover its tracks when asked directly for account information; and hid the Center's misconduct in an elaborate web of inappropriate commingling transactions. *See* Compl. ¶¶ 3, 98, 275–80, 312, 315–16. These allegations fit squarely within the bases for fraudulent concealment identified in *Cramer*. *See Cramer*, 672 B.R. at 548. Moreover, as the Complaint alleges, the Center has already admitted the essential facts of the underlying scheme *and* that the scheme was concealed from the victims for an additional two years after its discovery. *See* Compl. ¶¶ 18–19, 234. From all this, the reasonable inference must be drawn that the Bank kept its "improper conduct shrouded from sight" until, at the earliest, the date of the Chapter 11 filing. *W. Brook Isles,* 163 So. 3d at 639; *see also In re Palm*, 611 B.R. at 467.

17

    *4.     The Continuing Tort Doctrine Applies to Breach of Fiduciary Duty Claims.*

Separately and additionally, the applicable statute of limitations is measured from the conclusion of the Bank's tort, not the start of it. "A continuing tort is . . . perhaps best understood as a tort in which the wrong cannot be described as a discrete event." *Chakra 5, Inc. v. City of Miami Beach*, 254 So. 3d 1056, 1065 (Fla. 3d DCA 2018). That is, a continuing tort is "established by continual tortious *acts,* not by continual harmful effects from an original, completed act." *Suarez v. City of Tampa*, 987 So. 2d 681, 686 (Fla. 2d DCA 2008) (cleaned up) (emphasis in original)). Florida has long recognized the continuing tort doctrine, under which "the limitations period runs from the date the tortious conduct ceases." *Halkey-Roberts Corp. v. Mackal*, 641 So. 2d 445, 447 (Fla. 2d DCA 1994); *see also Seaboard Air Line R. Co. v. Holt*, 92 So. 2d 169, 170 (Fla. 1956) (applying the continuing tort doctrine to toll statute of limitations). The doctrine applies to breach of fiduciary duty claims. *See, e.g.*, *Kravitz v. Levy*, 973 So. 2d 1274, 1275–76 (Fla. 4th DCA 2008). Because the Bank's aiding and abetting consisted of an ongoing pattern of interrelated conduct, not one discrete act, the continuing tort doctrine counsels that the limitations period is counted from the Bank's *last* act, not its first. *See Halkey-Roberts*, 641 So. 2d at 447. Because the same facts giving rise to fraudulent concealment are integral to the Bank's tortious conduct, the continuing tort doctrine operates such that the limitations period would still be open to this day. *See* Compl. ¶¶ 3, 98, 275–80, 312, 315–16; Fla. Stat. § 95.11(3)(o).

    *5.     Equitable Principles Bar a Statute of Limitations Defense in This Case.*

Equitable principles of tolling and estoppel likewise apply to protect the Plaintiffs against the Bank's assertion of a statute of limitations defense. Because the Bank is responsible for the Plaintiffs' delayed knowledge of their injuries, it is estopped from benefiting from its own cover-up. *See Major League*, 790 So. 2d at 1077; *see also* Compl. ¶¶ 3, 98, 275–80, 312, 315–16

(describing the Bank's acts of concealment). And, even if that were not the case, equitable tolling would "delay the running of the limitations period based on the plaintiff's blameless ignorance and the lack of prejudice to the defendant." *Major League*, 790 So. 2d at 1076 n.11; *see* Compl. ¶¶ 18–19, 234 (alleging the Center's admission to the underlying theft and the two-year delay before the Plaintiffs had the ability to learn of their injuries).

      *6.    The Statute of Limitations Argument Fails Entirely.*

No matter how you slice it, the Bank's statute of limitations argument fails. The Bank invokes an affirmative defense that is almost always inappropriate for resolution at the motion to dismiss stage. *See Rigby*, 505 So. 2d at 601. The Bank improperly calculates accrual. *See Patten*, 965 So. 3d at 1224; *Brooks*, 959 So. 2d at 295. The Bank ignores fraudulent concealment tolling. *See Cramer*, 672 B.R. at 547–48; *Kleiman*, 2021 WL 5447110, at *8. The Bank ignores the continuing tort doctrine. *See Halkey-Roberts*, 641 So. 2d at 447; *Kravitz*, 973 So. 2d 1274 at 1275–76. And the Bank ignores equitable obstacles. *See Major League*, 790 So. 2d at 1076–77. For any or all of these reasons, the Motion must be denied on these grounds.

## CONCLUSION

The Bank wants this case dismissed for three reasons, all of which topple under the slightest scrutiny. Its failure-to-state-a-claim argument is based on the wrong law. Its statute of limitations argument is improperly presented and, even if credited, fails on the merits. And the Complaint is not a shotgun pleading. This Court should deny the Motion.

Respectfully submitted on December 8, 2025.

By: */s/ Meaghan Goldstein*
Tal J. Lifshitz, Esq.
Florida Bar No. 99519
tjl@kttlaw.com
Harley S. Tropin, Esq.

Florida Bar No. 241253
hst@kttlaw.com
Benjamin J. Widlanski, Esq.
Florida Bar No. 1010644
bwidlanski@kttlaw.com
Meaghan Goldstein, Esq.
Florida Bar No. 1024796
mgoldstein@kttlaw.com
Yarden (Jordan) Benatar
Florida Bar No. 1049274
jbenatar@kttlaw.com
KOZYAK TROPIN &
THROCKMORTON LLP
2525 Ponce de Leon Blvd.
9th Floor
Coral Gables, Florida 33134
Telephone:    (305) 372-1800
Facsimile:    (305) 372-3508

*Counsel for the Plaintiffs*
*and the Putative Class*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 8, 2025, a true copy of the foregoing has been filed with the Clerk of the Court using CM/ECF and is served on all counsel or parties of record via transmission of Notices of Electronic Filing generated by CM/ECF.

By: /s/ *Meaghan Goldstein*
    Meaghan Goldstein, Esq.

20